# FISH & RICHARDSON P.C.

601 Lexington Avenue,
52nd Floor
New York, New York
10022

Telephone
212 765-5070

Facsimile
212 258-2291

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

June 7, 2013

**<u>VIA ELECTRONIC MAIL</u>**

Hon. Alison J. Nathan
United States District Judge
Southern District of New York
500 Pearl Street, Rm. 614
New York, NY 10007



ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

HOUSTON

MUNICH

NEW YORK

SILICON VALLEY

SOUTHERN CALIFORNIA

TWIN CITIES

WASHINGTON, DC

**Re:    *Aereo, Inc. v. CBS et al.*, 13-CV-3013 [rel. 12-CV-1540] (S.D.N.Y.)**

Dear Judge Nathan:

On May 6, 2013, Plaintiff Aereo, Inc. filed a Complaint against Defendants CBS, et al., seeking a declaratory judgment that use of the Aereo technology does not infringe Defendants' copyrights or violate the Copyright Act of the United States. On May 28, 2013, Defendants filed a Motion to Dismiss Aereo's Complaint.  Pursuant to Your Honor's Individual Rule 3F, Aereo hereby notifies the Court and Defendants that Aereo intends to file the enclosed First Amended Complaint today.

Respectfully submitted,

*/s/ Tal Kedem*

Tal Kedem


cc: All Counsel of Record

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AEREO, INC.,

      Plaintiff,

v.

CBS BROADCASTING INC.; CBS STUDIOS INC.; CBS TELEVISION LICENSES, LLC D/B/A WSBK-TV, WBZ-TV, WJZ-TV; ATLANTA TELEVISION STATION WUPA, INC. D/B/A WUPA-TV; CBS TELEVISION STATIONS, INC. D/B/A WFOR-TV, KCNC-TV; MIAMI TELEVISION STATION WBFS, INC. D/B/A WBFS-TV; CBS BROADCASTING INC. D/B/A WBBM-TV, WWJ-TV, WCCO, KDKA-TV, KYW-TV; CBS STATIONS GROUP OF TEXAS, INC. D/B/A KTVT-TV; TELEVISION STATION KTXA, INC. D/B/A KTXA-TV; CBS OPERATIONS, INC. D/B/A WTOG-TV; DETROIT TELEVISION STATION WKBD, INC. D/B/A WKBD-TV, PITTSBURGH TELEVISION STATION WPCW, INC. D/B/A WPCW-TV; AND PHILADELPHIA TELEVISION STATION WPSG, INC. D/B/A WPSG-TV,

      Defendants.

No. 1:13-cv-3013 (AJN)
[rel. 12-cv-1540 (AJN)]


**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**

## INTRODUCTION

1.    In March 2012, CBS Broadcasting, Inc. ("CBS Broadcasting"), CBS Studios, Inc. ("CBS Studios") (together, "CBS") and the other major national television networks (including ABC, NBCUniversal, Fox, PBS, and Univision) filed two copyright infringement actions against Aereo, Inc. ("Aereo") in the United States District Court for the Southern District of New York (Civil Action Nos. 12-CV-1540-AJN and 12-CV-1543-AJN) ("the Consolidated 2012 Actions"), alleging that Aereo violates their asserted public performance and reproduction rights under the

Copyright Act by providing to consumers certain remote antenna and digital video recorder ("DVR") technology (the "Aereo Technology") so that the consumer can access, record, and play back over-the-air broadcasts made freely available to the public. In response, Aereo filed declaratory judgment counterclaims seeking a declaration that the operation of its technology does not infringe CBS's and the other networks' copyrights. CBS and the other networks moved for a preliminary injunction in the Consolidated 2012 Actions, claiming that Aereo infringes their asserted exclusive right to publicly perform their copyrighted works. The District Court denied the motion, ruling that the networks were unlikely to succeed on the merits of their claims and the United States Court of Appeals for the Second Circuit affirmed that decision in favor of Aereo. *Am. Broad. Cos., Inc. v. Aereo*, 874 F. Supp. 2d 373 (S.D.N.Y. 2012) (attached as Ex. A); *WNET, Thirteen v. Aereo, Inc.*, Nos. 12-Civ-2786, 12-Civ-2807, 2013 WL 1285591, at *1 (2d Cir. Apr. 1, 2013) (attached as Ex. B).

  2.  Having lost its preliminary injunction motion in the District Court and on appeal, CBS has now announced that it intends to file suit against Aereo in each jurisdiction where Aereo subsequently makes its technology available to consumers. For example, on April 23, 2013, Aereo publicly announced its plans to launch its technology in Boston, Massachusetts on May 15, 2013. See Ex. C (Aereo Press Release). In response to Aereo's announcement, Leslie Moonves, the President and Chief Executive Officer of CBS Broadcasting, reportedly stated that wherever Aereo expands from its first market in New York, "we'll follow" Aereo and "we'll sue them again" in those markets. Ex. D (Deadline Hollywood Article). Similarly, Dana McClintock, CBS Broadcasting's Executive Vice President of Communications, stated on his Twitter feed that "We will sue" in Boston, and that "Stealing our signal will be found to be illegal in Boston, just as it will be everywhere else." Ex. E (McClintock Twitter Feed) at 6.

3.      Such threatened follow-on suits would be an attempt to avoid or evade the District Court's rulings in the Consolidated 2012 Actions and the Second Circuit's affirmance of the denial of the preliminary injunction motion, by seeking "do-overs" in other courts. It is not proper for parties to attempt to re-litigate claims that are pending, let alone already decided. Among other reasons, it would be highly inefficient and a waste of judicial resources. The threatened follow-on suits would involve the same technology, involve the same witnesses, and implicate the same legal and factual issues that are already the subject of the Consolidated 2012 Actions.

4.      Any disputes regarding or related to the Aereo Technology should be resolved by the same Court currently handling the Consolidated 2012 Actions. Indeed, Aereo has already filed declaratory judgment claims in the Consolidated 2012 Actions that name the plaintiffs in those cases and seek judgment that the Aereo Technology does not infringe the plaintiffs' copyrights. However, in view of CBS's explicit threats to initiate duplicative follow-on suits in other jurisdictions, Aereo files this related action, naming additional CBS parties and seeking a declaratory judgment as set forth below.

5.      Aereo, by its attorneys, alleges against Defendants CBS Broadcasting and CBS Studios and against Defendants CBS Television Licenses, LLC, Atlanta Television Station WUPA, Inc., CBS Television Stations, Inc., Miami Television Station WBFS, Inc., CBS Stations Group of Texas, Inc., Television Station KTXA, Inc., CBS Operations, Inc., Detroit Television Station WKBD, Inc., Pittsburgh Television Station WPCW, Inc., and Philadelphia Television Station WPSG, Inc. (collectively, not including CBS Broadcasting or CBS Studios, the "CBS Licensing Entities") as follows:

## PARTIES

6.     Plaintiff Aereo is a New York corporation with its principal place of business in Long Island City, New York. Aereo currently offers the Aereo Technology to consumers in the New York City and Boston broadcast areas, and has announced plans to expand to other cities.

7.     Aereo provides the Aereo Technology to consumers for them to do what they are legally entitled to do: (1) access free and legally accessible over-the-air television broadcasts using an antenna; *see* 47 U.S.C. § 151 *et seq.*; (2) create individual, unique recordings of those broadcasts for personal use, *see Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984); and (3) record and play back those unique recordings on personal devices utilizing a remotely-located DVR, *see Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"). For a small monthly fee, Aereo members can access the Aereo Technology via the Internet and use their individual remote antenna and remote DVR to record and play back unique individual copies of local broadcast television programs for their personal use. When a member accesses broadcast television using the Aereo Technology, he or she uses a specific individual antenna that is tuned and used only by that member for the duration of that access. Members can then play their unique copies back to themselves on an Internet-connected device, such as a computer, an Internet-connected television, or other personal device such as a mobile phone or tablet.

8.     MyNetworkTV is a programming distribution service, airing original and off-network programming and is owned by Fox Entertainment Group, Inc., a subsidiary of News Corporation.

9.     The CW Television Network ("The CW") is a broadcast television network, formed as a joint venture between Warner Bros. Entertainment and CBS Corporation.

10.     The CBS Licensing Entities include: CBS owned-and-operated local CBS network stations (WBZ-TV, WJZ-TV, WFOR-TV, KCNC-TV, WBBM-TV, WWJ-TV, WCCO-TV, KDKA-TV, KYW-TV, KTVT-TV); unaffiliated stations owned by CBS (KTXA-TV); and stations owned by CBS that are affiliated with other networks or programming distribution services, including MyNetworkTV (WSBK-TV, WBFS-TV); and The CW (WUPA-TV. WTOG-TV, WKBD-TV, WPCW-TV, WPSG-TV). Upon information and belief, CBS and the CBS Licensing Entities claim to own copyrights in programming broadcast by each of the CBS Licensing Entities.

11.     WSBK-TV and WBZ-TV are television stations that broadcast in the Boston, Massachusetts area. Upon information and belief, WSBK-TV and WBZ-TV are operated by CBS Television Licenses, LLC, which is ultimately owned by CBS Broadcasting. Upon information and belief, WSBK-TV is an affiliate of MyNetworkTV and broadcasts programming allegedly copyrighted by CBS. Upon information and belief, WBZ-TV is an affiliate of CBS and broadcasts programming allegedly copyrighted by CBS.

12.     WUPA-TV is a television station that broadcasts in the Atlanta, Georgia area. Upon information and belief, WUPA-TV is operated by Atlanta Television Station WUPA, Inc., which is ultimately owned by CBS Broadcasting. Upon information and belief, WUPA-TV is an affiliate of The CW and broadcasts programming allegedly copyrighted by CBS.

13.     WFOR-TV and WBFS-TV are television stations that broadcast in the Miami, Florida area. Upon information and belief, WFOR-TV is operated by CBS Television Stations, Inc. and WBFS-TV is operated by Miami Television Station WBFS, Inc., each of which is ultimately owned by CBS Broadcasting. Upon information and belief, WFOR-TV is an affiliate of CBS and broadcasts programming allegedly copyrighted by CBS. Upon information and

5

belief, WBFS-TV is an affiliate of MyNetworkTV and broadcasts programming allegedly copyrighted by CBS.

14.     KTVT-TV and KTXA-TV are television stations that broadcast in the Dallas, Texas area. Upon information and belief, KTVT-TV is operated by CBS Stations Group of Texas, Inc. and KTXA-TV is operated by Television Station KTXA, Inc., each of which is ultimately owned by CBS Broadcasting. Upon information and belief, KTVT-TV is an affiliate of CBS and broadcasts programming allegedly copyrighted by CBS. Upon information and belief, KTXA-TV broadcasts programming allegedly copyrighted by CBS.

15.     WTOG-TV is a television station that broadcasts in the Tampa, Florida area. Upon information and belief, WTOG-TV is operated by CBS Operations, Inc., which is ultimately owned by CBS Broadcasting. Upon information and belief, WTOG-TV is an affiliate of The CW and broadcasts programming allegedly copyrighted by CBS.

16.     WBBM-TV is a television station that broadcasts in the Chicago, Illinois area. Upon information and belief, WBBM-TV is owned and operated by CBS Broadcasting. Upon information and belief, WBBM-TV is an affiliate of CBS and broadcasts programming allegedly copyrighted by CBS.

17.     KCNC-TV is a television station that broadcasts in the Denver, Colorado area. Upon information and belief, KCNC-TV is operated by CBS Television Stations, Inc., which is ultimately owned by CBS Broadcasting. Upon information and belief, KCNC-TV is an affiliate of CBS and broadcasts programming allegedly copyrighted by CBS.

18.     WWJ-TV and WKBD-TV are television stations that broadcast in the Detroit, Michigan area. Upon information and belief, WWJ-TV is owned and operated by CBS Broadcasting. Upon information and belief, WKBD-TV is operated by Detroit Television Station

WKBD, Inc., which is ultimately owned by CBS Broadcasting. Upon information and belief, WWJ-TV is an affiliate of CBS and broadcasts programming allegedly copyrighted by CBS. Upon information and belief, WKBD-TV is an affiliate of The CW and broadcasts programming allegedly copyrighted by CBS.

19.     WCCO-TV is a television station that broadcasts in the Minneapolis, Minnesota area. Upon information and belief, WCCO-TV is owned and operated by CBS Broadcasting. Upon information and belief, WCCO-TV is an affiliate of CBS and broadcasts programming allegedly copyrighted by CBS.

20.     KDKA-TV and WPCW-TV are television stations that broadcast in the Pittsburgh, Pennsylvania area. Upon information and belief, KDKA-TV is owned and operated by CBS Broadcasting. Upon information and belief, WPCW-TV is operated by Pittsburgh Television Station WPCW, Inc., which is ultimately owned by CBS Broadcasting. Upon information and belief, KDKA-TV is an affiliate of CBS and broadcasts programming owned by CBS. Upon information and belief, WPCW-TV is an affiliate of The CW and broadcasts programming allegedly copyrighted by CBS.

21.     WJZ-TV is a television station that broadcasts in the Baltimore, Maryland area. Upon information and belief, WJZ-TV is operated by CBS Television Licenses, LLC, which is ultimately owned by CBS Broadcasting. Upon information and belief, WJZ-TV is an affiliate of CBS and broadcasts programming allegedly copyrighted by CBS.

22.     KYW-TV and WPSG-TV are television stations that broadcast in the Philadelphia, Pennsylvania area. Upon information and belief, KYW-TV is owned and operated by CBS Broadcasting. Upon information and belief, WPSG-TV is operated by Philadelphia Television Station WPSG, Inc., which is ultimately owned by CBS Broadcasting. Upon

information and belief, KYW-TV is an affiliate of CBS and broadcasts programming allegedly copyrighted by CBS. Upon information and belief, WPSG-TV is an affiliate of The CW and broadcasts programming allegedly copyrighted by CBS.

23.     Upon information and belief, CBS Broadcasting is a New York corporation with its principal place of business at 51 West 52nd Street, New York, New York.

24.     Upon information and belief, CBS Studios is a Delaware corporation with its principal place of business at 51 West 52nd Street, New York, New York. Upon information and belief, CBS Studios actively is engaged in the worldwide production and distribution of copyrighted entertainment products, including certain programs broadcast on the television stations operated by the named Defendants in this case.

## CBS'S THREATS OF FURTHER LITIGATION

25.     Until recently, the Aereo Technology was available only to consumers living in the New York City Designated Market Area (which includes parts of New Jersey, Pennsylvania, and Connecticut), who could use the Aereo Technology to watch local programming. On May 15, 2013, Aereo began offering access to the Aereo Technology to select consumers, by invitation-only, living in the Boston Designated Market Area (which includes parts of Massachusetts, New Hampshire, and Vermont) to watch local programming. And on May 30, 2013, Aereo began offering access to the Aereo Technology to all consumers living in the Boston Designated Market Area to watch local programming.

26.     In addition to the New York City and Boston Designated Market Areas, Aereo has publicly announced that it will begin offering, on June 17, 2013, access to the Aereo Technology to select consumers, by invitation-only, living in the Atlanta Designated Market Area (which includes parts of Georgia, North Carolina, and Alabama) to watch local

programming. Aereo announced that access for all consumers in the Atlanta Designated Market will be available June 24, 2013. *See* Ex. F (Aereo May 14, 2013 Press Release).

27.    Aereo has also publicly announced that it intends to expand, by the end of 2013, to offer consumers access to the Aereo Technology in additional cities. In a press release dated January 8, 2013, Aereo announced that those cities identified for expansion were: Boston (where Aereo launched on May 15 and May 30, 2013, as noted above), Miami, Austin, Atlanta, Chicago, Dallas, Houston, Washington DC, Baltimore, Detroit, Denver, Minneapolis, Philadelphia, Pittsburgh, Tampa, Cleveland, Kansas City, Raleigh-Durham, Salt Lake City, Birmingham, Providence, and Madison. *See* Ex. G (Aereo Jan. 8, 2013 Press Release). Aereo has already taken steps to roll out its technology beyond New York and Boston, including entering into contracts with vendors and ordering equipment.

28.    When Aereo expands into other markets, members in those markets will use the same Aereo Technology that is at issue in the Consolidated 2012 Actions. The nature of that technology was largely undisputed in the Consolidated 2012 Actions and in the appeal of the District Court's denial of preliminary injunction heard by the United States Court of Appeals for the Second Circuit. The District Court made explicit findings of fact regarding those few facts that were disputed in connection with the Consolidated 2012 Actions, and Plaintiffs did not challenge the District Court's findings on appeal. *See Am. Broad. Co.*, 874 F. Supp. 2d at 381; *WNET*, 2013 WL 1285591, at *1.

29.    In the New York City and Boston markets, consumers can use the Aereo Technology to record and watch all programming broadcast by each of the CBS Licensing entities within the respective Designated Market Areas. In the case of the Boston market, this includes, for example, WSBK-TV and WBZ-TV.

9

30.     As Aereo expands into each of the additional cities listed above, it intends to make the Aereo Technology available so that consumers can record and watch all programming broadcast by each of the CBS Licensing Entities within the Designated Market Area associated with each of those cities. This includes the programming by each of the stations operated by the Defendants in these cities. CBS and the other networks already seek a nationwide permanent injunction in the Consolidated 2012 Actions. Nevertheless, CBS has publicly threatened Aereo with additional lawsuits as it expands its services outside of New York City, including specifically in Boston.

31.     Because Aereo's declaratory judgment counterclaims and CBS's copyright infringement claims seek nationwide relief and are not limited to the New York market, any further suit in Boston or otherwise would be duplicative of the Consolidated 2012 Actions, including the relief the parties are seeking in those actions.

32.     However, based on the statements of Mr. Moonves and Mr. McClintock, Aereo has reasonable apprehension that CBS and/or the CBS Licensing Entities intend to bring and will bring copyright infringement lawsuits against Aereo as it expands into additional cities. To prevent those duplicative actions, Aereo thus seeks declaratory judgment against CBS and the CBS Licensing Entities that use of the Aereo Technology does not violate the Copyright Act of the United States (17 U.S.C. § 101 *et seq.*).

## JURISDICTION AND VENUE

33.     This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, seeking a declaration of the rights and/or other legal relations of the parties to this litigation with respect to an actual controversy arising under the copyright laws of the United States, 17 U.S.C. § 101 *et seq.*

34.     This Court has exclusive jurisdiction over the copyright subject matter of this action pursuant to the Copyright Act (17 U.S.C. § 101 *et seq.*), 28 U.S.C. §§ 1331, 1338, and the Declaratory Judgment Act (28 U.S.C. § 2201).

35.     This Court has personal jurisdiction over CBS Broadcasting because CBS Broadcasting is a New York corporation with its principal place of business in this district. Moreover, CBS Broadcasting does continuous and systematic business in New York and this district. *See* N.Y.C.P.L.R. §§ 301, 302.

36.     This Court has personal jurisdiction over CBS Studios because CBS Studios has its principal place of business in this district. Moreover, CBS Studios does continuous and systematic business in New York and this district. *See* N.Y.C.P.L.R. §§ 301, 302.

37.     This Court has personal jurisdiction over the CBS Licensing Entities because they are owned by CBS Broadcasting, which is a New York corporation with its principal place of business in this district. Moreover, on information and belief, the CBS Licensing Entities conduct continuous and systematic business in New York and this district. *See* N.Y.C.P.L.R. §§ 301, 302.

38.     Venue is proper in the district pursuant to 28 U.S.C. § 1391.

### FACTS AND COMPLIANCE WITH LOCAL CIVIL RULE 1.6(A)

39.     The instant action is related to the Consolidated 2012 Actions. The Consolidated 2012 Actions and this case involve the same Aereo Technology, involve the same witnesses, implicate the same legal and factual issues (all involve declaratory judgment claims relating to the same allegations that Aereo has violated the Copyright Act of the United States), and share some of the same parties (*e.g.*, CBS and Aereo). This case was accepted as related and an association with case No. 1:12-cv-01540-AJN-HBP was created on May 17, 2013.

40.     This case should be heard by the same court handling the Consolidated 2012 Actions in order to avoid unnecessary duplication of judicial effort. The court has substantial experience with the factual and legal issues that are presented in this action.

41.     CBS and the other networks moved for a preliminary injunction in the Consolidated 2012 Actions, alleging that Aereo violated their asserted public performance rights. The District Court denied the motion. *Am. Broad. Cos., Inc.*, 874 F. Supp. at 373. On appeal, the Second Circuit agreed and affirmed the District Court order denying the motion for a preliminary injunction. *WNET, Thirteen*, 2013 WL 1285591, at *1.

## CLAIMS FOR RELIEF
## COUNT I

### (Request for Declaratory Judgment)

42.     Aereo repeats and realleges the allegations set forth in paragraphs 1-41 herein. Based on the fact that CBS has already sued Aereo in a related co-pending action seeking a nationwide permanent injunction, and based on the statements of Mr. Moonves and Mr. McClintock, Aereo has reasonable apprehension that CBS and/or the CBS Licensing Entities will bring copyright infringement lawsuits against Aereo as it expands into other cities, including Boston and Atlanta. There exists an actual and justiciable controversy between Aereo and the Defendants as to whether Aereo infringes any of the Defendants' copyrights and whether Aereo will infringe any of the Defendants' copyrights when it formally launches in other cities.

\*\*\*

WHEREFORE, Aereo respectfully requests that this Court enter judgment in its favor and against Defendants:

a.  Declaring that the use of the Aereo Technology does not infringe, and that Aereo does not otherwise infringe, any of Defendants' copyrights;

12

b.  Declaring that the use of the Aereo Technology does not violate, and that Aereo does not

   otherwise violate, the Copyright Act of the United States;

c.  Awarding Aereo its costs and attorneys' fees in accordance with 17 U.S.C. § 505 and

   other applicable law; and

d.  Granting Aereo such further relief as the Court deems just and proper.


\*\*\*


Dated: June 7, 2013                         Respectfully submitted,


                                          FISH & RICHARDSON P.C.
                                          R. David Hosp (DH 3344)
                                          Tal Kedem (TK 1337)
                                          Elizabeth Brenckman (admitted *pro hac vice*)
                                          601 Lexington Avenue, 52nd Floor
                                          New York, NY 10022
                                          Telephone:  (212) 765-5070
                                          Facsimile:  (212) 258-2291
                                          Email:     hosp@fr.com
                                                     kedem@fr.com
                                                     brenckman@fr.com

                                          Frank E. Scherkenbach (admitted *pro hac vice*)
                                          Christopher Dillon (admitted *pro hac vice*)
                                          Mark S. Puzella (admitted *pro hac vice*)
                                          One Marina Park Drive
                                          Boston, MA 02210
                                          Telephone: (617) 542-5070
                                          Facsimile: (617) 542-8906
                                          Email:     scherkenbach@fr.com
                                                     dillon@fr.com
                                                     puzella@fr.com

WINSTON & STRAWN LLP
Michael S. Elkin (ME 2300)
Thomas Patrick Lane (TL 8983)
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email:      melkin@winston.com
            tlane@winston.com

Seth D. Greenstein
Constantine Cannon LLP
One Franklin Square
1301 K Street NW
Suite 1050 East
Washington, D.C. 20005
Telephone: (202) 204-3500
Facsimile: (202) 204-3501
Email:      sgreenstein@constantinecannon.com

*Attorneys for Plaintiff Aereo, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies pursuant to Fed. R. Civ. P. 5 and L.R. 5.5, that on <u>June 7, 2013</u> a true and correct copy of the foregoing document was sent by electronic mail to all counsel of record.

_____
Jennifer Mavronas

# Exhibit A

misstatements and scienter to a corporation, "the individual making an alleged misstatement and the one with scienter do not have to be one and the same"). Accordingly, BoA's motion to certify the July 2012 Memorandum & Order for an interlocutory appeal is denied.[1]

### CONCLUSION

For the foregoing reasons, Defendant Bank of America's motion for reconsideration is denied. Defendant Bank of America's motion to certify an interlocutory appeal is also denied. The Clerk of the Court is directed to terminate the motion pending at ECF No. 151.

SO ORDERED.



**AMERICAN BROADCASTING COMPANIES, INC., et al.,**
**Plaintiffs,**

v.

**AEREO, INC., Defendant.**

**WNET, et al., Plaintiffs,**

v.

**AEREO, Inc., Defendant.**

**Nos. 12 Civ. 1540 (AJN), 12 Civ. 1543.**

United States District Court,
S.D. New York.

July 11, 2012.

**Background:** Holders of copyrights to broadcast television programs sued a provider of "live" internet broadcasts, alleging, inter alia, copyright infringement.

Plaintiffs moved for a preliminary injunction.

**Holding:** The District Court, Alison J. Nathan, J., held that plaintiffs failed to show a likelihood of success, and although they demonstrated that they faced irreparable harm, they did not demonstrate that the balance of hardships decidedly tipped in their favor.

Motion denied.

---

**1. Injunction** ⟛**1075, 1092**

Preliminary injunction is an extraordinary remedy, granted only if the plaintiff establishes that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

**2. Injunction** ⟛**1097, 1109**

Even if a plaintiff has not demonstrated a likelihood of success on the merits, a preliminary injunction may still be granted if the plaintiff shows a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiffs favor.

**3. Copyrights and Intellectual Property** ⟛**85**

Holders of copyrights to broadcast television programs failed to show a likelihood of success on a copyright infringement claim against a provider of "live" internet broadcasts, asserting that the internet performances were public for purposes of the Copyright Act's transmit clause, and thus, they were not entitled to

---

1. Plaintiff requests that if this Court certifies an interlocutory appeal on the issue of corporate scienter, that it also certify an interlocutory appeal of its dismissal of Plaintiff's claims under Section 11 and Section 15 of the

Securities Act of 1933. Plaintiff asserts this request only in its papers opposing BoA's motion. This Court denies Plaintiff's application for failure to comply with its Individual Practices.

preliminary injunctive relief; the provider's system created a unique copy of each program for each subscriber who requested to watch that program, saved to a unique directory on the provider's hard disks assigned to that user, each transmission to a subscriber was from that unique copy, and the transmission of the unique copy was made solely to the requesting subscriber who requested it.   17 U.S.C.A. §§ 101, 410(c).

**4. Copyrights and Intellectual Property**
        **☞51**

To make out a prima facie case of copyright infringement, a party must establish ownership of a valid copyright and that the defendant violated an exclusive right conferred by the ownership.

**5. Copyrights and Intellectual Property**
        **☞83(3.5)**

Plaintiffs claiming copyright infringement may make a prima facie showing of a valid copyright by submitting certificates of registration of the copyrights at issue. 17 U.S.C.A. § 410(c).

**6. Injunction ☞1106, 1111**

For purposes of the preliminary injunction factor asking whether plaintiffs will suffer irreparable harm in the absence of an injunction, the relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction.

**7. Copyrights and Intellectual Property**
        **☞85**

For purposes of a motion for preliminary injunctive relief on a copyright infringement claim, a court may not presume irreparable harm, but rather must consider the injury Plaintiffs will suffer if they lose on the preliminary injunction but ultimately prevail on the merits, though it may well be the case that most copyright plaintiffs who have shown a likelihood of success on the merits would be irreparably

harmed absent preliminary injunctive relief, and that the historical tendency to readily issue such injunctions in copyright cases reflects this possibility.

**8. Injunction ☞1106**

Showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction.

**9. Injunction ☞1106**

For purposes of a motion for preliminary injunctive relief, harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer.

**10. Copyrights and Intellectual Property**
        **☞85**

Holders of copyrights to broadcast television programs made a substantial, but not overwhelming, showing of imminent irreparable harm in support of a motion for preliminary injunctive relief on copyright infringement claims against a provider of "live" internet broadcasts; the provider would damage the copyright holders' ability to negotiate with advertisers by siphoning viewers from traditional distribution channels, and the provider's activities would damage the holders' ability to negotiate retransmission agreements, but it was not clear that the holders would suffer the full magnitude of their claimed irreparable harm during the pendency of the litigation.

**11. Copyrights and Intellectual Property**
        **☞85**

Holders of copyrights to broadcast television programs did not unduly delay in bringing copyright infringement claims against a provider of "live" internet broadcasts, for purposes of a motion for preliminary injunctive relief; it was not unreason-

able for them to wait until the provider's announcement that it had received additional venture financing and that it would publicly launch to conclude that it posed a substantial and imminent threat of irreparable harm, and they promptly filed suit after that announcement.

## 12. Copyrights and Intellectual Property ⬤=85

For purposes of a motion for preliminary injunctive relief on a copyright infringement claim asserted by holders of copyrights to broadcast television programs against a provider of "live" internet broadcasts, the balance of hardships did not tip decidedly in favor of the copyright holders; while the provider's activities could damage the copyright holders' ability to negotiate with advertisers by siphoning viewers from traditional distribution channels and could damage the holders' ability to negotiate retransmission agreements, there was evidence that an injunction might quickly mean the end of the provider as a business.

## 13. Copyrights and Intellectual Property ⬤=85

For purposes of a motion for preliminary injunctive relief on a copyright infringement claim asserted by holders of copyrights to broadcast television programs against a provider of "live" internet broadcasts, an injunction would not disserve the public interest; there was a strong public interest in the copyright system's function of motivating individuals to make available their creative works and increase the store of public knowledge.

---

Bruce P. Keller, Michael R. Potenza, Debevoise & Plimpton, LLP, New York, NY, for Plaintiffs, American Broadcasting Companies, Inc., et al.

David J. Bradford, Jenner & Block LLP, Chicago, IL, Julie A. Shepard, Richard L. Stone, Jenner & Block LLP, Los Angeles, CA, Scottt Block Wilkens, Steven R. Englund, Steven Bernard Fabrizio, Jenner & Block, LLP, Washington, DC, for Plaintiffs, WNET, et al.

Jennifer A. Golinveaux, Winston & Strawn LLP, San Francisco, CA, John Clifford Englander, Mark S. Puzella, R. David Hosp, Yvonne W. Chan, Goodwin Procter, L.L.P., Boston, MA, Michael S. Elkin, Thomas Patrick Lane, Winston & Strawn LLP, New York, NY, Seth D. Greenstein, Constantine Cannon LLP, Washington, DC, for Defendant.

### OPINION

ALISON J. NATHAN, District Judge:

Plaintiffs, a group of corporate entities engaged in the production, marketing, distribution, and transmission of broadcast television programs, move to enjoin Defendant AEREO, Inc., ("Aereo") from engaging in those aspects of its service that allow its users to access "live" copyrighted content over the internet. Aereo claims that its conduct does not violate copyright law, relying on *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir.2008) ("*Cablevision*"). But for *Cablevision's* express holding regarding the meaning of the provision of the Copyright Act in issue here—the transmit clause—Plaintiffs would likely prevail on their request for a preliminary injunction. However, in light of that decision, this Court concludes that it is bound to DENY Plaintiffs' request.

## I. *PROCEDURAL POSTURE*

On March 1, 2012, Plaintiffs filed two Complaints against Aereo alleging that its service unlawfully captures broadcast television signals in the New York City area,

including at least some corresponding to television programs on which Plaintiffs hold the copyright (Pls. Ex. 83), and provides them over the internet to Aereo subscribers.[1] (*E.g.*, Hrg. Tr. at 132:7–141:13, 292:3–25; Pls. Br. at 4–5; Aereo Br. at 6). Although Plaintiffs' Complaints assert multiple theories of liability, including infringement of the right of public performance, infringement of the right of reproduction, and contributory infringement (Complaint at ¶¶ 28–38, *ABC, Inc. v. AEREO, Inc.*, No. 12–cv–01540, Docket Entry 1; Complaint at ¶¶ 142–58, *WNET v. AEREO, Inc.*, No. 12–cv–01543, Docket Entry 1), the issue presently before the Court is quite limited. On March 13, 2012, Plaintiffs moved for a preliminary injunction, asserting that Aereo was directly liable for copyright infringement by publicly performing Plaintiffs' copyrighted works.[2] (3/13/12 Tr. at 7:23–8:5, 28:12–29:5). This motion was further limited in scope, challenging only the aspects of Aereo's service that allow subscribers to view Plaintiffs' copyrighted television programs contemporaneously with the over-the-air broadcast of these programs. (Hrg. Tr. 255:6–18, 267:14–23). After a roughly eleven week period of expedited discovery and briefing on the preliminary injunction motion, the Court held a two-day evidentiary hearing on May 30 and 31, 2012, to establish the record for deciding the motion.

## II. *PRELIMINARY INJUNCTION STANDARD*

[1, 2] A preliminary injunction is an extraordinary remedy, granted only if the plaintiff establishes "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Even if a plaintiff has not demonstrated a likelihood of success on the merits, a preliminary injunction may still be granted if the plaintiff shows "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiffs favor." *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir.2010).

## III. *FACTS*

### A. *Aereo's System*

The facts surrounding the operation of Aereo's system are largely—though not entirely—undisputed. (*See, e.g.*, Hrg. Tr. at 14:12–15, 23:6–15, 309:8–22). Even if not disputing facts, the parties are significantly at odds as to how Aereo's service should be properly characterized.

#### 1. *The Audience Perspective*

Aereo's system allows users to access free, over-the-air broadcast television

---

1. Aereo characterizes itself as a technology platform, rather than a service, and argues that it is not liable because it is the user, rather than Aereo, that controls the operation of Aereo's system and "makes" the performances at issue. (Aereo Prop. COL at ¶¶ 48; *see also* Aereo Br. at 6–7). As explained below, *infra* Section IV.B.6, the Court does not reach this question, and any description of Aereo as providing a "service" or of Aereo "doing" any particular acts should not be viewed as a decision on this issue.

2. Certain of the Plaintiffs also moved for a preliminary injunction on a theory of unfair competition. (3/13/12 Tr. at 28:12–29:5; Mem. in Support of Mot. for Preliminary Injunction on the WNET Plaintiffs' Claim in the Alternative for Unfair Competition, *WNET v. AEREO, Inc.*, No. 12–CV–01543, Docket Entry 72). The Court dismissed this claim prior to the hearing as preempted by 17 U.S.C. § 301(a). *See Wnet v. Aereo, Inc.*, No. 12–CV–01543, 871 F.Supp.2d 281, 2012 WL 1850911, 2012 U.S. Dist. LEXIS 70749 (S.D.N.Y. May 21, 2012).

through antennas and hard disks located at Aereo's facilities. (*See infra* Section II.A.2). A user of Aereo's system, after logging into their account on Aereo's website, may navigate through a programming guide to select television programs that are currently being aired or that will be aired at a later time. (Hrg. Tr. at 133:2–134:24). If the user selects a program that is currently being aired, the user is given two options, "Watch" and "Record." (Hrg. Tr. at 73:2–19; Kelly Decl. ¶¶ 38–39; Horowitz Rep. ¶ 64). Selecting "Watch" causes Aereo's system to transmit a web page to the user in which the program starts after a short delay, allowing the user to view the program "live," *i.e.,* roughly contemporaneous with its over-the-air broadcast. (Hrg. Tr. at 73:9–19; Kelly Decl. ¶¶ 39, 41). While viewing the program, the user may pause or rewind it, increasing the disparity between the time at which the program is *initially* broadcast and the time at which the user watches it. (Hrg. Tr. at 107:9–18, 111:20–112:12). If enough time has passed, a user may end up watching the program "live" after it has been fully broadcast. If the user presses the "Record" button after having begun watching a program using the "Watch" feature, the Aereo system retains the copy that the user has been watching, and the user may watch that program again later; if "Record" is not selected, the copy is not retained and cannot be viewed again later. (Hrg. Tr. at 88:15–90:9, 112:22–114:17; 121:15–25, 141:7–13; Kelly Decl. ¶¶ 42–43).

Instead of selecting the "Watch" function at the outset, the user may press the "Record" button to schedule a recording of a program that will be broadcast at a later time or that is currently being aired. (Hrg. Tr. at 73:15–74:6, 134:11–24, 136:8–15). However, the "Record" feature can also be used, like the "Watch" feature, to view programs "live": users can direct Aereo's system to begin a recording and

then immediately begin playback of the recording as it is being made. (Hrg. Tr. at 121:15–25, 138:3–139:3, 140:18–141:6).

Thus, from the user's perspective, Aereo's system is similar in operation to that of a digital video recorder ("DVR") (*See, e.g.,* Hrg. Tr. 290:11–291:10, 298:16–23, 305:9–306:12), particularly a remotely located DVR, although Aereo users access their programming over the internet rather than through a cable connection. One further difference is that Aereo allows users to view the programming on their computers, laptops, or mobile devices, whereas to watch television on these devices using a standard DVR, the user might need to purchase an additional device, such as a Slingbox. (Hrg. Tr. at 132:16–20; 306:16–308:25; Lipowski Decl. ¶ 6). Slingbox allows users to stream video, including live broadcast television, over the internet to their mobile devices. (Hrg. Tr. at 306:23–307:4). Plaintiffs do not appear to contend in this litigation that services such as Slingbox are unlawful, instead claiming that they are "irrelevant" and that Aereo's service is distinguishable because Slingbox consumers themselves set up the Slingbox in their homes. (Def. Ex. 41; Pls. Obj. to Aereo's Proposed FOF ¶¶ 24, 26).

### 2. *Behind the Scenes*

Behind the scenes, the process is more complicated. When a user clicks on the "Watch" button, the web browser sends a request to Aereo's Application Server, which in turn sends a request and certain information about the user and the requested television program to Aereo's Antenna Server. (Hrg. Tr. at 74:10–21; Kelly Decl. ¶¶ 44–45; *see also* Lipowski Decl. ¶ 35). The Antenna Server allocates resources to the user, including an antenna and transcoder, depending on whether the user is a "static" or "dynamic" user, a

distinction based on the user's subscription plan with Aereo. (Hrg. Tr. at 74:22–78:2; Kelly Decl. ¶¶ 45–46; Lipowski Decl. ¶¶ 32, 35). Static users have a set of previously selected antennas that have been assigned to them, whereas dynamic users—the vast majority of Aereo's subscribers—are randomly assigned an antenna each time they use Aereo's system. (Hrg. Tr. at 74:22–78:2; Kelly Decl. ¶¶ 47–49; *see also* Lipowski Decl. ¶¶ 32, 35). No two users are assigned a single antenna at the same time. (Hrg. Tr. at 104:20–105:1, 234:3–15).

Thus, although any particular antenna can be used by only one user at a time, dynamic users "share" antennas in that a given antenna may be assigned to different users at different times.[3] (Hrg. Tr. at 74:22–78:2, 104:20–106:24,234:3–15). Static users may similarly "share" antennas in the event that the antennas permanently assigned to them are unavailable, in which case the Aereo system will randomly assign them another unused antenna that may at some other time be allocated to another user. (Hrg. Tr. at 74:22–78:2, 104:20–106:24; Kelly Decl. ¶¶ 47–49). However, just as the antennas are not shared when they are in use, the data obtained by a particular antenna while allocated to a particular user is not "shared" with or accessible by any other Aereo user. (Hrg. Tr. at 104:20–106:24, 137:1–7, 139:12–16; Pozar Decl. ¶¶ 10–14, 19; Pozar Rep. at 6; Horowitz Rep. ¶ 59; Volakis Decl. ¶ 66).

Once these resources are allocated, the Antenna Server sends a "tune" request that directs the user's antenna to "tune into" a particular broadcast frequency band to obtain the desired program. (Hrg. Tr. at 103:4–21; Kelly Decl. ¶ 50; Volakis Decl. ¶ 58; Lipowski Decl. ¶¶ 33,

35–37; Horowitz Rep. ¶ 64). The Antenna Server also sends a request to the Streaming Server that creates a unique directory, assigned to the user, for storing the output data received by the antennas and processed by the transcoder. (Kelly Decl. ¶ 50). Once this directory is created, an electrical signal is sent from the antenna, processed and converted into data packets, and then sent to the transcoder, which encodes it in a form to be transmitted over the internet. (Hrg. Tr. at 82:13–85:5; Kelly Decl. ¶ 51; Volakis Decl. ¶¶ 59–63, 65; *see also* Lipowski Decl. ¶¶ 37, 41–45; Horowitz Rep. ¶ 62). The encoded data is sent to the Streaming Server, where it is saved on a hard disk to a file in the previously created directory and, once saved, is read from that file into a "RAM memory buffer" that sends the data to the user over the internet once a sufficient amount of data—at least six or seven seconds of programming—has accumulated. (Hrg. Tr. at 85:6–88:3, 106:25–107:8, 139:8–11, 248:18–22; Kelly Decl. ¶ 52; Lipowski Decl. ¶ 42; Horowitz Rep. ¶ 63). As additional data is received from the antenna, that data continues to be saved to the hard disk and then read into the RAM memory buffer to be transmitted to the user. (Hrg. Tr. at 85:6–88:3, 137:1–138:15; Kelly Decl. ¶ 52). Whereas the file saved to the hard disk retains all of the data received by the antenna at least until the user finishes watching the program, allowing the user to pause and rewind, the data in the RAM memory buffer contains only a small packet of data that is continuously replaced as data is sent to the user and new packets of data are fed into the buffer. (Hrg. Tr. at 87:11–88:3, 107:9–108:1, 108:23–110:15, 111:20–112:21,309:25–311:8).

---

3. Other components of the system are also "shared" resources, such as the computer servers, insofar as the servers hold and process data for multiple users—although the data for

each user is kept segregated—and transcoders which also may be randomly assigned. (Hrg. Tr. at 250:5–19; Kelly Decl. ¶¶ 47–49; *see also* Lipowski Decl. ¶ 32)

Essentially the same process occurs when the user engages the "Record" function of Aereo's system. (Hrg. Tr. at 88:15–90:9, 294:1–300:5). The only substantial difference between the "Watch" and "Record" functions is that when a user engages the "Record" function, the file saved to the hard disk is tagged as permanent and automatically retained, whereas the file saved to the hard disk using the "Watch" function is not automatically retained unless the user clicks "Record" while the show is still open on the user's web browser. (Hrg. Tr. at 88:15–90:9, 112:22–114:17, 121:15–25, 141:7–13).

## B. *Aereo's Antennas*

The only significant factual dispute concerns the operation of Aereo's antennas. Aereo contends that each of its antennas functions separately to receive the incoming broadcast signals. Plaintiffs assert that Aereo's antennas function collectively as a single antenna, aided by a shared metallic substructure. (Volakis Decl. ¶¶ 58, 66, 68).

Each of Aereo's antennas consists of a pair of metal loops roughly the size of a dime. (Volakis Decl. ¶¶ 2, 53–54). Eighty such antennas are packed on one end of a circuit board, with a metal rail that separates the area with the antenna elements from an area housing the electronic components used to operate the antennas and process the signal. (Hrg. Tr. at 80:11–82:12; Volakis Decl. ¶¶ 2–3, 53, 55; Horowitz Rep. ¶ 59; Pls. Ex. 80). Sixteen such boards are stored parallel to one another in a metal housing, like books a on shelf, with the portion of the circuit board containing the antennas sticking out of the housing. (Hrg. Tr. at 80:11–82:12; Volakis Decl. ¶¶ 2, 52–53; Pls. Ex. 80; Pls. Ex. 81). When the boards are placed in the housing, the metal rails fit close together and form a barrier between the antennas and the other electronic elements of Aereo's

system. (Hrg. Tr. at 80:11–82:12; Volakis Decl. ¶ 2).

In support of their contention that single Aereo antennas cannot function on their own to receive usable television signals, Plaintiffs submit the declaration of Dr. John Volakis. According to Dr. Volakis, minimizing antenna size is challenging, because smaller antennas tend to have lower bandwidth and higher "impedance mismatch" than larger antennas, both of which impair their performance. (Volakis Decl. ¶¶ 33–34, 41, 43–44). Although these problems can be reduced or eliminated, doing so typically means the antenna will need to receive a more powerful broadcast signal to function. (Volakis Decl. ¶¶ 45–49). These principles lead Dr. Volakis to opine that Aereo's antennas do not function independently. Instead, according to Dr. Volakis, the antennas are packed on the board so close together that the incoming signal "does not see the loops as separate elements, but rather as one continuous piece of metal," the function of which is further aided by a common metal substructure formed by the circuit boards and the metal rails. (Volakis Decl. ¶¶ 71, 73–74; *see also* Pls. Ex. 86 at 200:21–201:11, 204:11–205:2; Pls. Ex. 87 at 36:7–15, 137:4–7, 137:24–138:3; Pls. Ex. 88 at 54:5–12).

Dr. Volakis's declaration sets forth a series of tests that he claims support this opinion. First, Dr. Volakis "activate[d] only a single [antenna] element, while leaving the loop elements immediately around it turned off," and observed an electromagnetic field around not just the active loop, but also the inactive loops as well. (Volakis Decl. ¶ 79–80). Second, he made "metallization changes" on the circuit board, and found that none of the changes affected reception, contrary to what he would expect if the antenna were functioning independently. (Volakis Decl. ¶¶ 81, 83).

Third, he obstructed roughly half of the antenna loops with radio absorbing material to suppress their presence and monitored reception of a single unobstructed loop element, and saw a substantial drop in signal received by that antenna as compared to when the other antenna loops were unobstructed. (Volakis Decl. ¶ 82).

Aereo's experts note two overarching flaws in the tests Dr. Volakis performed. First, Dr. Volakis oriented the antennas vertically and with the antenna board "broadside" to the signal transmitter, whereas Aereo orients the antennas horizontally, with the board oriented "edge-on" toward the transmitter, a significant change according to Dr. Horowitz. (Hrg. Tr. 323:17–325:1; Pozar Decl. ¶¶ 24–26; Horowitz Decl. ¶¶ 36–37; Pls. Ex. 80). Second, Aereo also notes the lack of a "control" in several of Dr. Volakis's experiments, because Dr. Volakis did not perform these tests on a single, stand-alone antenna element.[4] (Pozar Decl. ¶¶ 27–28; Horowitz Decl. ¶¶ 32, 46).

Aereo's experts also dispute the reliability of each of Dr. Volakis's particular tests. As to the test in which Dr. Volakis activated only a single loop element (Volakis Decl. ¶¶ 79–80), Aereo notes that Dr. Volakis's conclusions were drawn from a computer simulation which inaccurately positioned the antennas and did not properly model the antennas resistive elements, and that Dr. Volakis was unable to precisely reproduce or explain his results at his deposition. (Hrg. Tr. at 318:13–319:3,

322:13–323:14; Pozar Decl. ¶¶ 22, 30–32; Horowitz Decl. ¶¶ 29–31, 33). As to Dr. Volakis's metallization experiments (Volakis Decl. ¶¶ 81, 83), Dr. Volakis could not identify precisely how he changed the metallization of the board and, according to Aereo's experts, his results could be fairly interpreted to mean that the antennas at issue simply are not affected by nearby metallization and do, in fact, function independently. (Pozar Decl. ¶ 27; Horowitz Decl. ¶¶ 34, 40, 48–49; see also Hrg. Tr. at 239:9–12). Finally, Aereo's experts opine that Dr. Volakis's tests using radio absorbing material were flawed because the size of the absorbing material and its proximity to the measured antenna element would have disrupted the electromagnetic field around the antenna being measured. (Pozar Decl. ¶ 28; Horowitz Decl. ¶¶ 42–45, 47).

Because Plaintiffs did not offer Dr. Volakis as a witness at the hearing or otherwise defend his results, these substantial criticisms are largely unrebutted. Moreover, Plaintiffs provide only a general description of the tests Dr. Volakis performed rather than explaining the details of this testing, which renders his experiments difficult to assess or credit in the first instance; combined with the flaws Aereo points out in these tests, the Court cannot accept their reliability at this stage of the proceedings.

In contrast, Aereo presented significant evidence that each antenna functions independently. Dr. Pozar and Dr. Horowitz

---

4. As previously explained in the Court's April 30, 2012 order, whether due to inadvertence or strategy, Plaintiffs failed to request permission to conduct destructive testing on Aereo's antenna board until the close of discovery and well after the service of their expert reports, despite their awareness since the outset of this litigation that the function of Aereo's antennas would be at issue in this case. (Order, *WNET v. AEREO, Inc.*, No. 12–cv–01543, Docket Entry 67). To the extent that Plain-

tiffs' questioning of witnesses at the hearing suggests that they believe their decision not to perform such testing during the discovery period in this case hindered their ability to conduct such "control" experiments, the Court notes that it has numerous other reasons to credit Aereo's experts' conclusions that the antennas function independently. In particular, the live testimony of Dr. Horowitz and Mr. Lipowski, detailed herein, was highly credible and persuasive.

maintain that the construction of the antenna system requires the antennas to function independently, and Dr. Horowitz has observed numerous (if small) differences in recordings of the same program created by two different antennas. (Hrg. Tr. at 240:23–241:1, 300:16–304:14; Pozar Decl. ¶¶ 10–14, 19; Pozar Rep. at 6; Horowitz Rep. ¶ 59; Def. Ex. 55 at 54:13–55:20, 71:20–72:3). Aereo's chief technology officer, Joe Lipowski, attests that his experience with the antennas suggests that the proximity of one antenna to another does not improve and may actually degrade signal reception, a point on which Aereo's experts concur. (Lipowski Decl. ¶¶ 62–63; Pozar Decl. ¶ 19; Horowitz Decl. ¶ 28; Def. Ex. 50 at 42:20–43:4, 78:13–79:11). Moreover, tests performed at the Aereo site demonstrate that the signal received by Aereo's antennas is 1,000 times stronger than that needed for reliable reception, allowing Aereo to circumvent the difficulties associated with creating small antennas, discussed above. (Horowitz Decl. ¶ 26; Lipowski Decl. ¶ 61; Hrg. Tr. at 319:8–320:24). Such evidence goes to the heart of whether Aereo's antennas are capable of functioning independently, as even Dr. Volakis testified at his deposition that a sufficiently strong signal would overcome the problems he identified relating to small antenna size. (Def. Ex. 49 at 205:3–23). Finally, Aereo's expert Dr. Pozar also tested a single Aereo antenna which he observed to function with a signal level well above that required to generate the televi-

sion picture. (Pozar Rep. at 10–12; *see also* Hrg. Tr. at 245:12–246:23). Dr. Volakis argues that such tests are not meaningful because the antenna was mounted on a circuit board with a metal plate that served as a substructure enhancing the performance of the antenna.[5] (Volakis Decl. ¶¶ 85–87, 90; *see also* Pls. Ex. 88 at 223:15–22). However, Dr. Pozar testified at his deposition that he could "pretty much guarantee" that the metal plate was not going to have any effect on whether the single antenna loop could function given the strength of the signal received at Aereo's facilities, a point on which Dr. Horowitz agrees. (Pls. Ex. 88 at 232:14–233:21; Def. Ex. 55 at 233:22–235:7, 270:13–271:9; *see also* Pls. Ex. 88 at 239:16–240:24; Horowitz Decl. ¶¶ 52–53).

Based on the evidence at this stage of the proceedings, the Court finds that Aereo's antennas function independently. That is to say, each antenna separately receives the incoming broadcast signal, rather than functioning collectively with the other antennas or with the assistance of the shared metal substructure.

## IV. *LIKELIHOOD OF SUCCESS*

[3–5] The first consideration in the preliminary injunction analysis is the probability of success on the merits. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir.2010). "[T]o make out a *prima facie* case of copyright infringement, a party must establish ownership of a valid copyright and that the

---

5. Plaintiffs also argue that the antenna used in Dr. Pozar's tests was not the final production version of the antenna. (Volakis Decl. ¶ 88; Pls. Ex. 87 at 118:6–22, 120:23–123:8; Pls. Ex. 88 at 211:23–212:18, 215:5–21). Aereo responds that the antennas used in Dr. Pozar's tests were "designed to be electronically the same as the production antennas" and were the "test pair and board from which the production antennas were created." (Lipowski Decl. ¶ 58–59; *see also* Def. Ex. 55 at 212:13–18, 216:2–11). Dr. Pozar testified

that he did not believe that such differences affected his analysis or the results he obtained during his testing. (Def. Ex. 55 at 243:4–244:8). Although Plaintiffs have identified certain differences between the antenna used for Dr. Pozar's tests and those used at Aereo's facilities, they have not demonstrated that the differences are sufficient to render Dr. Pozar's tests unreliable in demonstrating that Aereo's antennas can function independently. (*See also* Volakis Decl. ¶ 88–89).

defendant violated an exclusive right conferred by the ownership." *Blue Moon Media Group, Inc. v. Field,* No. 08–cv–01000, 2011 WL 4056068, at *15, 2011 U.S. Dist. LEXIS 108066, at *46–47 (E.D.N.Y. Apr. 11, 2011) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 360, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)); *see also Arista Records LLC v. Doe,* 604 F.3d 110, 117 (2d Cir.2010). Plaintiffs may make a *prima facie* showing of a valid copyright by submitting certificates of registration of the copyrights at issue, *see* 17 U.S.C. § 410(c), and there appears to be no dispute for purposes of this motion that Plaintiffs' works are copyrighted or that Aereo's users will access those works using Aereo's service. (Pls. Ex. 83).

### A. *Cablevision*

At issue in this case is the applicability of the Second Circuit's decision in *Cablevision,* which held, *inter alia,* that Cablevision's Remote Storage DVR ("RS–DVR") system did not infringe the plaintiffs' public performance right under the Copyright Act. *Cablevision,* 536 F.3d at 139–40. In particular, *Cablevision* construed the "transmit clause" in 17 U.S.C. § 101, which provides in relevant part that

> [t]o perform or display a work "publicly" means . . . to transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101. The same provision is at issue here.

Aereo argues that as in *Cablevision* it effectively rents to its users remote equipment comparable to what these users could install at home, and that its activities are materially identical to those in *Cablevi-*

sion such that the Second Circuit's analysis and holding in that case are directly applicable, precluding any public-performance liability. Plaintiffs contend that there are factual distinctions between *Cablevision* and the present case that render that decision inapplicable and require the Court to find that Aereo engages in a public performance under the transmit clause. Because this case turns on determining if the analysis in *Cablevision* is controlling or, as Plaintiffs maintain, there are factual distinctions sufficient to escape *Cablevision's* holding, the Court must undertake a detailed review of that case, including the mechanics of Cablevision's RS–DVR system.

#### 1. *The Mechanics of the Cablevision RS–DVR System*

The RS–DVR system in *Cablevision* was designed to allow customers who did not have a stand-alone DVR in their homes to record cable programming on central hard drives housed and maintained by Cablevision at a remote location. *See Cablevision,* 536 F.3d at 124. Customers could receive playback of those programs using a remote control on their home television sets, allowing those consumers to achieve DVR functionality without actually possessing an in-home set-top DVR *See id.* at 124–25.

To provide this service, Cablevision took the single stream of data that it received containing the programming of various television channels and split it into two separate streams. *Id.* at 124. The first stream was treated as standard cable programming and routed immediately to customers. *See id.* The second stream of data was used for Cablevision's unlicensed RS–DVR service. *See id.* at 124–25. The second stream of data was first sent to a primary ingest buffer, which queried whether any consumer wanted to record any of the programming contained in the

data stream. *Id.* at 124–25. If so, the data for that program moved to a secondary buffer, and then onto a portion of the hard disk allocated to that consumer where a copy was created and stored for playback by the consumer. *See id.* A unique "playback copy" of the television program was thus stored on the hard drive for each individual subscriber, to be sent to the consumer when they requested to watch the program. *See id.* at 125, 130, 135, 138–39. As a result, Cablevision's RS–DVR system allowed numerous consumers to watch the same television program with DVR functionality, although each consumer did so through playback of a unique copy that he or she created and that was accessible only to that consumer.

### 2. *The District Court's Decision*

Considering these facts, then-District Court Judge Chin concluded that, notwithstanding the specifics of how Cablevision's system operated, Cablevision was engaged in a public performance of the plaintiffs' copyrighted works. *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F.Supp.2d 607, 624 (S.D.N.Y.2007). In doing so, the district court rejected Cablevision's argument that any "performance is fundamentally private ... [because] each streaming emanates from a distinct copy of a program uniquely associated with one customer's set-top box and intended for that customer's exclusive viewing in his or her home." *Id.* at 622. Instead, the district court focused on the fact that each of Cablevision's RS–DVR subscribers were being transmitted the same underlying program, and found that this resulted in a public performance. *See id.* at 622–23.

In reaching this conclusion, the district court found two out-of-circuit cases particularly instructive, *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F.Supp. 787 (N.D.Cal.1991) and *Columbia Pictures Indus. v. Redd Horne*, 749 F.2d 154 (3d Cir.1984). Both cases involved infringers who delivered copyrighted programming to multiple people, albeit at different times and in different places, and in both cases the court found that the infringers engaged in public performances under the transmit clause. In *Columbia Pictures*, 749 F.2d at 156–57, the defendants operated video rental stores and set up private booths in which customers could watch copyrighted videotapes played by a VCR at the front of the store. Similarly, in *On Command*, 777 F.Supp. at 788–89, the infringing plaintiff developed a system through which a hotel could use a bank of VCRs to play videotapes to rooms in the hotel. The district court explained that, as in these cases, Cablevision's service fell within the scope of the transmit clause and that it made no difference that the subscribers may have viewed the programs at different times and in different places. *See Twentieth Century Fox Film Corp.*, 478 F.Supp.2d at 623–24. Thus, the district court effectively viewed the transmit clause broadly, with the "same time or ... different times" and "same place or ... different places" language controlling the outcome of the case because the relevant transmission was that of the underlying program, and not each playback copy to each particular user.

### 3. *The Second Circuit's Decision*

The Second Circuit approached the problem posed by *Cablevision* from a substantially different starting point, one that led it to reverse the district court. *See Cablevision*, 536 F.3d at 140. In particular, the Court of Appeals began its analysis with two crucial premises in mind. First, the Court of Appeals explained that under the "transmit clause," "a transmission of a performance is itself a performance" for infringement purposes. *Cablevision*, 536 F.3d at 134–35, 139. This meant that, in determining whether there has

been a public performance, courts are to look to the transmission being made as the performance at issue, rather than simply to whether the public receives the underlying work. *See id.* at 134–36 ("[W]e believe that when Congress speaks of transmitting a performance to the public, it refers to the performance created by the act of transmission."); *see also United States v. Am. Soc'y of Composers*, 627 F.3d 64, 73–74 (2d Cir.2010) (" '[T]ransmittal of a work' is distinct from a transmittal of 'a performance'—the former being a transmittal of the underlying work and the latter being a transmittal that is itself a performance of the underlying work."). Second, the Court of Appeals found that the transmit clause directs courts to "examine who precisely is 'capable of receiving' a particular transmission of a performance" to determine if a performance is public. *Cablevision*, 536 F.3d at 135.

From this perspective, the Second Circuit's view of the transmit clause was substantially narrower than the district court's. Because the Second Circuit considered the relevant performance to be the discrete transmission of each user's unique playback copy of the television program to that user, the potential audience "capable of receiving" that performance was limited to that user, and each such performance was private, not public. *See id.* at 125, 135, 139. Specifically, the Second Circuit explained that because "each RS–DVR playback transmission is made to a single subscriber using a single unique copy produced by that subscriber, . . . such transmissions are not performances 'to the public.' " *Id.* at 139. As such, the Second Circuit held that "the use of a unique copy may limit the potential audience of a transmission and is therefore relevant to whether that transmission is made 'to the public.' " *Id.* at 138. Importantly, the Second Circuit viewed the transmissions in that case as made from each unique playback copy, even though those playback copies

could arguably have been viewed as merely part of a "device or process" through which a large-scale transmission to the public was accomplished. *See* 17 U.S.C. § 101; *Cablevision*, 536 F.3d at 124–25, 137.

This reading of the transmit clause also led the Second Circuit to expressly reject the district court's reasoning, explaining that the transmit clause "speaks of people capable of receiving a particular 'transmission' or 'performance,' and not of the potential audience of a particular 'work.' " *Cablevision*, 536 F.3d at 135. Likewise, it concluded that *Redd Horne* and *On Command* were inapposite, in large part because each of those cases involved the retransmission of a copyrighted work from a single "master copy," rather than unique copies created for each viewer, as in *Cablevision*. *See id.* at 138–39.

Similar reasoning led the Second Circuit to reject the plaintiffs' argument on appeal that Cablevision was engaged in a public performance because it transmitted to the public the "same performance" of any given work—the performance of that work that "occurs when the programming service supplying Cablevision's content transmits that content to Cablevision and the service's other licensees." *Id.* at 136. In other words, the plaintiffs argued that because the upstream content providers transmitted the copyrighted work to Cablevision and other cable companies, which Cablevision retransmitted to its subscribers, the Second Circuit should view the initial transmission from the content providers as the relevant performance (rather than the subsequent transmission of each playback copy to each user) and treat *that* performance as made "to the public." *See id.* The Second Circuit disagreed, explaining that "HBO transmits its own performance of a work when it transmits to Cablevision, and Cablevision transmits its

own performance of the same work when it retransmits the feed from HBO," and it was therefore inappropriate to look back to the initial transmission made by the plaintiffs as the relevant performance. *Id.* Importantly, the Second Circuit held that courts should look "downstream, rather than upstream or laterally, to determine whether any link in a chain of transmissions made by a party constitutes a public performance." *Id.* at 137.

### B. *Lawfulness of Aereo's System*

Aereo characterizes its system as merely allowing users to rent a remotely located antenna, DVR, and Slingbox-equivalent device, in order to access content they could receive for free and in the same manner merely by installing the same equipment at home. Housing this argument more specifically in the terms defined by *Cablevision*, Aereo contends that, like the RS–DVR system in *Cablevision*, its system creates unique, user-requested copies that are transmitted only to the particular user that created them and, therefore, its performances are nonpublic. Moreover, Aereo submits that because each of its antennas function independently, even if the Court adopts Plaintiffs' view that these copies are not legally significant, an injunction still should not issue because each user is receiving a distinct transmission generated by their own individually rented antenna.

Plaintiffs disagree, arguing that *Cablevision* does not control and the Court should view Aereo's system as a technological gimmick—a "device or process"—through which Aereo passes along Plaintiffs' copyrighted content to the public. Specifically, Plaintiffs attempt to distinguish *Cablevision* on its facts, arguing that because Aereo's subscribers are watching these programs as they are still being broadcast, they are not using the copies Aereo creates for "time-shifting" and these copies therefore do not "break[ ] the chain of the [over-the-air] transmission" received by Aereo. (Pls. Br. at 22–23; Pls. Reply at 14). Thus, Plaintiffs contend, Aereo is engaged in a public performance that "emanates from the original broadcast signal" (Pls. Reply at 10), much like a "community antenna" which simply passes along a broadcast signal to the public. In other words, according to Plaintiffs, Aereo's copies should be viewed as merely facilitating the transmission of a single master copy—in this case, the broadcast signal—rather than as copies from which a distinct transmission is made.[6] Having identified this hook on which to hang their legal position, Plaintiffs advocate that the Court is bound only by *Cablevision's* specific holding as applied to its precise facts and is free to depart from the transmit clause analysis of that case to find that Aereo engages in a public performance. (*See, e.g.,* Hrg. Tr. at 400:5–402:19 (citing *Barclays Capital Inc. v. Theflyonthewall.com, Inc.,* 650 F.3d 876, 899 (2d Cir.2011) (explaining that "appellate judges cannot make law except insofar as they reach a conclusion based on the specific facts and circumstances presented to the court in a particular appeal"))).

Despite this creative attempt to escape from the express holding of *Cablevision,* for the reasons discussed below this Court finds itself constrained to reject the approach Plaintiffs urge. Contrary to Plaintiffs' arguments, the copies Aereo's system creates are not materially distinguishable from those in *Cablevision,* which found that the transmission was made from those copies rather than from the incoming signal. Moreover, Plaintiffs' attempt to dis-

---

6. For the sake of brevity, the Court will refer to the former as "facilitating copies" and the latter as "transmission copies."

tinguish *Cablevision* based on time-shifting fails when confronted with the reasoning of that case, particularly considering that the Second Circuit's analysis was directly focused on the significance of Cablevision's copies but did not say one word to suggest that time-shifting played any part in its holding.

### 1. *Cablevision Suggests that the Copies Saved to Aereo's Hard Disks Do Not Merely Facilitate a Broader Transmission*

In assessing the parties' arguments, this Court first looks to *Cablevision's* basis for finding that the copies created by Cablevision's RS–DVR system thwarted the plaintiffs' public performance claim, as this holding is necessarily premised on the conclusion that the copies in that case were not mere facilitating copies. *See Cablevision*, 536 F.3d at 139 ("[E]ach RS–DVR playback transmission is made to a single subscriber using a single unique copy produced by that subscriber"). In doing so, this Court finds that on the key points on which *Cablevision* actually relied, *see id.*, Aereo's system is materially identical to that in *Cablevision*, suggesting that the copies Aereo creates are as significant as those created in *Cablevision*. First, Aereo's system creates a unique copy of each television program for each subscriber who requests to watch that program, saved to a unique directory on Aereo's hard disks assigned to that user. *See id.* at 124 ("If a customer has requested a particular program, the data for that program move from the primary buffer into a secondary buffer, and then onto a portion of one of the hard disks allocated to that customer."). Second, each transmission that Aer-

eo's system ultimately makes to a subscriber is from that unique copy. *See id.* at 137 ("[T]he RS–DVR system, as designed, only makes transmissions to one subscriber using a copy made by that subscriber"). Third, the transmission of the unique copy is made *solely* to the subscriber who requested it;[7] no other subscriber is capable of accessing that copy and no transmissions are made from that copy except to the subscriber who requested it. *See id.* ("[T]he universe of people capable of receiving an RS–DVR transmission is the single subscriber whose self-made copy is used to create that transmission."). The overall factual similarity of Aereo's service to *Cablevision* on these points suggests that Aereo's service falls within the core of what *Cablevision* held lawful.

Another point of similarity between this case and *Cablevision* is found in the undercurrent to the Second Circuit's reasoning suggesting that the Cablevision system merely allowed subscribers to enjoy a service that could also be accomplished using any standard DVR or VCR. *See, e.g., id.* at 125 ("To the customer, however, the processes of recording and playback on the RS–DVR are similar to that of a standard set-top DVR."); *see also id.* at 131 (noting that it "d[id] not believe that an RS–DVR customer is sufficiently distinguishable from a VCR user to impose liability" for infringement of the reproduction right). As in *Cablevision*, the functionality of Aereo's system from the user's perspective substantially mirrors that available using devices such as a DVR or Slingbox, which allow users to access free, over-the-air broadcast television on mobile internet devices of their choosing. (*See supra* Section

---

7. That Aereo users may "share" resources like antennas by using them at different times does not affect this analysis, as it remains clear that the copies Aereo's system makes are unique for each user and are not "shared." Moreover, a number of the re-

sources in *Cablevision* were also "shared," including the servers and, most significantly, the unlicensed signal from which the unique copies were made. *See Cablevision*, 536 F.3d at 124–25, (Hrg. Tr. at 116:1–10).

II.A.1). To the extent that the Second Circuit's holding in *Cablevision* was premised on an inability to distinguish Cablevision's system from otherwise lawful activities, Aereo's system deserves the same consideration.

In addition, beyond the substantial factual similarities of Aereo's copies to those in *Cablevision*, the analysis the Second Circuit undertook in finding that the performance to the end user was made from those copies rather than from, for example, the incoming stream of data, is equally applicable here. For one thing, *Cablevision* held that a public performance does not occur merely because a number of people are transmitted the same television program. *See id.* at 135–36. The Second Circuit was similarly unwilling to accept the plaintiffs' arguments on appeal that, notwithstanding its creation of unique copies, Cablevision was actually transmitting to its users the performance of that work that "occurs when the programming service supplying Cablevision's content transmits that content to Cablevision and the service's other licensees." *Id.* at 136. Plaintiffs argue that Aereo's transmissions actually "emanate[ ] from the original broadcast signal" rather than from the unique copies Aereo's system creates is just another variant of these arguments, rejected by *Cablevision*, that the Court should look back (or "upstream") to the point at which Aereo's antennas obtain the broadcast content to conclude that Aereo engages in a public performance in retransmitting this content.

In fact, the Second Circuit expressly refused to look back to the received signal to conclude that Cablevision was engaged in a public performance, finding a dividing line between the transmissions made by the content providers and the transmissions made by Cablevision. *See id.* ("HBO transmits its own performance of a work when it transmits to Cablevision, and Cablevision transmits its own performance of the same work when it retransmits the feed from HBO."). Indeed, in light of this Court's factual determination that each antenna functions independently, in at least one respect the Aereo system is a stronger case than *Cablevision* for attaching significance to such copies because, unlike *Cablevision* in which multiple copies were all created from a *single* stream of data, *see id.* at 124, each copy made by Aereo's system is created from a *separate* stream of data. *See id.* at 137 (refusing to accept the plaintiffs' argument that Cablevision publicly performs a work when it splits and retransmits the incoming programming stream); *see also Am. Soc'y of Composers*, 627 F.3d at 75 (applying the "same distinction" as drawn in *Cablevision* regarding the creation of unique copies to conclude that a performance made from those copies is not public). Taken in conjunction with the substantial factual parallels between Aereo's service and that in *Cablevision*, that Plaintiffs raise arguments profoundly similar to those already considered and rejected by the Second Circuit demonstrates, in part, why *Cablevision* controls this case.

### 2. *Plaintiffs Cannot Persuasively Distinguish* Cablevision *Based on Time–Shifting*

In the face of these controlling similarities, Plaintiffs try to devise factual distinctions to circumvent *Cablevision's* holding. Primarily, Plaintiffs argue that the copies in this case are unlike those in *Cablevision* because *Cablevision* addressed only copies used for time-shifting—recording programs to view them at a later time—whereas Aereo's system allows users to view television programs close in time to their initial broadcast. Plaintiffs further contend that in order to be time-shifted, there can be no overlap between the over-the-air broadcast of the program and con-

sumer playback of a recorded copy of that program—that any time-shifting must be "complete" to turn a facilitating copy into a transmission copy. (*See, e.g.,* Hrg. Tr. at 386:19–387:8, 416:24–420:15). The Court cannot accept this reading of *Cablevision,* which applies controlling significance to facts on which the Second Circuit did not rely, requests that this Court read volumes into *Cablevision's* silence, and has no foundation in the articulated reasoning on which the Second Circuit's decision was actually grounded.

### a. *Plaintiffs apply controlling significance to facts on which Cablevision does not rely.*

Beginning with the first point, that Plaintiffs attempt to apply controlling significance to facts on which *Cablevision* did not rely, the Second Circuit's holding regarding the meaning of the transmit clause required a focus on who is "capable of receiving" a given performance—*i.e.,* the potential audience—in determining whether that performance was made "to the public." *See Cablevision,* at 134–35, 139. The facts on which the Second Circuit relied in holding that the potential audience of the transmissions in *Cablevision* was limited are the same as those present here, namely the use of unique copies, accessible only to the users who requested them, and transmitted only to those users. *See id.* at 139. Notwithstanding the scattered background-section references in *Cablevision* to programs that were "previously recorded" that Plaintiffs cite (Pls. Br. at

17–18; Pls. Reply at 3 n.1, 11, 13; Hrg. Tr. at 420:7–15, 425:5–24), time-shifting is simply not the basis of the Second Circuit's opinion. Far from it: the Second Circuit never even mentioned time-shifting, whether complete or partial, as a reason to conclude the copies Cablevision created were significant or that the performances at issue were non-public. *See generally id.* Thus, even accepting that a distinction based on time-shifting exists in this case, nothing in the Second Circuit's analysis indicates that this distinction is material, and this Court remains obligated to apply Circuit precedent with fidelity to its underlying reasoning. *See, e.g., Rutherford v. Katonah–Lewisboro Sch. Dist.,* 670 F.Supp.2d 230, 247 (S.D.N.Y.2009); *Shipkevich v. Staten Island Univ. Hosp.,* No. 08–cv–01008, 2009 WL 1706590, at *1–2, 2009 U.S. Dist. LEXIS 51011, at *5 (E.D.N.Y. June 16, 2009). Indeed, even in *Theflyonthewall.com, Inc.,* 650 F.3d at 899, 902, on which Plaintiffs heavily rely for the proposition that "appellate judges cannot make law except insofar as they reach a conclusion based on the specific facts and circumstances presented to the court in a particular appeal," the Second Circuit still applied the *reasoning* of controlling precedent to reach its result.[8]

### b. *Cablevision's silence on time-shifting refutes Plaintiffs' argument*

Turning to the second basic flaw in Plaintiffs' argument, Plaintiffs admit that nowhere in *Cablevision* did the Second Circuit articulate a requirement that the

---

8. Plaintiffs also direct the Court to the conclusion of the *Cablevision* opinion in which the Second Circuit explains that "[t]his holding ... does not generally permit content delivery networks to avoid all copyright liability by making copies of each item of content and associating one unique copy with each subscriber to the network, or by giving their subscribers the capacity to make their own individual copies." *Cablevision,* 536 F.3d at 139. (Pls. Reply at 4). Plaintiffs argue that

this portion of the opinion limited *Cablevision* to its facts and that, therefore, this Court should not "extend [ ] *Cablevision* as Aereo urges." (Pls. Reply at 4). This excerpt from *Cablevision* is better construed as directing that copyright liability may attach to these actions for violations of other exclusive rights provided for by copyright or through contributory liability, not as limiting *Cablevision's* public performance holding to its precise facts. *See id.* at 139–40.

copies be used for time-shifting in order to "break the chain" of transmission—the distinction on which they now found their case. (Hrg. Tr. at 402:23–412:7). Specifically, Plaintiffs argue that the lawfulness of playback of programs contemporaneous with the initial broadcast of those programs was not before the Second Circuit because Cablevision was licensed to have live transmissions of this content. (Hrg. Tr. at 397:5–398:5, 398:19–400:4). *See Cablevision*, 536 F.3d at 124 ("Generally, this stream [of data comprising the content of various television programs] is processed and transmitted to Cablevision's customers in real time.... The first [data stream used in the RS–DVR service] is routed immediately to customers as before."). As such, Plaintiffs contend that the Second Circuit was only called upon to rule on the lawfulness of a system allowing users to access time-shifted programming and that this Court should disregard the Second Circuit's complete silence on the significance of time-shifting to its analysis.

Plaintiffs' position that the Second Circuit's decision in *Cablevision* turned on its unstated reliance on the importance of time-shifting as "breaking the chain of transmission" is unpersuasive. The Second Circuit's analysis of the public performance claim was entirely directed toward explaining why the copies created by the system in *Cablevision* were significant and resulted in performances to a limited, non-public audience. *See generally id.* Plaintiffs' view of *Cablevision* requires the dubious conclusion that despite the Second Circuit's extensive discussion of the importance of these unique copies, the Second Circuit relied on the time-shifted nature of these copies as case-dispositive but left this crucial consideration in the background for subsequent courts to puzzle out on their own. Moreover, Plaintiffs' contention that the parties in *Cablevision* extensively relied on time-shifting before the district court and Second Circuit (Pls.

Prop. COL ¶¶ 40–43, 67) completely undercuts their claim that the Second Circuit did not discuss time-shifting because that issue was not squarely before them. (Hrg. Tr. at 397:5–398:5, 398:19–400:4). By Plaintiffs' own admission, the purported significance of time-shifting was "actually presented to the Second Circuit in *Cablevision*" (Pls. Prop. COL ¶ 43) through Cablevision's briefing, yet the Second Circuit gave no indication it considered these facts important, let alone controlling. Plaintiffs' argument relying on time-shifting is, therefore, implausible.

### c. *Plaintiffs' arguments are contrary to the reasoning of Cablevision*

Third, and perhaps most importantly, Plaintiffs' arguments are simply not consistent with the reasoning of *Cablevision*. For example, although they gesture toward housing their position within the reasoning of *Cablevision* by suggesting that complete time-shifting limits the potential audience of a program, (Pls. Reply at 14; Pls. Proposed COL at ¶ 63); *see id.* at 138 (explaining that "the use of a unique copy *may* limit the potential audience of a transmission and is therefore *relevant* to whether that transmission is made 'to the public.'" (emphasis added)), the logic of this argument is opaque. Whether a user watches a program through Aereo's service as it is being broadcast or after the initial broadcast ends does not change that the transmission is made from a unique copy, previously created by that user, accessible and transmitted only to that user, the factors *Cablevision* identified as limiting the potential audience. *See id.* at 134–39. To the extent Plaintiffs mean to suggest that time-shifting limits the potential audience because it "breaks the chain of transmission," this is merely a restatement of the conclusion that Plaintiffs hope the Court will draw, not an independent argument that explains why *only* a time-shifted

copy limits the potential audience of a transmission to render the resulting performance nonpublic.

In fact, nothing in *Cablevision* suggests that whether a performance is public turns on the times at which individuals receive the transmission. Focusing on the text of the Copyright Act, *Cablevision* explained that "it is of no moment that the potential recipients of the transmission ... may receive the transmission at different times." *Id.* at 134; *see also* 17 U.S.C. § 101 (explaining that a transmission may be "to the public ... whether the members of the public capable of receiving the performance ... receive it ... at the same time or at different times."). Rather, as *Cablevision* instructed, it is not the timing of the receipt of the transmission that courts should look to in determining whether the transmission is to the public, but the factors set forth in *Cablevision*. *See Cablevision*, 536 F.3d at 134 ("The implication from this same language, however, is that it is relevant, in determining whether a transmission is made to the public, to discern who is 'capable of receiving' the performance being transmitted.").[9]

Furthermore, in rejecting the plaintiffs' arguments on appeal, the Second Circuit

explained in *Cablevision* that certain of these arguments would lead to "odd results," such as imposing public performance liability on "a hapless customer who records a program in his den and later transmits the recording to a television in his bedroom." *Id.* at 136. Plaintiffs' position raises a similar concern that "a hapless customer who records a program in his den" and then uses a Slingbox to "transmit[ ] the recording to a [mobile device] in his bedroom would be liable for publicly performing the work." *Id.* Such a consumer, watching a program "live" on his or her mobile device would not, according to Plaintiffs' logic, "break the chain of transmission" from the initial, over-the-air broadcast. As such, that consumer would merely be passing along a transmission that "emanates from the broadcast signal" (Pls. Reply at 10) distributed to the public generally, and thus would have engaged in a public performance even though the transmission was made from a unique copy stored on his or her DVR, solely to himself.[10]

Finding *Cablevision* cuts against them, Plaintiffs also try to locate their claimed distinction of *Cablevision* in other precedent, particularly the holding in *NFL v.*

---

9. Consider a television program initially broadcast at 6:00 pm Eastern Standard Time in New York but initially broadcast at 6:00 pm Pacific Standard Time in California. An Aereo user in New York who begins watching his or her recording of that program at 9:00 pm Eastern watches that program fully time-shifted from one perspective, but also concurrently to the over-the-air broadcast of that program to a segment of the public. Similarly, consider a program that is broadcast for the first time at 10:00 pm, and then rebroadcast the next day at 2:00 pm—is a user who watches a recording of the 10:00 pm program the next day at 2:00 pm part of a public performance? If not, how is he or she distinguishable from the user using Aereo to watch that program "live" from a recording begun at 2:00? Keying whether a performance is public off of whether it has been time-shifted

and whether other users are simultaneously receiving the program "over-the-air" creates odd dilemmas regarding under what circumstances a performance is public or private.

10. Any attempt to distinguish this hypothetical by arguing that Aereo transmits the broadcast signal to multiple users fails when one considers that each copy is uniquely generated from a single antenna for each user and follows a distinct signal path, much as it would be for the stand-alone hapless consumer. As such, to find that Aereo engages in a public performance the Court must look back to the over-the-air broadcast signal as the "master copy" being retransmitted—hence the Court's belief, articulated above, that Plaintiffs' argument is merely a variant of those rejected by *Cablevision*.

*Primetime 24 Joint Venture* that "a public performance or display includes each step in the process by which a protected work wends its way to its audience." *NFL v. Primetime 24 Joint Venture,* 211 F.3d 10, 13 (2d Cir.2000) (quotation marks omitted). In that case, the Second Circuit addressed whether PrimeTime's satellite transmissions were an infringing "public performance" under the transmit clause, even though the transmissions from the satellite were received in Canada, where the Copyright Act does not apply. *See id.* at 11–12. The Second Circuit found that PrimeTime's uplink transmission of the signals, which occurred in the United States, was a step in the process of transmission and, therefore, PrimeTime was making a public performance in the United States subject to the Copyright Act. *See id.* at 13. Moreover, in *American Society of Composers* the Second Circuit explained its conclusion in *NFL,* noting that the fact that the *immediately sequential* downlink from the satellite to Canadian PrimeTime subscribers was a public performance of the games" was of "controlling significance" to *NFL's* conclusion that PrimeTime's satellite uplink was part of this public performance. *Am. Soc'y of Composers,* 627 F.3d at 74 (emphasis added). Plaintiffs hope to persuade the Court that this holding in *NFL* should lead it to conclude that Aereo creates mere facilitating copies.

Again, however, this argument simply runs hard against the reasoning and holding of *Cablevision.* Both *Cablevision* and *Composers* expressly distinguished *NFL* based on the creation, in those cases, of unique copies from which the transmissions were made, explaining that such copies meant that the ultimate performance was not "to the public." *See id.* at 75 ("Just as in *Cartoon Network,* the Internet Companies transmit a copy of the work to the user, who then plays his unique copy of the song whenever he wants to hear it; because the performance is made by a

unique reproduction of the song that was sold to the user, the ultimate performance of the song is not 'to the public.'"); *Cablevision,* 536 F.3d at 137. Moreover, Plaintiffs' attempts to analogize this case to *NFL* cannot overcome the substantial other points that demonstrate that *Cablevision* controls this case, including *Cablevision's* rejection of the arguments that it should look back to the receipt of the initial broadcast signal as the relevant performance. (*See supra* at Section IV.B.1); *Cablevision,* 536 F.3d at 136–37 (discussing *NFL's* holding that courts should consider each step in which a public performance wends its way to its audience and explaining that *NFL* only directs courts to look "downstream" rather than "upstream or laterally" and rejecting the argument that splitting the single data stream in *Cablevision* resulted in a public performance).

Plaintiffs further attempt to rely on cases in which courts have concluded or the parties have conceded that internet streaming results in a public performance. *See, e.g., Am. Soc'y of Composers,* 627 F.3d at 74 (explaining that "[a] stream is an electronic transmission that renders the musical work audible as it is received by the client-computer's temporary memory" and that "all parties agree [such stream transmissions] constitute public performances"); *WPIX, Inc. v. ivi, Inc.,* 765 F.Supp.2d 594, 601 (S.D.N.Y.2011) (undisputed that internet streaming at issue was a public performance); *Warner Bros. Entm't, Inc. v. WTV Sys.,* 824 F.Supp.2d 1003, 1008–11 (C.D.Cal.2011) (internet streaming of DVDs was a public performance). *But see Capitol Records, Inc. v. MP3tunes, LLC,* 821 F.Supp.2d 627, 649–50 (S.D.N.Y.2011) (finding that a data compression algorithm that eliminated redundant digital data from stored copies did not result in the creation of a "master copy" storage system and, under

*Cablevision,* there was no public performance liability). Such cases, however, have generally not considered the impact of the creation of unique copies—the focus of *Cablevision's* analysis—on whether internet streaming transmissions involve a public performance and thus did not address the question currently before the Court. *See, e.g., Am. Soc'y of Composers,* 627 F.3d at 74–75 (using streaming transmissions to distinguish downloading unique copies of songs); *ivi, Inc.,* 765 F.Supp.2d at 601; *Warner Bros. Entm't Inc.,* 824 F.Supp.2d at 1008–11 (C.D.Cal.2011) (streaming was accomplished from master copies of "rented" DVDs).

Even though these cases did not address the question presented by *Cablevision,* Plaintiffs suggest that they are persuasive because they present facts similar to this case, arguing that the copies Aereo creates are equivalent to the buffer copies generally used in internet streaming. (*See* Hrg. Tr. at 92:5–96:7). In particular, Plaintiffs emphasize that the copies Aereo creates in the "Watch" mode—in contrast to those created using "Record"—are retained only until the user finishes watching the program. (*See, e.g.,* Pls. Reply at 3–4, 10 & n.6, 11–15; *see generally* Pls. Br. (describing Aereo's copies as "buffer" copies)). The difference between the "Watch" and "Record" services has always been tenuous, hinging as it does on this sole point of distinction, and Plaintiffs cannot persuasively analogize the copies stored on Aereo's hard disk to "buffer" copies. Even the copies created by the "Watch" mode are not "buffer" copies, as they are stored for the duration of the user's viewing experience, and are not purely fleeting repositories of data as it is immediately passed to the user. *See, e.g., Cablevision,* 536 F.3d at 124–25, 127–30 (describing the fleeting nature of these buffer copies). This difference is established by, among other things, the testimony of Dr. Horowitz—which Plaintiffs repeatedly miscon-

strue (*see, e.g.,* Pls. Prop. FOF at 13 n.4; Pls. Obj. to Aereo's Prop. FOF at 3–4, 8, 25–26). In particular, Dr. Horowitz contrasted the "firehose" nature of buffer copies, which act purely to pass through data, with the copies saved to Aereo's hard disk, which are "nonvolatile storage" as typically used to make a recorded copy on a standard DVR. (Hrg. Tr. at 310:8–311:6; *see also* Hrg. Tr. at 106:25–107:24, 111:12–114:17, 298:14–23; Lipowski Decl. ¶¶ 51–55). Moreover, by clarifying that their present challenge in this motion encompasses all retransmissions of their content while the initial broadcast is occurring (*Compare* Pls. Br. at 3, 5 n.1 *with* Hrg. Tr. 255:6–18, 267:14–23), including through the "Record" mode in which Plaintiffs' own expert conceded the copies made are "permanent" (Hrg. Tr. at 90:7–9, 113:6–19), even the tenuous point of distinction between the "Watch" and "Record" function vanishes, and Aereo's copies cannot be viewed as purely "temporary."

Finally, Plaintiffs try to side-step *Cablevision* and refocus this Court on the text of the transmit clause which provides that "[t]o 'perform' a work 'publicly' means 'to *transmit* or *otherwise communicate* a performance or display of the work . . . to the public, by means of *any device or process.*" (Pls. Br. at 9–10 (quoting 17 U.S.C. § 101)). In doing so, Plaintiffs claim that Aereo is engaged in a "quintessential public performance" because it uses a device or process to communicate performances of Plaintiffs' copyrighted work to members of the public. (Pls. Br. at 9–10). But *Cablevision* makes this argument a non-starter. If Plaintiffs' view of the transmit clause were correct, the Second Circuit in *Cablevision* would have affirmed the result reached by the district court, as *Cablevision* likewise used a "device or process" to "transmit" the copyrighted works to multiple subscribers. Indeed, *Cablevision* expressly rejected the argument, ad-

vanced again here, that the mere fact that a content provider is making a given work available to all of its subscribers results in a public performance. *See id.* at 135–36. Thus, although the text of the transmit clause suggests that Congress intended that clause's coverage to sweep broadly, absent a persuasive distinction that demonstrates Aereo's copies—unlike those in *Cablevision*—are merely such a "device or process," Plaintiffs gain no ground through reliance on this language.

### 3. *Plaintiffs' Reliance on "Complete" Time–Shifting Further Undermines Their Arguments*

Plaintiffs' proposed requirement of "complete" time-shifting is even less justified than their contention that *Cablevision sub silentio* relied on time-shifting in reaching its holding.[11] Plaintiffs' sole legal rationale for this argument is an attempt to locate it in the Supreme Court's decision in *Sony Corporation of America v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), by claiming that *Sony* defined what it means to time-shift a television program, and that the technology at issue in *Sony* only allowed "complete" time-shifting. (Hrg. Tr. at 385:21–386:10, 420:1–6, 428:19–429:6). This argument is wholly misplaced. First, the Court in *Sony* never required that time-shifting of a program be "complete." The Court merely described time-shifting as "the practice of recording a program to view it once at a later time, and thereafter erasing it." *Id.* at 423, 104 S.Ct. 774. Second, Plaintiffs' argument that *Sony* only addressed complete time-shifting because the technology at issue required that the programming be broadcast in full before the recording could be watched is incorrect. Nothing prevents a person

from recording the first half of a show on a VCR, stopping that recording, and watching that recording while the second half of that program continues to be broadcast. Finally, as Plaintiffs concede, the *Sony* court discussed time-shifting in the context of fair use and infringement of the right of reproduction, *see id.* at 447–56, 104 S.Ct. 774 (*see also* Pls. Reply at 18), not in the context of Plaintiffs' novel argument regarding whether a copy sufficiently "breaks the chain of transmission" to avoid liability for a public performance. Thus, even if Plaintiffs were right regarding how the *Sony* Court defined time-shifting, they have provided no principled reason to apply this definition here.

More fundamentally, the basis for Plaintiffs' argument that time-shifting is required to "break the chain of transmission" is that copies immediately used to retransmit a signal are more akin to simply passing along that signal than those also used for substantial time-shifting. Such immediacy also is the other part of the basis for Plaintiffs' attempt to analogize Aereo's service to cases involving standard internet streaming and "buffer" copies, as well as the arguable basis for analogizing this case to *NFL*. As already explained, it is difficult to locate this requirement in *Cablevision* in the first place, but Plaintiffs' position requiring "complete" time-shifting is even more difficult, as it is no longer tied to the immediacy of the retransmission but rather would require the Court to conclude that even if there has inarguably been substantial time-shifting, Aereo still engages in a public performance.

For example, as Plaintiffs would have it, an Aereo user who begins watching a recording of the Academy Awards, initially

---

11. Another way of phrasing this argument for complete time-shifting is that the copy saved on Aereo's system must be complete before viewing begins. Regardless of how this argu-

ment is articulated, this Court's analysis does not change and *Cablevision* did not give any indication its conclusion turned on this factor.

broadcast at 6:00 pm, one minute before the program ends at 11:00 pm has not allowed the chain of transmission to be broken, despite the nearly five hours of time-shifting that has occurred. In contrast, a user who begins watching a standard half-hour sitcom just a minute after its initial broadcast ends would "break the chain of transmission" for that program after just 31 minutes of time shifting. These examples suggest the extent to which Plaintiffs' position regarding "complete" time-shifting is unmoored from its foundation in "breaking the chain of transmission."

Indeed, Plaintiffs concede that their position that copies must be completely time-shifted for *Cablevision's* analysis to apply is not "completely principled." (Hrg. Tr. 416:24–420:6, 428:6–429:6). In particular, Plaintiffs were unable to provide an argument as to why a user who begins watching a recording of a program one minute (or five minutes, or ten minutes) before the broadcast ends is part of a public performance but a user who begins watching a minute after the program ends is not, instead asserting that complete time-shifting provides a bright line rule. (Hrg. Tr. 416:24–420:6, 428:6–429:6). The mere existence of a potential bright-line is not, in itself, a sufficient basis to draw such a line. *Cf., e.g., Colon v. Howard,* 215 F.3d 227, 235–36 (2d Cir.2000) (Walker, J., concurring) (discussing bright-line rules and noting that "any rule we announce must be justified as necessary to its present application").

As this Court has concluded, Plaintiffs' attempt to distinguish *Cablevision* from this case based on time-shifting is unsustainable, and Plaintiffs proposal that the Court require "complete" time-shifting further drives home why the Court cannot adopt this position.

### 4. *Cablevision Is Not Distinguishable Based on Aereo's Transmissions to Different Devices, Mediums, and Places than the Broadcast Transmission*

Plaintiffs also suggest that *Cablevision* addressed only transmissions using the same medium as the initial broadcast that were made to the same device and to the same place as the initial transmission. (*See, e.g.,* Pls. Br. at 17). Although these may be points of distinction from *Cablevision,* there is no reason to believe that they are material. Plaintiffs made no showing at the hearing that whether a transmission is made over co-axial cable or the internet, and whether it is to a user's television in their home or their mobile device on the street has any bearing, in itself, on who is "capable of receiving" that transmission or whether Aereo "breaks the chain of transmission."

### 5. *Jurisprudential Principles Caution Against Plaintiffs' Creative Approach*

Plaintiffs raise the specter of congressional intervention should this Court find that Aereo's system is lawful, noting Congress's overruling of the Supreme Court's decisions in *Fortnightly Corp. v. United Artists Television,* 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968) and *Teleprompter Corp. v. Columbia Broadcasting System, Inc.,* 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974), cases which held that "cable systems were not 'performing' broadcast programming when retransmitting its signals" and thus were not infringing any copyrights. *ivi, Inc.,* 765 F.Supp.2d at 602 (summarizing these cases); (Pls. Br. at 7–8, 10 n.6; Pls. Pre–Hearing Br. at 6–8). Plaintiffs maintain that in doing so, Congress evinced an intent that the transmit clause be construed broadly (Pls. Pre–

Hearing Br. at 7–8), and that this Court should follow suit. (Pls. Reply at 10).

This argument, however, cuts both ways, as it also demonstrates that to the extent that a court concludes that the Copyright Act does not cover an activity, it is Congress's prerogative to step in if it "view[s] this result as an 'injustice.'" (Pls. Pre–Hearing Br. at 7). In fact, the Supreme Court has cautioned that "it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors." *Sony,* 464 U.S. at 429, 104 S.Ct. 774. As such, the "judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme" in copyright jurisprudence and, in "case[s] like this, in which Congress has not plainly marked [the Court's] course, [it] must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests." *Id.* at 431–32, 104 S.Ct. 774. This Court must be guided by the law as it has been written by Congress and, importantly for present purposes, how that law has been interpreted by the Second Circuit.

Such caution is additionally warranted in light of the value of preserving the expectations of parties, like Aereo, who rely on binding precedent. *Republic of Aus. v. Altmann,* 541 U.S. 677, 693, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (noting, in the retroactivity context, that predictability and stability are matters of prime importance in considering contractual or property rights); *Allied–Signal, Inc. v. Dir., Div. of Taxation,* 504 U.S. 768, 783, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992) (noting that adherence to precedent promotes stability, predictability, and respect for judicial authority); *cf. McDonald v. City of Chicago,* —— U.S. ——, 130 S.Ct. 3020, 3102, 177 L.Ed.2d 894 (2010) (Stevens, J., dissenting)

(explaining that stare decisis is a rule of judicial process "prizing stability and order in the law" and "respecting reliance interests"). As detailed below, Aereo has made substantial investments of money and human capital in its system, all in reliance on the assumption that the Second Circuit meant what it said in *Cablevision* rather than what it did not say. Particularly considering the role of district courts to faithfully apply their best understanding of the Second Circuit's precedent, this Court does not believe it would be appropriate to blaze a trail that runs opposed to the direction dictated by *Cablevision.*

In urging the Court to depart from the course set by the Second Circuit, Plaintiffs have relied on statements in the brief of the United States opposing *certiorari* in *Cablevision* that arguably criticize that decision. In particular, Plaintiffs cite to then-Solicitor General Kagan's brief stating: "scattered language in [*Cablevision*] could be read to endorse overly broad, and incorrect, propositions about the Copyright Act" and, as such, the Second Circuit "carefully tie[d] its actual holdings to the facts of [the] case." Brief of the United States as Amicus Curiae at 6, *Cable News Network, Inc. v. CSC Holdings, Inc.,* 129 S.Ct. 2890 (2009). To the extent that the Solicitor General's brief suggests that the Second Circuit's interpretation of the transmit clause was "overly broad and incorrect," this Court is still bound by the Second Circuit's decision. Moreover, to the extent that this brief suggests that *Cablevision*'s holding is limited, the precise limiting factors the Solicitor General identified are *all* present here. *See id.* at 21 ("The Second Circuit repeatedly explained that its rejection of petitioners' public-performance claim depended on a range of factors: not only that each transmission would be sent to a single recipient, but also that (1) each transmission would be made using a unique copy of the relevant pro-

gram; and (2) each transmission would be made solely to the person who had previously made that unique copy."); *see also supra* Section IV.B.1.

For all of the reasons articulated above, this Court concludes that faithful application of *Cablevision* requires the conclusion that Plaintiffs are unlikely to succeed on the merits of their public performance claim.

### 6. *Scope of the Court's Decision*

A few words are in order regarding the scope of the Court's decision. First, the Court need not, and does not, accept Aereo's position that the creation of any fixed copy from which a transmission is made always defeats a claim for a violation of the public performance right. (Hrg. Tr. at 451:7–454:4). This position would eviscerate the transmit clause given the ease of making reproductions before transmitting digital data, and *Cablevision* does not require such a far sweep. *See United States v. Aleynikov*, 676 F.3d 71, 81 (2d Cir.2012) ("[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").

Neither does the Court need to resolve Aereo's argument that their antennas, standing alone, defeat Plaintiffs' claim that Aereo engages in a public performance. Aereo's use of single antennas does, however, reinforce the conclusion that the copies created by Aereo's system are unique and accessible only to a particular user, as they indicate that the copies are created using wholly distinct signal paths. Moreover, Aereo's antennas also reinforce the dividing line between the over-the-air signal the Aereo antennas receive and the transmissions Aereo's system makes to its users. Because the copies are created from a signal received independently by each antenna, in order to find a "master"

copy that is arguably being transmitted, the Court would be required to look back to the incoming over-the-air signal rather than simply an earlier step in Aereo's process. Aereo's antennas thus reinforce the significance of the copies its system creates and aid the Court in finding that Aereo does not create mere facilitating copies.

As such, the Court's holding that Plaintiffs have not demonstrated a likelihood of success is limited. There may be cases in which copies are purely facilitory, such as true buffer copies or copies that serve no function whatsoever other than to pass along a clearly identifiable "master" copy from which the transmission is made. These facts, however, are not before the Court today.

Finally, Aereo has argued that it cannot be held liable for copyright infringement because it does not engage in "volitional conduct" sufficient to impose such liability, contending that it is Aereo's users, rather than Aereo itself, who direct the operation of Aereo's system. (Aereo Prop. COL at ¶¶ 45–48). Because the Court concludes that Plaintiffs have failed to demonstrate they are likely to succeed in establishing that Aereo's system results in a public performance, the Court need not reach the issue of whether Aereo escapes liability because it is "the consumer, not Aereo, who makes the transmissions that Plaintiffs complain of." (Aereo Prop. COL at ¶ 48).

## V. IRREPARABLE HARM

Having determined that Plaintiffs have not persuasively distinguished *Cablevision* and therefore are not likely to prevail on the merits, the Court could conclude its analysis here. *See, e.g., Pope v. County of Albany*, 687 F.3d 565, 570 n. 2 (2d Cir. 2012). However, this Court recognizes that this case turns on important legal

questions and Plaintiffs' have indicated that they are likely to seek interlocutory appeal to the Second Circuit. (3/13/12 Tr. at 42:2–10). Accordingly, the Court will set forth its analysis of the remaining factors to ensure that the record is fully developed. Moreover, district courts deciding preliminary injunction motions routinely consider alternative bases for their holdings, even if they find that one or more of the preliminary injunction factors would itself dispose of the case. *See, e.g., Int'l Bhd. of Teamsters v. Nason's Delivery, Inc.,* No. 11–cv–00186S, 2011 WL 3862322, at *2–7, 2011 U.S. Dist. LEXIS 98422, at *6–18 (W.D.N.Y. Aug. 31, 2011); *Pope v. County of Albany,* No. 11–cv–00736, 2011 WL 3651114, at *2–3, 2011 U.S. Dist. LEXIS 93103, at *5–7 (N.D.N.Y Aug. 18, 2011); *Stokely–Van Camp, Inc. v. Coca–Cola Co.,* 646 F.Supp.2d 510, 530–31 (S.D.N.Y.2009).

**[6, 7]** The second preliminary injunction factor is whether Plaintiffs will suffer irreparable harm in the absence of an injunction. "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger,* 607 F.3d at 81. The Court may not presume irreparable harm, but rather must consider the injury Plaintiffs will suffer if they lose on the preliminary injunction but ultimately prevail on the merits. *Id.* at 82; *ivi, Inc.,* 765 F.Supp.2d at 617. However, "it may well be the case" that "most copyright plaintiffs who have shown a likelihood of success on the merits would . . . be irreparably harmed absent preliminary injunctive relief," and that the historical tendency to readily issue such injunctions in copyright cases reflects this possibility. *Salinger,* 607 F.3d at 82; *see also eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 395, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (Roberts, C.J., concurring) ("Th[e] 'long tradition of equity practice' [of grant-

ing injunctions in patent cases] is not surprising, given the difficulty of protecting a right to exclude through monetary remedies . . . ."). *But see MGM Studios, Inc. v. Grokster, Ltd.,* 518 F.Supp.2d 1197, 1216 (C.D.Cal.2007).

**[8, 9]** " 'The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction.' " *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.,* 754 F.Supp.2d 616, 621 (S.D.N.Y.2010) (quoting *Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002)). "Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger,* 607 F.3d at 81. Courts have tended to issue injunctions in the copyright context because proving loss of sales due to infringement is "notoriously difficult." *Id.; see also MGM Studios, Inc.,* 518 F.Supp.2d at 1215 (explaining that proof of irreparable harm in the copyright context is not difficult to establish in the run-of-the-mill copyright case based on, for example, the infringing acts).

### A. *Plaintiffs Have Demonstrated That They Will Suffer Irreparable Harm*

**[10]** The evidence establishes that Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction. Plaintiffs have identified a number of categories of irreparable harm, several of which have been accepted in similar cases as supporting the issuance of a preliminary injunction.

First, Aereo will damage Plaintiffs' ability to negotiate with advertisers by siphoning viewers from traditional distribution channels, in which viewership is measured by Nielsen ratings, into Aereo' service which is not measured by Nielsen, artificially lowering these ratings. (Franks

Decl. ¶¶ 18–20; Davis Decl. ¶¶ 12–20; Bond Decl. ¶¶ 23–25; Brennan Decl. ¶¶ 7–9; Hrg. Tr. at 48:10–49:2, 57:4–18, 62:20–64:6, 351:7–22, 357:9–22). The record establishes the importance of Nielsen ratings to Plaintiffs' ability to negotiate with advertisers to monetize their programming, as well as the importance of such advertising revenue. (*See, e.g.,* Hrg. Tr. at 57:4–18, 58:23–59:5, 351:8–11, 357:14–19). Harm of this sort has been accepted as irreparable based, at least in part, on the difficulty of proving or quantifying such damages—even if Plaintiffs can generally track declines in advertising revenue, as Aereo suggests (Def. Ex. 51 at 55:20–56:13), this does not necessarily allow them to determine the extent to which such declines are attributable to Aereo.[12] *See ivi, Inc.,* 765 F.Supp.2d at 618 (explaining that allowing viewers to access programming from unsanctioned sources would inevitably damage the plaintiffs' ability to profit from sanctioned sources, and that such losses are a notoriously difficult to prove and "nearly impossible to quantify"); *see also Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 404 (2d Cir.2004) (affirming finding of irreparable harm based on inability to quantify or measure harm resulting from damage to business relationships); *Pearson Educ., Inc. v. Vergara,* No. 09–cv–06832, 2010 WL 3744033, at *4, 2010 U.S. Dist. LEXIS 101597, at *11–12 (S.D.N.Y. Sept. 27, 2010); *Les Ballets Trockadero de Monte Carlo v. Trevino,* 945 F.Supp. 563, 574 (S.D.N.Y.1996) (damage to licensing negotiations constituted irreparable harm).

Similarly, the evidence shows that by poaching viewers from cable or other companies that license Plaintiff's content, Aereo's activities will damage Plaintiffs' ability to negotiate retransmission agreements, as these companies will demand concessions from Plaintiffs to make up for this decrease in viewership. (Franks Decl. ¶¶ 11, 23–26; Davis Decl. ¶¶ 21–26; Bond Decl. ¶¶ 7–19; Brennan Decl. ¶¶ 10, 14; Hrg. Tr. at 59:6–60:21; Pls. Ex. 89 at 158:6–160:7; Def. Ex. 43); *ivi, Inc.,* 765 F.Supp.2d at 618. The record reflects that such agreements amount to billions of dollars of revenue for broadcasters. (Pls. Ex. 5; Bond Decl. ¶ 15). Because these harms go to Plaintiffs' negotiating position with the cable companies, they are difficult to measure. *See Register.com, Inc.,* 356 F.3d at 404; *ivi, Inc.,* 765 F.Supp.2d at 618; (*See, e.g.,* Bond Decl. ¶¶ 16–17; Davis Decl. ¶ 25). This lack of quantifiability is compounded by the difficulty of determining whether consumers have "cut the cord" with their cable company due to Aereo's service or for other reasons. (Bond Decl. ¶ 19).

This harm is not speculative. For example, Sherry Brennan, a Fox executive, testified that based on her many years of experience, cable companies will demand such concessions or refuse to pay retransmission fees based on Aereo's refusal to do so. (Hrg. Tr. at 357:9–358:7; Brennan Decl. ¶ 10; *see also* Hrg. Tr. at 40:10–41:2; Def. Ex. 43 (identifying suppression of retransmission fees as a threat)). Ms. Brennan further testified that such retransmission agreements are currently being renegotiated. (Hrg. Tr. at 361:10–15). Martin Franks, a CBS executive, similarly testified that cable companies were concerned about free-riders such as Aereo and suggested they would be unwilling to pay "when other people can take the exact

---

12. That Aereo is willing to have its subscriber's viewing habits measured by Nielsen (Kanojia Decl. ¶ 39), or that other distribution media are not or, in the case of standard DVRs, previously were not measured by Niel-  sen (Hrg. Tr. at 48:23–49:8, 51:15–52:6) does not detract from this harm, as it appears undisputed that Nielsen presently does not measure Aereo's subscribers.

same product for free." (Hrg. Tr. at 60:8–21).

Although Aereo has submitted evidence that cable companies have not yet raised Aereo's service during retransmission agreement negotiations (Def. Ex. 53 at 157:2–158:5; Def. Ex. 52 at 56:4–8; Def. Ex. 51 at 77:5–13), Aereo's service has only just begun to operate on any significant scale and Aereo has conceded that, if not enjoined, it intends to expand its operations. (Hrg. Tr. at 225:19–226:23). The record reflects evidence that Aereo may expand beyond its limited New York market over the next year. (Hrg. Tr. at 225:22–25; Pls. Ex. 2). Moreover, even if Aereo does not intend to grow beyond the New York market until after this case is decided, it is clear that it has the capacity to grow rapidly in this market (Hrg. Tr. 229:16–230:5) and is, in fact, doing so, having gone from 100 users earlier this year to 3,500 users by the time of the preliminary injunction hearing a few months later. "The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred," *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir.2010), and Plaintiffs have demonstrated such a threat.

In fact, Aereo has conducted surveys suggesting its services could prompt a substantial proportion of its subscribers to cancel their cable subscriptions. (Hrg. Tr. at 209:5–13; Pls. Ex. 41 at 6, 24). Moreover, Aereo's CEO, Chaitanya Kanojia, has explained that part of the idea behind Aereo was to allow consumers to bypass cable companies to watch broadcast television, including live television, and the record is replete with other evidence that Aereo recognizes that its service will likely prompt cable subscribers to cancel their subscriptions. (Kanojia Decl. ¶¶ 6–7; Hrg. Tr. at 202:17–203:21; *see also* Hrg. Tr. at 130:1–25, 184:20–185:12, 188:9–190:21, 201:21–24; Pls. Ex. 13; Pls. Ex. 33 at 5–6; Pls. Ex.

34; Pls. Ex. 47; Def. Ex. 37; Potenza Decl. Ex. 1 at 293:8–298:16).

Plaintiffs' loss of control over their content is likely to harm them in other ways. For example, Plaintiffs stream their content over their own websites, in which they have invested substantial sums, and which provide an opportunity for Plaintiffs to engage in marketing and demographic research, and to build goodwill. (Brennan Decl. ¶ 9, 18; Franks Decl. ¶ 18; Davis Decl. ¶¶ 29–30). Moreover, Aereo's activities may damage Plaintiffs' relationships with content providers, advertisers, or licensees to the extent that Aereo's internet streaming of Plaintiffs' programs causes Plaintiffs to violate agreements with these entities. (*See, e.g.*, Segaller Decl. ¶¶ 4–5, 9, 11; Davis Decl. ¶ 29; Franks Decl. ¶ 12; Hrg. Tr. at 61:8–62:3).

The Court does not, however, believe that Plaintiffs will suffer the full magnitude of their claimed irreparable harm during the pendency of this litigation. *See Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d Cir.1995) ("[I]rreparable harm is measured in terms of the harm arising during the interim between the request for an injunction and final disposition of the case on the merits...."). For example, Plaintiffs' attempt to claim dramatically at oral argument that free broadcast of major television events such as the Super Bowl would become a thing of the past if Aereo is not enjoined (Hrg. Tr. at 429:25–430:7; *see also* Bond Decl. ¶ 12) is flawed because there is no evidence such harm would actually occur during the pendency of this litigation (*cf., e.g.*, Pls. Ex. 4 (noting the execution of a nine-year contract)). Similarly, although Plaintiffs assert that cable companies may abandon their present business model of licensing content from Plaintiffs in favor of adopting a content delivery service similar to Aereo's (Davis Decl. ¶ 26, Franks Decl. ¶ 26; Bond Decl. ¶ 18; Hrg. Tr. at 216:7–217:14; Pls. Ex.

38; Pls. Ex. 39), Plaintiffs have not demonstrated that this shift is likely to occur before this case is disposed of on the merits.

Similarly, the Court does not find that the evidence establishes that Aereo's continued activities during this litigation would irreparably damage Plaintiffs' ability to enter the mobile viewing market. (*See* Dalvi Decl. ¶¶ 5–13; Bond Decl. ¶¶ 20–21; Brennan Decl. ¶ 16). Although Plaintiffs have submitted evidence that they are investing in such platforms, which may launch later this year, (*see, e.g.,* Bond Decl. ¶¶ 20–22; Def. Ex. 51 at 180:16–181:5; Def. Ex. 54:16–57:16; Pls. Ex. 53; 54; 71), they have provided little evidence that Aereo will impede this launch beyond the bare assertion that if Aereo continues to operate, television stations and device manufacturers may not be willing to incur the expenses associated with launching this service (Bond Decl. ¶ 22; Dalvi Decl. ¶ 13). Plaintiffs have not, for example, established that Aereo's service has prompted them to forgo their plans to launch this venture (Def. Ex. 51 at 102:24–103:11; Hrg. Tr. at 372:25–373:23), nor have they provided a foundation for their claim that Aereo's service threatens the survival of their mobile venture. Particularly given that other products are already available that can provide broadcast content to mobile devices contemporaneous with its initial broadcast (Hrg. Tr. at 306:23–307:4), Plaintiffs have not established that this harm is imminent and nonspeculative.

Plaintiffs also maintain that Aereo's geographic limitation on its service is easily overridden by Aereo's users, which may damage Plaintiffs' relationships with local licensed broadcasters or advertisers. *See ivi, Inc.,* 765 F.Supp.2d at 618. While the evidence suggests that Aereo users willing to disable Aereo's location verification

measures and lie about their location may circumvent Aereo's geographic restrictions (Hrg. Tr. at 166:14–167:22), and that this may cause harm to the Plaintiffs (*see, e.g.,* Hrg. Tr. at 348:22–350:11), there is no evidence on the frequency with which users actually do so. Likewise, Plaintiffs' witnesses were unable to provide sufficient details as to how Aereo's service would increase the risk of viral infringement for the Court to accept this testimony as nonspeculative, and the Court therefore does not rely on this claimed element of Plaintiffs' irreparable harm. (Franks Decl. ¶¶ 27–30; Dalvi Decl. ¶ 16; Bond Decl. ¶¶ 6, 26–27; Brennan Decl. ¶ 11; Hrg. Tr. at 46:6–48:9).

In sum, the Court concludes that Aereo threatens Plaintiffs with irreparable harm by luring cable subscribers from that distribution medium into Aereo's service, diminishing Plaintiffs' ability to benefit from their content in ways that are fundamentally difficult to measure or prove with specificity. Plaintiffs' showing of imminent irreparable harm is substantial, but not overwhelming.

### B. *Plaintiffs Did Not Unduly Delay*

[11] Aereo points out that most of the Plaintiffs were aware of its existence for roughly a full year before seeking this injunction and, during that time, took no meaningful steps to seek to have Aereo shut down. (Franks Decl. ¶¶ 31–33; Davis Decl. ¶¶ 32–34; Dalvi Decl. ¶¶ 17–21; Bond Decl. ¶¶ 28–30; Brennan Decl. ¶ 21; Segaller Decl. ¶ 16). Aereo submits that this delay rebuts Plaintiffs' claims of irreparable harm and the Court should therefore disregard Plaintiffs' evidence of such harm. (Aereo Br. at 22–24).

Unexcused delay in seeking a preliminary injunction has been held to undermine or rebut a claim of irreparable harm.[13] *See, e.g., MGM–Pathe Commc'ns*

---

13. Plaintiffs claim that Aereo's delay argument is a vestige of a line of cases in which

*Co. v. Pink Panther Patrol,* 774 F.Supp. 869, 873 (S.D.N.Y.1991) (collecting cases). However, where plaintiffs have demonstrated that they did not unduly sleep on their rights, courts have discounted delay as an argument against irreparable harm. *See King v. Innovation Books,* 976 F.2d 824, 831–832 (2d Cir.1992) (eight month delay excused where, during that time, plaintiff sought information regarding the alleged unlawful conduct and objected to the conduct at issue); *MGM–Pathe Commc'ns Co.,* 774 F.Supp. at 873 (roughly six month delay in seeking a preliminary injunction excused because plaintiffs were "caught in a bind" with regard to whether to file suit). These cases demonstrate that delay undermines a claim of irreparable harm not as an absolute rule, but rather because undue delay tends to be counter to the sense of urgency that typically accompanies the prospect of irreparable harm. *See King,* 976 F.2d at 831 ("This is not conduct that undercuts a sense of urgency or of an imminent threat. . . ."); *MGM–Pathe Commc'ns Co.,* 774 F.Supp. at 873.

Here, Plaintiffs' delay was for roughly one year and was based on the limited availability of Aereo's service, its status in beta testing, and the prospect that litigation was unnecessary until it became clear that Aereo posed a viable threat of harm. (Franks Decl. ¶¶ 31–33; Davis Decl. ¶¶ 32–34; Dalvi Decl. ¶¶ 17–21; Bond Decl. ¶¶ 28–30; Brennan Decl. ¶ 21; Segaller Decl. ¶ 16; Kanojia Decl. ¶ 17; Hrg. Tr. at

34:12–17, 38:1–24, 42:2–45:19, 55:20–25, 356:10–357:4; Def. Ex. 42; Def. Ex. 44). Although this claim is undercut by Aereo's April 2011 announcement which disclosed that it had already received a substantial $4.5 million in seed financing and the media attention this announcement received (Hrg. Tr. at 147:17–25, 149:16–24, 375:9–18; Pls. Ex. 45 at 2), the evidence suggests that Aereo's service was not an imminent threat of harm to Plaintiffs until substantially later. Until January 2012, just months before Plaintiffs filed suit, Aereo had only about 100 total subscribers and to this day remains an "invitation only" product, although it now has roughly 3,500 users. (Hrg. Tr. at 164:25–165:20; 218:25–219:10). Moreover, there is testimony that suggests at least some of the Plaintiffs believed that Aereo's technology, as described, was simply not viable. (Hrg. Tr. at 356:20–25). With this in mind, it was not unreasonable for Plaintiffs to wait until Aereo's February 2012 announcement that it had received yet more venture financing and that it would publicly launch in New York to conclude that Aereo posed a substantial and imminent threat of irreparable harm. (Franks Decl. ¶¶ 31–33; Davis Decl. ¶¶ 32–34; Dalvi Decl. ¶¶ 17–21; Bond Decl. ¶¶ 28–30; Brennan Decl. ¶ 21; Def. Ex. 39). Plaintiffs promptly filed suit after this announcement.

As such, Plaintiffs' delay in this case does not suggest that Plaintiffs will avoid the harms described above or that those harms will be reparable.[14] *See Tom Do-*

---

delay rebutted a presumption of irreparable harm and that such cases are now abrogated after the Supreme Court's decision in *eBay* that no such presumption exists. (Pls. Prop. COL ¶ 115; Hrg. Tr. at 475:14–476:10); *see Salinger,* 607 F.3d at 82. This is a dubious proposition given the reasons, discussed herein, why delay has been found to rebut irreparable harm. In addition, Plaintiffs have not explained why evidence that is sufficient to rebut a presumption of irreparable harm—*i.e.,* evidence courts have held suggests irrepa-

rable harm does not exist—cannot also rebut a factual showing of such harm.

**14.** Aereo notes that, before filing suit, representatives of Plaintiffs or their affiliates met with Aereo personnel, expressed interest in Aereo's system, or indicated that they might be interested in doing business with Aereo. (Kanojia Decl. ¶ 18; Hrg. Tr. 150:7–151:15, 162:13–24). The Court does not find credible claims that Aereo was caught off guard by Plaintiffs' decision to sue (Hrg. Tr. at 172:16–173:1), particularly given the evidence that

402 FEDERAL SUPPLEMENT, 2d SERIES

herty Assocs. v. Saban Entm't Inc., 60 F.3d 27, 39 (2d Cir.1995) ("The cases in which we have found that a delay rebutted the presumption of irreparable harm are trademark and copyright cases in which the fair inference was drawn that the owner of the mark or right had concluded that there was no infringement but later brought an action because of the strength of the commercial competition."); *Guinness United Distillers & Vintners B.V. v. Anheuser–Bush, Inc.,* No. 02–cv–00861, 2002 WL 1543817, at *6, 2002 U.S. Dist. LEXIS 12722, at *19–20 (S.D.N.Y. July 12, 2002) ("Based on the limited distribution and media penetration of 'Red Label From Budweiser' to date, this Court will not deny injunctive relief based on plaintiff's delay in seeking relief."); *cf. Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.,* 314 F.3d 62, 68 (2d Cir.2002). A contrary holding would require plaintiffs to rush to court at the first sign of potential infringement, even if the prospect of harm is remote, and is thus counter to the requirement that irreparable harm must be "imminent." *See Rex Med. L.P.,* 754 F.Supp.2d at 621.

## VI. *BALANCE OF HARDSHIPS*

[12] The third factor that the Court must consider is the balance of hardships, issuing an injunction only if the balance of hardships tips in the Plaintiffs' favor. *Salinger,* 607 F.3d at 80. The harms Plaintiffs are likely to suffer if Aereo is not enjoined are discussed above.

Aereo identifies several hardships that it will suffer should an injunction issue, the majority of which could not be remedied through the requirement of an injunction bond. *See* Fed. R. Civ. Proc. 65(c); *Colla-*

Genex Pharms., Inc. v. IVAX Corp., 375 F.Supp.2d 120, 140 (E.D.N.Y.2005) (Pohorelsky, M.J.) (financial harm to defendant could be ameliorated by the requirement of a bond). First and foremost, the evidence establishes that an injunction may quickly mean the end of Aereo as a business. *See MyWebGrocer, LLC v. Hometown Info, Inc.,* 375 F.3d 190, 195 (2d Cir.2004) ("[I]f a preliminary injunction were issued, D'Agostino would be forced to shut down its online grocery store, at least temporarily, perhaps permanently losing customers."); *Vanlines.com LLC v. Net-Marketing Group, Inc.,* 486 F.Supp.2d 292, 297 (S.D.N.Y.2007). Aereo has sufficient capital to continue operations for just six to seven months, after which it would likely shut down absent investment of further capital. (Hrg. Tr. at 170:10–16,231:13–232:17). The extent of this harm is further manifest in the substantial investment in both labor and capital that Aereo has already expended to develop and launch its system, at least some of which would come to naught if Aereo were to go out of business. (Kanojia Decl. ¶¶ 48–49; Hrg. Tr. at 144:10–24, 238:9–239:17). For example, Mr. Kanojia testified that the development of Aereo's antennas and selecting a site for Aereo's facilities required substantial investment. (Hrg. Tr. at 144:10–24, 145:19–146:10). Further, because Aereo offers users a free 90-day trial, if it is enjoined at this point it will not be able to recoup the money it has spent so far, as it anticipated at the hearing that it would only begin receiving revenue in June 2012. (Kanojia Decl. ¶ 51).

Aereo also presented testimony that an injunction will diminish or destroy a variety of its intangible resources. For exam-

Aereo knew its activities would likely be viewed as infringement (Hrg. Tr. at 142:16–22), its knowledge of the likelihood it would be sued and its decisions to earmark funds for

defending an infringement suit (Hrg. Tr. at 175:8–177:4; *see also* Pls. Ex. 77), and media coverage suggesting that it was likely to be sued (Hrg. Tr. at 174:6–10; Pls. Ex. 20).

ple, an injunction is likely to cause Aereo to lose employees and damage its ability to attract investors to obtain new capital. *See M & G Elecs. Sales Corp. v. Sony Kabushiki Kaisha,* 250 F.Supp.2d 91, 105 (E.D.N.Y.2003); (Kanojia Decl. ¶¶ 54–55). A majority of Aereo's employees left jobs at other companies in order to come to Aereo and, according to Mr. Kanojia's testimony, would be likely to seek other employment should an injunction issue. (Hrg. Tr. at 160:2–16, 170:5–20, 171:17–172:2). Moreover, Aereo also maintains that an injunction will damage its goodwill with its customers, defeat its substantial investments in launching its service, and diminish its competitive advantage in launching a unique and innovative product. *See id.;* (Kanojia Decl. ¶¶ 52–53). For example, Aereo has expended substantial funds to develop its brand and market its service, and to develop favorable media coverage. (Hrg. Tr. at 159:3–12, 163:2–164:24). Mr. Kanojia testified that, should an injunction issue, Aereo likely would lose all of its customers and the goodwill it has generated. (Hrg. Tr. at 170:21–23; Kanojia Decl. ¶ 52)

Plaintiffs put forward only a limited factual challenge to Aereo's claimed hardships.[15] Rather, Plaintiffs' primary argument on this point is to cite *ivi* for the proposition that Aereo's harms are not cognizable because Aereo's business is based on infringement. *See ivi, Inc.,* 765 F.Supp.2d at 620–21 ("Having found that ivi has infringed plaintiffs' copyrights, it follows that ivi is not legally harmed by the fact that it cannot continue streaming plaintiffs' programming, even if this ultimately puts ivi out of business."). *ivi's* conclusion on this point is unpersuasive in the present case, however, because it is

founded on at least a strong showing of likelihood of success, if not a firm conclusion of liability, and does not adequately contemplate the possibility that the infringer's service may be lawful. Having concluded, in this case, that Aereo's service is likely lawful, the Court cannot disregard the harms to Aereo that an injunction would cause by assuming its business is founded on infringement. *See, e.g., Shred–It USA, Inc. v. Mobile Data Shred, Inc.,* 202 F.Supp.2d 228, 234 (S.D.N.Y. 2002) ("The harm to Cruz, who operates a new and relatively small business, if she is *improperly* enjoined from operating her business for the few months required to hold a trial in this case will be much greater than the harm to Shred–It . . . .") (emphasis added); *Ottoman's v. Sunshine State Laboratories,* No. 92–cv–05386, 1992 WL 212473, at *1–2, 1992 U.S. Dist. LEXIS 12710, at *3–4 (S.D.N.Y. Aug. 24, 1992); *see also Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 612 (1st Cir.1988).

In light of this evidence, the Court finds that the balance of hardships certainly does not tip "decidedly" in favor of Plaintiffs.

## VII. *PUBLIC INTEREST*

[13] Finally, the Court must consider whether an injunction is in the public interest. *Salinger,* 607 F.3d at 82; *see also eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (courts must consider whether the public interest would be disserved by granting an injunction). There is limited Second Circuit precedent on where the public interest lies because the Court only recently began considering this factor.

---

**15.** Plaintiffs have suggested that Aereo might sell the antenna technology it has developed, but have not put forth evidence as to the feasibility of doing so (Hrg. Tr. at 232:24–

233:17), and this possibility does not respond to the prospect that Aereo's business model, as it currently stands, could be disrupted or destroyed.

*Salinger*, 607 F.3d at 80 n. 8 ("This Court has rarely considered the public's interest before deciding whether an injunction should issue.... [T]he public's interest has not in the past been a formal factor in this Court's standard for when to issue copyright injunctions."). However, the Court finds that an injunction in this case would not disserve the public interest.

There is a strong public interest in the copyright system's function of motivating individuals to make available their creative works and increase the store of public knowledge. *See id.* at 82 ("The object of copyright law is to promote the store of knowledge available to the public. But to the extent it accomplishes this end by providing individuals a financial incentive to contribute to the store of knowledge, the public's interest may well be already accounted for by the plaintiff's interest."); *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F.Supp.2d 127, 146 (E.D.N.Y.2011) (noting the strong public interest in protecting copyrights and concluding that this supported issuing an injunction); *WPIX, Inc. v. ivi, Inc.*, No. 10–cv–07415, 2011 WL 1533175, at *4, 2011 U.S. Dist. LEXIS 43582, at *13–14 (S.D.N.Y. Apr. 18, 2011) ("The programming that defendants wish to make available to the public is not a natural resource that may be exploited by whomever obtains access. It is proprietary material that plaintiffs spend millions of dollars to develop and protect. The public is served by enjoining those who seek to illegally exploit the statutory rights of copyright holders."). In particular, Plaintiffs note the public interest in maintaining the copyright system and protecting the content that they generate, arguing that the disruption to their business model by activities like Aereo's jeopardizes the creation of such content.

Aereo and *amici* argue that the public interest would be disserved by an injunction because the public has an interest in the availability of the broadcast and the free receipt of Plaintiffs' content in the marketplace of ideas. This argument is not persuasive, as there are numerous other methods through which the public can lawfully receive access to Plaintiffs' content, including standard broadcast transmission, cable television, and licensed internet streaming sites, among others. There is a logical gap—one that Aereo and *amici* fail to bridge—between any public interest in receiving broadcast television signals generally and the public interest in receiving them from Aereo's particular service.

Relatedly, *amici* argue that there is a public interest in the free access to and reception of broadcast television. (EFF Br. at 19). The Court notes, however, that even setting aside the other lawful methods through which consumers may access broadcast television even in Aereo's absence, Aereo is a business and does not provide "free" access to broadcast television. Moreover, although this argument carries some force to the extent that there is a public interest in access to television broadcast over the free public airwaves and Aereo facilitates such access, it cannot be afforded substantial weight because it proves too much. The same logic would support a finding that the public interest favors imposing no copyright restrictions on any form of redistribution of Plaintiffs' broadcast television, as unrestrained piracy of that content would also increase public access to content broadcast over the free public airwaves. For example, distributing over the internet an infringing bootleg copy of a television program that was initially broadcast on the public airwaves increases access to that program. *Amici*'s argument thus bears an unacceptable resemblance to advocacy that copyright infringement of broadcast television is generally in the public interest, a point on which this Court cannot agree.

## *CONCLUSION*

Because the Court concludes that it cannot accept Plaintiffs' novel attempt to distinguish *Cablevision,* Plaintiffs have not shown a likelihood of success on the merits. And although they have demonstrated that they face irreparable harm, they have not demonstrated that the balance of hardships decidedly tips in their favor. As such, the Court DENIES Plaintiffs motion for a preliminary injunction.

SO ORDERED.



**Amy BATES, et al., Plaintiffs,**

**v.**

**DELAWARE HEALTH CORPORATION, et al., Defendants.**

**Civil Action No. 11–452–RGA.**

United States District Court,
D. Delaware.

July 5, 2012.

**Background:** Certified nursing assistants brought putative class action against employer defendants, alleging violations of the Fair Labor Standards Act (FLSA) and the Delaware Wage Payment and Collection Law. Defendants moved to dismiss.

**Holding:** The District Court, Andrews, J., held that it would exercise supplemental jurisdiction over employees' claims under the Delaware Wage Payment and Collection Law.

Motion denied.

**1. Federal Courts ⚖14.1**

The decision whether to exercise supplemental jurisdiction is a discretionary one. 28 U.S.C.A. § 1367.

**2. Federal Courts ⚖16**

In employees' putative class action alleging violations of the Fair Labor Standards Act (FLSA) and the Delaware Wage Payment and Collection Law, the district court would exercise supplemental jurisdiction over employees' claims under the Delaware Wage Payment and Collection Law, even though there was an interesting legal issue about how Delaware's "meal break" statute should be interpreted; the case was still at the initial pleading stage, Delaware had a fairly robust procedure for getting timely rulings on novel state law questions, and if, in the exercise of its discretion, the Delaware Supreme Court did not accept and promptly decide a properly certified question, there did not appear to be any reason the supplemental jurisdiction determination could not be revisited at a later time. 28 U.S.C.A. § 1367; West's Del.C.Ann. Const. Art. 4, § 11(8); 19 West's Del.C. §§ 1101 et seq., 1707; Del.Sup.Ct.Rules, Rule 41.

———

Thomas Neuberger, Esq., Wilmington, DE, Michael Anderson, Esq., Washington, D.C., for Plaintiffs.

Scott A. Holt, Esq., Wilmington, DE, for Defendant.

**MEMORANDUM OPINION**

ANDREWS, District Judge:

Before the Court is the Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction. (D.I. 9).

The Complaint has two counts. The first count claims violations of the Fair Labor Standards Act (FLSA). The Court has subject matter jurisdiction over this Count, and defendants do not argue otherwise. (D.I. 9, n. 1). The second count claims violations of the Delaware Wage

# Exhibit B

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

**H**
Only the Westlaw citation is currently available.

United States Court of Appeals,
Second Circuit.
WNET, THIRTEEN, Fox Television Stations, Inc.,
Twentieth Century Fox Film Corporation, WPIX, Inc.,
Univision Television Group, Inc., The Univision
Network Limited Partnership, and Public Broadcast-
ing Service, Plain-
tiffs–Counter–Defendants–Appellants,
v.
**AEREO**, INC., f/k/a Bamboom Labs, Inc., Defend-
ant–Counter–Claimant–Appellee.
American Broadcasting Companies, Inc., Disney
Enterprises, Inc., CBS Broadcasting Inc., CBS Studios
Inc., NBCUniversal Media, LLC, NBC Studios, LLC,
Universal Network Television, LLC, Telemundo
Network Group LLC, and WNJU–TV Broadcasting
LLC, Plaintiffs–Counter–Defendants–Appellants,
v.
Aereo, Inc., Defendant–Counter–Claimant–Appellee.

Docket Nos. 12–2786–cv, 12–2807–cv.
Argued: Nov. 30, 2012.
Decided: April 1, 2013.

**Background:** Holders of copyrights to broadcast
television programs sued a provider of "live" Internet
broadcasts, alleging, inter alia, copyright infringe-
ment. The United States District Court for the South-
ern District of New York, Alison J. Nathan, J., 874
F.Supp.2d 373, denied plaintiffs' motion for prelimi-
nary injunction barring defendant from transmitting
recorded broadcast television programs to its sub-
scribers while programs were airing on broadcast
television. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Droney, Circuit

Judge, held that:
(1) transmissions of "live" Internet broadcasts by
provider likely were not public performances;
(2) holders did not demonstrate sufficiently serious
questions going to merits of claim of infringement;
and
(3) balance of hardships did not tip decidedly in favor
of the copyright holders.

Affirmed.

Chin, Circuit Judge, filed dissenting opinion.

West Headnotes

[1] Federal Courts 170B ⟨⟨⟩⟩ 815

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)4 Discretion of Lower Court
            170Bk814 Injunction
               170Bk815 k. Preliminary Injunction;
Temporary Restraining Order. Most Cited Cases

A district court's denial of a preliminary injunc-
tion is reviewed for abuse of discretion.

[2] Federal Courts 170B ⟨⟨⟩⟩ 812

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)4 Discretion of Lower Court
            170Bk812 k. Abuse of Discretion. Most
Cited Cases

A district court abuses its discretion when its de-
cision rests on legal error or a clearly erroneous factual

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

finding, or when its decision, though not the product of legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions.

**[3] Copyrights and Intellectual Property 99 ⊂⟶85**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)2 Remedies
            99k72 Actions for Infringement
               99k85 k. Preliminary Injunction.
Most Cited Cases

A district court may issue a preliminary injunction for copyright infringement only if the plaintiff has demonstrated either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor.

**[4] Copyrights and Intellectual Property 99 ⊂⟶85**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)2 Remedies
            99k72 Actions for Infringement
               99k85 k. Preliminary Injunction.
Most Cited Cases

A plaintiff seeking a preliminary injunction for copyright infringement must demonstrate that he is likely to suffer irreparable injury in the absence of an injunction; a court may not presume irreparable injury in the copyright context; rather the plaintiff must demonstrate actual harm that cannot be remedied later by damages should the plaintiff prevail on the merits.

**[5] Copyrights and Intellectual Property 99 ⊂⟶85**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)2 Remedies
            99k72 Actions for Infringement
               99k85 k. Preliminary Injunction.
Most Cited Cases

When a plaintiff seeks a preliminary injunction for copyright infringement, a district court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor.

**[6] Copyrights and Intellectual Property 99 ⊂⟶85**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)2 Remedies
            99k72 Actions for Infringement
               99k85 k. Preliminary Injunction.
Most Cited Cases

When a plaintiff seeks a preliminary injunction for copyright infringement, a court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction.

**[7] Copyrights and Intellectual Property 99 ⊂⟶67.1**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)1 What Constitutes Infringement
            99k67.1 k. Motion Pictures and Other Audiovisual Works. Most Cited Cases

The Transmit Clause in the Copyright Act directs courts to consider the potential audience of the indi-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

vidual transmission; if that transmission is "capable of being received by the public," the transmission is a public performance. 17 U.S.C.A. § 101.

**[8] Copyrights and Intellectual Property 99**
**67.1**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)1 What Constitutes Infringement
            99k67.1 k. Motion Pictures and Other
Audiovisual Works. Most Cited Cases

The public capability of receiving the same underlying work or original performance of the work by means of many transmissions is irrelevant to an analysis under the Transmit Clause of the Copyright Act. 17 U.S.C.A. § 101.

**[9] Copyrights and Intellectual Property 99**
**67.1**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)1 What Constitutes Infringement
            99k67.1 k. Motion Pictures and Other
Audiovisual Works. Most Cited Cases

If the potential audience of the transmission is only one subscriber, the transmission is not considered a public performance under the Transmit Clause of the Copyright Act; however, when private transmissions are generated from the same copy of the work, these private transmissions should be aggregated, and if these aggregated transmissions from a single copy enable the public to view that copy, the transmissions are public performances. 17 U.S.C.A. § 101.

**[10] Copyrights and Intellectual Property 99**
**67.1**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)1 What Constitutes Infringement
            99k67.1 k. Motion Pictures and Other
Audiovisual Works. Most Cited Cases

Any factor that limits the potential audience of a transmission is relevant to the analysis under the Transmit Clause of the Copyright Act. 17 U.S.C.A. § 101.

**[11] Copyrights and Intellectual Property 99**
**85**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
      99I(J)2 Remedies
         99k72 Actions for Infringement
            99k85 k. Preliminary Injunction.
Most Cited Cases

Transmissions of "live" Internet broadcasts by provider likely were not public performances, weighing against issuing preliminary injunction against provider on infringement claim of holders of copyrights to broadcast television programs, since provider's system created unique copy of each program for each subscriber who requested it and saved it to unique directory on provider's hard disks assigned to that user, each transmission to subscriber was from that unique copy, and transmission of unique copy was made solely to requesting subscriber. 17 U.S.C.A. §§ 101, 106(4).

**[12] Courts 106 90(2)**

106 Courts
   106II Establishment, Organization, and Procedure
      106II(G) Rules of Decision

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

106k88 Previous Decisions as Controlling or as Precedents
106k90 Decisions of Same Court or Co-Ordinate Court
106k90(2) k. Number of Judges Concurring in Opinion, and Opinion by Divided Court. Most Cited Cases

One panel of the Court of Appeals cannot overrule a prior decision of another panel; the panel is bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of the Court of Appeals or by the Supreme Court.

**[13] Courts 106 🔑90(2)**

106 Courts
106II Establishment, Organization, and Procedure
106II(G) Rules of Decision
106k88 Previous Decisions as Controlling or as Precedents
106k90 Decisions of Same Court or Co-Ordinate Court
106k90(2) k. Number of Judges Concurring in Opinion, and Opinion by Divided Court. Most Cited Cases

A panel of the Court of Appeals is not bound by a prior decision of another panel when an intervening Supreme Court decision casts doubt on controlling precedent.

**[14] Copyrights and Intellectual Property 99 🔑85**

99 Copyrights and Intellectual Property
99I Copyrights
99I(J) Infringement
99I(J)2 Remedies
99k72 Actions for Infringement
99k85 k. Preliminary Injunction.
Most Cited Cases

Holders of copyrights to broadcast television programs did not demonstrate sufficiently serious questions going to merits of claim of infringement based on transmission of program still airing on broadcast television to make it fair ground for litigation, weighing against issuing preliminary injunction, since provider's service likely did not infringe holders' public performance right. 17 U.S.C.A. § 101.

**[15] Copyrights and Intellectual Property 99 🔑85**

99 Copyrights and Intellectual Property
99I Copyrights
99I(J) Infringement
99I(J)2 Remedies
99k72 Actions for Infringement
99k85 k. Preliminary Injunction.
Most Cited Cases

For purposes of a motion for preliminary injunctive relief on a copyright infringement claim asserted by holders of copyrights to broadcast television programs against a provider of "live" internet broadcasts, the balance of hardships did not tip decidedly in favor of the copyright holders; while the provider's activities could damage the copyright holders' ability to negotiate with advertisers by siphoning viewers from traditional distribution channels and could damage the holders' ability to negotiate retransmission agreements, there was evidence that an injunction might quickly mean the end of the provider as a business. 17 U.S.C.A. § 101.

Paul M. Smith, Steven B. Fabrizio, Scott B. Wilkens, Matthew E. Price, Jenner & Block LLP, Washington, DC; Richard L. Stone, Amy M. Gallegos, Jenner & Block LLP, Los Angeles, CA, for Plaintiffs–Appellants WNET, Thirteen, et al.

Bruce P. Keller, Jeffrey P. Cunard, Michael R. Po-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

tenza, Debevoise & Plimpton LLP, New York, NY, for Plaintiffs–Appellants Am. Broad. Cos., Inc., et al.

R. David Hosp, John C. Englander, Mark S. Puzella, Yvonne W. Chan, Erin M. Michael, Goodwin Procter LLP, Boston, MA; Michael S. Elkin, Thomas P. Lane, Winston & Strawn LLP, New York, NY; Seth D. Greenstein, Constantine Cannon LLP, Washington, DC; Jennifer A. Golinveaux, Winston & Strawn LLP, San Francisco, CA, for Defendant–Appellee.

Robert Alan Garrett, Lisa S. Blatt, Stephen M. Marsh, R. Stanton Jones, Arnold & Porter LLP, Washington, DC, for amici curiae National Basketball Association, NBA Media Ventures, LLC, NBA Properties, Inc., National Football League, National Hockey League, Office of the Commissioner of Baseball, and MLB Advanced Media, L.P. in support of Plaintiffs–Appellants.

Kelly M. Klaus, Munger, Tolles & Olson LLP, Los Angeles, CA; Samantha Dulaney, I.A.T.S.E. In House Counsel, New York, NY; Duncan W. Crabtree–Ireland, Chief Administrative Officer & General Counsel, SAG–AFTRA, Los Angeles, CA; Anthony R. Segall, Rothner, Segall & Greenstone, Pasadena, CA; Susan Cleary, Vice President & General Counsel, Independent Film & Television Alliance, Los Angeles, CA, for amici curiae Paramount Pictures Corporation, Warner Bros. Entertainment Inc., Directors Guild of America, Inc., Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, Its Territories and Canada, AFL–CIO, CLC, Screen Actors Guild–American Federation of Television and Radio Artists, Writers Guild of America, West, Inc., Independent Film & Television Alliance, Lions Gate Entertainment, Inc., and Metro–Goldwyn–Mayer Studios Inc. in support of Plaintiffs–Appellants.

Robert A. Long, Matthew S. DelNero, Daniel Kahn, Covington & Burling LLP, Washington, DC, for amici

curiae The National Association of Broadcasters, The **ABC** Television Affiliates Association, The CBS Television Network Affiliates Association, The NBC Television Affiliates, and The Fox Television Affiliates Association in support of Plaintiffs–Appellants.

Jeffrey A. Lamken, Robert K. Kry, MoloLamken LLP, Washington, DC, for amicus curiae Cablevision Systems Corporation in support of Plaintiffs–Appellants.

Steven J. Metalitz, Eric J. Schwartz, J. Matthew Williams, Mitchell Silberberg & Knupp LLP, Washington, DC; Paul V. LiCalsi, Mitchell Silberberg & Knupp LLP, New York, NY, for amici curiae The American Society of Composers, Authors and Publishers, Broadcast Music, Inc., The National Music Publishers Association, The Association of Independent Music Publishers, The Church Music Publishers Association, The Nashville Songwriters Association International, The Recording Industry Association of America, the Recording Academy, SESAC, Inc., The Society of Composers & Lyricists, The Songwriters Guild of America, Inc., and Soundexchange, Inc., in support of Plaintiffs–Appellants.

Ralph Oman, The George Washington University Law School, Washington, DC, for amicus curiae Ralph Oman, Former Register of Copyrights of the United States in support of Plaintiffs–Appellants.

Jonathan Band, Jonathan Band PLLC, Washington, DC, for amici curiae The Computer & Communications Industry Association and The Internet Association in support of Defendant–Appellee.

Michael C. Rakower, Law Office of Michael C. Rakower, P.C., New York, NY, for amici curiae Intellectual Property and Copyright Law Professors in support of Defendant–Appellee.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

Mitchell L. Stoltz, Electronic Frontier Foundation, San Francisco, CA; Sherin Siy, John Bergmayer, Public Knowledge, Washington, DC; Michael Petricone, Consumer Electronics Association, Arlington, VA, for amici curiae The Electronic Frontier Foundation, Public Knowledge, and The Consumer Electronics Association in support of Defendant–Appellee.

Peter Jaszi, Kate Collins, Seth O. Dennis, Sarah K. Leggin, Bijan Madhani, American University Washington College of Law, Washington, DC, for amici curiae The Consumer Federation of America and Consumers Union in support of Defendant–Appellee.

Before: CHIN and DRONEY, Circuit Judges, GLEESON, District Judge. [FN*]

Judge CHIN dissents in a separate opinion.

DRONEY, Circuit Judge:

**\*1** Aereo, Inc. ("**Aereo**") enables its subscribers to watch broadcast television programs over the internet for a monthly fee. Two groups of plaintiffs, holders of copyrights in programs broadcast on network television, filed copyright infringement actions against **Aereo** in the United States District Court for the Southern District of New York. They moved for a preliminary injunction barring **Aereo** from transmitting programs to its subscribers while the programs are still airing, claiming that those transmissions infringe their exclusive right to publicly perform their works. The district court (Nathan, J.) denied the motion, concluding that the plaintiffs were unlikely to prevail on the merits in light of our prior decision in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.,* 536 F.3d 121 (2d Cir.2008) (" *Cablevision* "). We agree and affirm the order of the district court denying the motion for a preliminary injunction.[FN1]

## BACKGROUND

The parties below agreed on all but one of the relevant facts of **Aereo's** system, namely whether **Aereo's** antennas operate independently or as a unit. The district court resolved that issue, finding that **Aereo's** antennas operate independently. The Plaintiffs do not appeal that factual finding. Thus the following facts are undisputed.

### I. Aereo's System

**Aereo** transmits to its subscribers broadcast television programs over the internet for a monthly subscription fee. **Aereo** is currently limited to subscribers living in New York City and offers only New York area channels. It does not have any license from copyright holders to record or transmit their programs.

The details of **Aereo's** system are best explained from two perspectives. From its subscribers' perspective, **Aereo** functions much like a television with a remote Digital Video Recorder ("DVR") and Slingbox.[FN2] Behind the scenes, **Aereo's** system uses antennas and a remote hard drive to create individual copies of the programs **Aereo** users wish to watch while they are being broadcast or at a later time. These copies are used to transmit the programs to the **Aereo** subscriber.

### A. The Subscriber's Perspective

**Aereo** subscribers begin by logging on to their account on **Aereo's** website using a computer or other internet-connected device. They are then presented with a programming guide listing broadcast television programs now airing or that will air in the future. If a user selects a program that is currently airing, he is presented with two options: "Watch" and "Record." If the user selects "Watch," the program he selected begins playing, but the transmission is briefly delayed relative to the live television broadcast.[FN3] Thus the user can watch the program nearly live, that is, almost contemporaneously with the over-the-air broadcast. While the user is watching the program with the "Watch" function, he can pause or rewind it as far back as the point when the user first began watching the program.[FN4] This may result in the user watching the program with the "Watch" feature after the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

over-the-air broadcast has ended. At any point while watching the program with the "Watch" feature, the user can select the "Record" button, which will cause **Aereo's** system to save a copy of the program for later viewing. The recorded copy of the program will begin from the point when the user first began watching the program, not from the time when the user first pressed the "Record" button.[FN5] If a user in "Watch" mode does not press "Record" before the conclusion of the program, the user is not able to watch that program again later.

*2 An **Aereo** user can also select a program that is currently airing and press the "Record" button. In that case, a copy of the program will be saved for later viewing. However, the "Record" function can also be used to watch a program nearly live, because the user can begin playback of the program being recorded while the recording is being made. Thus the difference between selecting the "Watch" and the "Record" features for a program currently airing is that the "Watch" feature begins playback and a copy of the program is not retained for later viewing, while the "Record" feature saves a copy for later viewing but does not begin playback without further action by the user.

If an **Aereo** user selects a program that will air in the future, the user's only option is the "Record" function. When the user selects that function, **Aereo's** system will record the program when it airs, saving a copy for the user to watch later. An **Aereo** user cannot, however, choose either to "Record" or "Watch" a program that has already finished airing if he did not previously elect to record the program.

The final notable feature of **Aereo's** system is that users can watch **Aereo** programing on a variety of devices. **Aereo's** primary means of transmitting a program to a user is via an internet browser, which users can access on their computers. **Aereo** users can also watch programs on mobile devices such as tablets or smart phones using mobile applications. Finally,

**Aereo** subscribers can watch **Aereo** on an internet-connected TV or use a stand-alone device to connect their non-internet TVs to **Aereo**.

**Aereo's** system thus provides the functionality of three devices: a standard TV antenna, a DVR, and a Slingbox-like device. These devices allow one to watch live television with the antenna; pause and record live television and watch recorded programing using the DVR; and use the Slingbox to watch both live and recorded programs on internet-connected mobile devices.

**B. The Technical Aspects of Aereo's System**

**Aereo** has large antenna boards at its facility in Brooklyn, New York. Each of these boards contains approximately eighty antennas, which consist of two metal loops roughly the size of a dime. These boards are installed parallel to each other in a large metal housing such that the antennas extend out of the housing and can receive broadcast TV signals. **Aereo's** facility thus uses thousands of individual antennas to receive broadcast television channels.[FN6]

When an **Aereo** user selects a program to watch or record, a signal is sent to **Aereo's** antenna server. The antenna server assigns one of the individual antennas and a transcoder to the user. The antenna server tunes that antenna to the broadcast frequency of the channel showing the program the user wishes to watch or record. The server transcodes the data received by this antenna, buffers it, and sends it to another **Aereo** server, where a copy of the program is saved to a large hard drive in a directory reserved for that **Aereo** user. If the user has chosen to "Record" the program, the **Aereo** system will create a complete copy of the program for that user to watch later. When the user chooses to view that program, **Aereo's** servers will stream the program to the user from the copy of the program saved in the user's directory on the **Aereo** server. If the user instead has chosen to "Watch" the program, the same operations occur, except that once six or seven seconds of programming have been saved

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

in the hard drive copy of the program in the user's directory on the **Aereo** server, the **Aereo** system begins streaming the program to the user from this copy. Thus even when an **Aereo** user is watching a program using the "Watch" feature, he is not watching the feed directly or immediately from the antenna assigned to him. Rather the feed from that antenna is used to create a copy of the program on the **Aereo** server, and that copy is then transmitted to the user. If at any point before the program ends, the user in "Watch" mode selects "Record," the copy of the program is retained for later viewing. If the user does not press "Record" before the program ends, the copy of the program created for and used to transmit the program to the user is automatically deleted when it has finished playing.

*3 Three technical details of **Aereo's** system merit further elaboration. First, **Aereo** assigns an individual antenna to each user. No two users share the same antenna at the same time, even if they are watching or recording the same program.[FN7] Second, the signal received by each antenna is used to create an individual copy of the program in the user's personal directory. Even when two users are watching or recording the same program, a separate copy of the program is created for each. Finally, when a user watches a program, whether nearly live or previously recorded, he sees his individual copy on his TV, computer, or mobile-device screen. Each copy of a program is only accessible to the user who requested that the copy be made, whether that copy is used to watch the program nearly live or hours after it has finished airing; no other **Aereo** user can ever view that particular copy.

**II. The Present Suits**

Two groups of plaintiffs (the "Plaintiffs") filed separate copyright infringement actions against **Aereo** in the Southern District of New York. They asserted multiple theories, including infringement of the public performance right, infringement of the right of reproduction, and contributory infringement. **ABC** and

its co-plaintiffs moved for a preliminary injunction barring **Aereo** from transmitting television programs to its subscribers while the programs were still being broadcast. The two sets of plaintiffs agreed to proceed before the district court in tandem, and the motion for preliminary injunction was pursued in both actions simultaneously.

Following expedited briefing and discovery and an evidentiary hearing, the district court denied the Plaintiffs' motion. *Am. Broad. Cos., Inc. v. Aereo,* 874 F.Supp.2d 373, 405 (S.D.N.Y.2012). The district court began its analysis with the first factor relevant to granting a preliminary injunction: whether the Plaintiffs have demonstrated a likelihood of success on the merits. *Id.* at 381 (citing *Salinger v. Colting,* 607 F.3d 68, 80 (2d Cir.2010)). The district court found that this factor was determined by our prior decision in *Cablevision,* 536 F.3d 121, *Aereo,* 874 F.Supp.2d at 381–82. After a lengthy discussion of the facts and analysis of that decision, the district court concluded that **Aereo's** system was not materially distinguishable from Cablevision's Remote Storage Digital Video Recorder system, which we held did not infringe copyright holders' public performance right. *Id.* at 385–86. The district court found unpersuasive each of the Plaintiffs' arguments attempting to distinguish *Cablevision. See id.* at 386–96. Thus the court concluded that the Plaintiffs were unlikely to prevail on the merits. *Id.* at 396.

The district court then considered the other three preliminary injunction factors. First, the court concluded that the Plaintiffs had demonstrated a likelihood that they would suffer irreparable harm in the absence of a preliminary injunction. *Id.* at 396–402. But second, the district court found that an injunction would severely harm **Aereo,** likely ending its business. *Id.* at 402–03. As such, the balance of hardships did not tip "decidedly" in favor of the Plaintiffs. *Id.* at 403. Finally, the district court concluded that an injunction "would not disserve the public interest." *Id.* at 403–04. Because the Plaintiffs had not demonstrated a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

likelihood of success on the merits or a balance of hardship tipping decidedly in their favor, the district court denied their motion for a preliminary injunction. *Id.* at 405. The Plaintiffs promptly filed an interlocutory appeal, and this case was briefed on an expedited schedule.

## DISCUSSION

**\*4** [1][2] We review a district court's denial of a preliminary injunction for abuse of discretion. *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278 (2d Cir.2012). A district court abuses its discretion when its decision rests on legal error or a clearly erroneous factual finding, or when its decision, though not the product of legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions. *Id.*

[3][4][5][6] Our decisions identify four factors relevant to granting a preliminary injunction for copyright infringement. First, a district court may issue a preliminary injunction "only if the plaintiff has demonstrated either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir.2010) (internal citation and quotation marks omitted). Second, a plaintiff seeking a preliminary injunction must demonstrate " 'that he is likely to suffer irreparable harm in the absence of' " an injunction. *Id.* at 79–80 (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). A court may not presume irreparable injury in the copyright context; rather the plaintiff must demonstrate actual harm that cannot be remedied later by damages should the plaintiff prevail on the merits. *Id.* at 80 (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)). Third, a district court "must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Id.*

Fourth and finally, "the court must ensure that 'the public interest would not be disserved' by the issuance of a preliminary injunction." *Id.* (quoting *eBay*, 547 U.S. at 391, 126 S.Ct. 1837).

The outcome of this appeal turns on whether **Aereo's** service infringes the Plaintiffs' public performance right under the Copyright Act. The district court denied the injunction, concluding, as mentioned above, that (1) Plaintiffs were not likely to prevail on the merits given our prior decision in *Cablevision* and (2) the balance of hardships did not tip "decidedly" in the Plaintiffs' favor. *Aereo*, 874 F.Supp.2d at 405. Plaintiffs' likelihood of success on the merits depends on whether **Aereo's** service infringes Plaintiffs' copyrights. And, as we discuss further below, the balance of hardships is largely a function of whether the harm **Aereo** would suffer from the issuance of an injunction is legally cognizable, which in turn depends on whether **Aereo** is infringing the Plaintiffs' copyrights. *See ivi*, 691 F.3d at 287. As a result, a preliminary injunction can only be granted if Plaintiffs can show that **Aereo** infringes their public performance right. We now turn to that issue.

### I. The Public Performance Right

The 1976 Copyright Act (the "Act") gives copyright owners several exclusive rights and then carves out a number of exceptions. The fourth of these rights, at issue in this appeal, is the copyright owner's exclusive right "in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly." 17 U.S.C. § 106(4). The Act defines "perform" as "to recite, render, play, dance, or act [a work], either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible." 17 U.S.C. § 101. The Act also states:

**\*5** To perform or display a work "publicly" means—

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101. This appeal turns on the second clause of this definition (the "Transmit Clause" or "Clause").

The relevant history of the Transmit Clause begins with two decisions of the Supreme Court, *Fortnightly Corp. v. United Artists Television, Inc.,* 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), and *Teleprompter Corp. v. Columbia Broadcasting System, Inc.,* 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974). These decisions held that under the then-current 1909 Copyright Act, which lacked any analog to the Transmit Clause, a cable television system that received broadcast television signals via antenna and retransmitted these signals to its subscribers via coaxial cable did not "perform" the copyrighted works and therefore did not infringe copyright holders' public performance right. *Teleprompter,* 415 U.S. at 408, 94 S.Ct. 1129; *Fortnightly,* 392 U.S. at 399–401, 88 S.Ct. 2084. Even before these cases were decided, Congress had begun drafting a new copyright act to respond to changes in technology, most notably, cable television.

These efforts resulted in the 1976 Copyright Act. The Act responded to the emergence of cable television systems in two ways. First, it added the Transmit Clause. The legislative history shows that the Transmit Clause was intended in part to abrogate *Fortnightly* and *Teleprompter* and bring a cable television system's retransmission of broadcast television programming within the scope of the public performance right. H.R. Rep. 94–1476, 1976 U.S.C.C.A.N. 5659, at 63 (1976) ("House Report") ("[A] sing[er] is performing when he or she sings a song; a broadcasting network is performing when it transmits his or her performance (whether simultaneously or from records); a local broadcaster is performing when it transmits the network broadcast; a cable television system is performing when it retransmits the broadcast to its subscribers; and any individual is performing when he or she plays a phonorecord embodying the performance or communicates it by turning on a receiving set."). Second, Congress recognized that requiring cable television systems to obtain a negotiated license from individual copyright holders may deter further investment in cable systems, so it created a compulsory license for retransmissions by cable systems.[FN8] *See* 17 U.S.C. § 111(d).

Plaintiffs claim that **Aereo's** transmissions of broadcast television programs while the programs are airing on broadcast television fall within the plain language of the Transmit Clause and are analogous to the retransmissions of network programing made by cable systems, which the drafters of the 1976 Copyright Act viewed as public performances. They therefore believe that **Aereo** is publicly performing their copyrighted works without a license.[FN9] In evaluating their claims, we do not work from a blank slate. Rather, this Court in *Cablevision,* 536 F.3d 121, closely analyzed and construed the Transmit Clause in a similar factual context. Thus the question of whether **Aereo's** transmissions are public performances under the Transmit Clause must begin with a discussion of *Cablevision.*

**II. *Cablevision's* Interpretation of the Transmit Clause**

   *6 In *Cablevision,* 536 F.3d 121,* we considered

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

whether Cablevision's Remote Storage Digital Video Recorder ("RS–DVR") infringed copyright holders' reproduction and public performance rights. Cablevision, a cable television system, wished to offer its customers its newly designed RS–DVR system, which would give them the functionality of a stand-alone DVR via their cable set-top box. 536 F.3d at 124–25. Before the development of the RS–DVR system, Cablevision would receive programming from various content providers, such as ESPN or a local affiliate of a national broadcast network, process it, and transmit it to its subscribers through coaxial cable in real time. *Id.* With the RS–DVR system, Cablevision split this stream into two. One stream went out to customers live as before. The second stream was routed to a server, which determined whether any Cablevision customers had requested to record a program in the live stream with their RS–DVR. If so, the data for that program was buffered, and a copy of that program was created for that Cablevision customer on a portion of a Cablevision remote hard drive assigned solely to that customer. Thus if 10,000 Cablevision customers wished to record the Super Bowl, Cablevision would create 10,000 copies of the broadcast, one for each customer. A customer who requested that the program be recorded could later play back the program using his cable remote, and Cablevision would transmit the customer's saved copy of that program to the customer. Only the customer who requested that the RS–DVR record the program could access the copy created for him; no other Cablevision customer could view this particular copy.[FN10] *See* 536 F.3d at 124–25.

Copyright holders in movies and television programs sued, arguing that Cablevision's RS–DVR system infringed their reproduction right by creating unauthorized copies of their programs and their public performance right by transmitting these copies to Cablevision customers who previously requested to record the programs using their RS–DVRs. The district court granted the plaintiffs' motion for summary judgment and issued an injunction against Cablevision. *See Twentieth Century Fox Film Corp. v. Ca-*

*blevision Sys. Corp.,* 478 F.Supp.2d 607 (S.D.N.Y.2007). The court found that the RS–DVR infringed the plaintiffs' reproduction right in two ways: (1) by creating temporary buffer copies of programs in order to create a permanent copy for each of its customers on its hard drives and (2) by creating a permanent copy of the program for each customer. *Id.* at 617–22. The court also found that Cablevision's transmission of a recorded program to the customer who had requested the program was a public performance under the Transmit Clause and therefore was infringing on that basis as well. *Id.* at 622–23.

This Court reversed on all three issues. *Cablevision,* 536 F.3d at 140. Because the Plaintiffs in the present cases did not pursue their claim that **Aereo** infringes their reproduction right in the injunction application before the district court, we need not discuss the two reproduction right holdings of *Cablevision* except where relevant to the public performance issue. Instead, we will focus on *Cablevision's* interpretation of the public performance right and the Transmit Clause, which the court below found determinative of the injunction application.

*7 The *Cablevision* court began by discussing the language and legislative history of the Transmit Clause. 536 F.3d at 134–35. Based on language in the Clause specifying that a transmission may be "to the public ... whether the members of the public capable of receiving the performance ... receive it in the same place or in separate places and at the same time or at different times," 17 U.S.C. § 101, this Court concluded that "it is of no moment that the potential recipients of the transmission are in different places, or that they may receive the transmission at different times." 536 F.3d at 134. As the language makes plain, in determining whether a transmission is to the public it is important "to discern who is 'capable of receiving' the performance being transmitted." *Id.* (quoting 17 U.S.C. § 101). *Cablevision* then decided that "capable of receiving the performance" refers not to the performance of the underlying work being trans-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

mitted but rather to the transmission itself, since the "transmission of a performance is itself a performance." *Id.* The Court therefore concluded that "the transmit clause directs us to examine who precisely is 'capable of receiving' *a particular transmission of a performance.*" 536 F.3d at 135 (emphasis added).

In adopting this interpretation of the Transmit Clause, *Cablevision* rejected two alternative readings. First, it considered the interpretation accepted by the district court in that case. According to that view, a transmission is "to the public," not based on the "potential audience of a particular transmission" but rather based on the "potential audience of the underlying work (i.e., 'the program') whose content is being transmitted." *Id.* at 135. The *Cablevision* court rejected this interpretation of the Transmit Clause. Given that "the *potential* audience for every copyrighted audiovisual work is the general public," this interpretation would render the "to the public" language of the Clause superfluous and contradict the Clause's obvious contemplation of non-public transmissions. *Id.* at 135–36.

Second, the *Cablevision* court considered "a slight variation of this interpretation" offered by the plaintiffs. *Id.* Plaintiffs argued that "both in its real-time cablecast and via the RS-DVR playback, Cablevision is in fact transmitting the 'same performance' of a given work: the performance that occurs when the programming service supplying Cablevision's content transmits that content to Cablevision and the service's other licensees." *Id.* In this view, the Transmit Clause requires courts to consider "not only the potential audience [of a particular] transmission, but also the potential audience of any transmission of the same underlying 'original' performance." *Id.* This interpretation of the Transmit Clause would aggregate all transmissions of the same underlying performance, and if these transmissions enabled the performance to reach the public, each transmission, regardless of its potential audience, should be deemed a public performance. *Cablevision* rejected this view because it

would make a seemingly private transmission public by virtue of actions taken by third parties. *Id.* For example, if a person records a program and then transmits that recording to a television in another room, he would be publicly performing the work because some other party, namely the original broadcaster, had once transmitted the same performance to the public. *Id.* The *Cablevision* court concluded that Congress could not have intended "such odd results"; instead, the Transmit Clause directed courts to consider only the potential audience of the "performance created by the act of transmission." *Id.* The *Cablevision* court found this interpretation consistent with prior opinions of this Court construing the Clause. *Id.; see Nat'l Football League v. PrimeTime 24 Joint Venture,* 211 F.3d 10 (2d Cir.2000).

*8 Finally, the *Cablevision* court considered *Columbia Pictures Industries, Inc. v. Redd Horne, Inc.,* 749 F.2d 154 (3d Cir.1984). In *Redd Horne,* the defendant operated a video rental store that utilized private booths containing individual televisions. Customers would select a movie from the store's catalog and enter a booth. A store employee would then load a copy of the movie into a VCR hard-wired to the TV in the customer's booth and transmit the content of the tape to the television in the booth. *See* 749 F.2d at 156–57. The Third Circuit, following an interpretation of the Transmit Clause first advanced by Professor Nimmer, held that this was a public performance because the same copy of the work, namely the individual video cassette, was repeatedly "performed" to different members of the public at different times. *Id.* at 159 (quoting 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.14[C][3], at 8.192.8(1) (Matthew Bender rev. ed.)). The *Cablevision* court endorsed this conclusion [FN11]; whether a transmission originates from a distinct or shared copy is relevant to the Transmit Clause analysis because "the use of a unique copy may limit the potential audience of a transmission and is therefore relevant to whether that transmission is made 'to the public.'" 536 F.3d at 138.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

Applying this interpretation of the Transmit Clause to the facts of the RS–DVR, the *Cablevision* court concluded that Cablevision's transmission of a recorded program to an individual subscriber was not a public performance. *Id.* Each transmission of a program could be received by only one Cablevision customer, namely the customer who requested that the copy be created. No other Cablevision customer could receive a transmission generated from that particular copy. The "universe of people capable of receiving an RS–DVR transmission is the single subscriber whose self-made copy is used to create that transmission." *Id.* at 137. The transmission was therefore not made "to the public" within the meaning of the Transmit Clause and did not infringe the plaintiffs' public performance right. *Id.* at 138.

[7][8][9][10] We discuss *Cablevision's* interpretation of the Transmit Clause in such detail because that decision establishes four guideposts that determine the outcome of this appeal. First and most important, the Transmit Clause directs courts to consider the potential audience of the individual transmission. *See id.* at 135. If that transmission is "capable of being received by the public" the transmission is a public performance; if the potential audience of the transmission is only one subscriber, the transmission is not a public performance, except as discussed below. Second and following from the first, private transmissions—that is those not capable of being received by the public—should not be aggregated. It is therefore irrelevant to the Transmit Clause analysis whether the public is capable of receiving the same underlying work or original performance of the work by means of many transmissions. *See id.* at 135–37. Third, there is an exception to this no-aggregation rule when private transmissions are generated from the same copy of the work. In such cases, these private transmissions *should* be aggregated, and if these aggregated transmissions from a single copy enable the public to view that copy, the transmissions are public performances. *See id.* at 137–38. Fourth and finally,

"any factor that limits the *potential* audience of a transmission is relevant" to the Transmit Clause analysis. *Id.* at 137.

**III. *Cablevision's* Application to Aereo's System**

*9 [11] As discussed above, *Cablevision's* holding that Cablevision's transmissions of programs recorded with its RS–DVR system were not public performances rested on two essential facts. First, the RS–DVR system created unique copies of every program a Cablevision customer wished to record. 536 F.3d at 137. Second, the RS–DVR's transmission of the recorded program to a particular customer was generated from that unique copy; no other customer could view a transmission created by that copy. *Id.* Given these two features, the potential audience of every RS–DVR transmission was only a single Cablevision subscriber, namely the subscriber who created the copy.[FN12] And because the potential audience of the transmission was only one Cablevision subscriber, the transmission was not made "to the public."

The same two features are present in **Aereo's** system. When an **Aereo** customer elects to watch or record a program using either the "Watch" or "Record" features, **Aereo's** system creates a unique copy of that program on a portion of a hard drive assigned only to that **Aereo** user. And when an **Aereo** user chooses to watch the recorded program, whether (nearly) live or days after the program has aired, the transmission sent by **Aereo** and received by that user is generated from that unique copy. No other **Aereo** user can ever receive a transmission from that copy. Thus, just as in *Cablevision,* the potential audience of each **Aereo** transmission is the single user who requested that a program be recorded.

Plaintiffs offer various arguments attempting to distinguish *Cablevision* from the **Aereo** system. First, they argue that *Cablevision* is distinguishable because Cablevision had a license to transmit programming in the first instance, namely when it first aired the programs; thus the question was whether Cablevision

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

needed an additional license to retransmit the programs recorded by its RS–DVR system. **Aereo**, by contrast, has no license. This argument fails, as the question is whether **Aereo's** transmissions are public performances of the Plaintiffs' copyrighted works. If so, **Aereo** needs a license to make such public performances; if they are not public performances, it needs no such license. Thus whether **Aereo** has a license is not relevant to whether its transmissions are public and therefore must be licensed. This argument by the Plaintiffs also finds no support in the _Cablevision_ opinion. _Cablevision_ did not hold that Cablevision's RS–DVR transmissions were _licensed_ public performances; rather it held they were not public performances. It does not appear that the _Cablevision_ court based its decision that Cablevision's RS–DVR transmissions were non-public transmissions on Cablevision's license to broadcast the programs live. Indeed, such a conclusion would have been erroneous, because having a license to publicly perform a work in a particular instance, such as to broadcast a television program live, does not give the licensee the right to perform the work again. That Cablevision had a license to transmit copyrighted works when they first aired thus should have no bearing on whether it needed a license to retransmit these programs as part of its RS–DVR system. Indeed, if this interpretation of _Cablevision_ were correct, Cablevision would not need a license to retransmit programs using video-on-demand and there would have been no reason for Cablevision to construct an RS–DVR system employing individual copies.

\*10 Second, Plaintiffs argue that discrete transmissions should be aggregated to determine whether they are public performances. This argument has two aspects. Plaintiffs first argue that because **Aereo's** discrete transmissions enable members of the public to receive "the same performance (i.e., **Aereo's** retransmission of a program)" they are transmissions made "to the public." Br. of Pls.-Appellants Am. Broad. Cos., et al. at 19. But this is nothing more than the _Cablevision_ plaintiffs' interpretation of the

Transmit Clause, as it equates **Aereo's** transmissions with the original broadcast made by the over-the-air network rather than treating **Aereo's** transmissions as independent performances. _See_ 536 F.3d at 136. This approach was explicitly rejected by the _Cablevision_ court. _See id._

Plaintiffs also argue that the Copyright Act requires that all of **Aereo's** discrete transmissions "be aggregated and viewed collectively as constituting a public performance." Br. of Pls.-Appellants WNET, Thirteen, et al. at 34. This is not contrary to _Cablevision,_ they argue, because _Cablevision_ only held that transmissions of the same performance or work made by different entities should not be aggregated. On their view, discrete transmissions of the same performance or work made by the same entity should be aggregated to determine whether a public performance has occurred. This argument is also foreclosed by _Cablevision._ First, _Cablevision_ made clear that the relevant inquiry under the Transmit Clause is the potential audience of a particular transmission, not the potential audience for the underlying work or the particular performance of that work being transmitted. _See_ 536 F.3d at 135. But the only reason to aggregate **Aereo's** discrete transmissions along the lines suggested by Plaintiffs is that they are discrete transmissions _of the same performance or work._ Thus Plaintiffs are asking us to adopt a reading of the Transmit Clause that is contrary to that adopted by _Cablevision_ because it focuses on the potential audience of the performance or work being transmitted, not the potential audience of the particular transmission. Second, Plaintiffs provide no reason why **Aereo's** multiple, audience-of-one transmissions of unique copies of the same underlying program should be aggregated but not Cablevision's multiple, audience-of-one transmissions of unique copies of the same underlying program. Both **Aereo** and Cablevision are making multiple private transmissions of the same work, so adopting the Plaintiffs' approach and aggregating all transmissions made by the same entity would require us to find that both are public performances. While it does not appear that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

*Cablevision* explicitly rejected this view, interpreting the Transmit Clause as the Plaintiffs urge so as to aggregate **Aereo's** transmissions would, if fairly applied to the facts of *Cablevision,* require us to aggregate Cablevision's distinct RS–DVR transmissions. For these reasons, we cannot accept Plaintiffs' arguments that **Aereo's** transmissions to a single **Aereo** user, generated from a unique copy created at the user's request and only accessible to that user, should be aggregated for the purposes of determining whether they are public performances.

**\*11** Plaintiffs' third argument for distinguishing *Cablevision* is that *Cablevision* was decided based on an analogy to a typical VCR, with the RS–DVR simply an upstream version, but **Aereo's** system is more analogous to a cable television provider. While it is true that the *Cablevision* court did compare the RS–DVR system to the stand-alone VCR, these comparisons occur in the section of that opinion discussing Cablevision's potential liability for infringing the plaintiffs' reproduction right. *See* 536 F.3d at 131. No part of *Cablevision's* analysis of the public performance right appears to have been influenced by any analogy to the stand-alone VCR. Moreover, this Court has followed *Cablevision's* interpretation of the Transmit Clause in the context of internet music downloads. *See United States v. Am. Soc'y of Composers, Authors & Publishers,* 627 F.3d 64, 73–76 (2d Cir.2010) (" *ASCAP* "); *see also United States v. Am. Soc'y of Composers, Authors & Publishers (Application of Cellco P'Ship),* 663 F.Supp.2d 363, 371–74 (S.D.N.Y.2009) (following *Cablevision's* analysis of the Transmit Clause in the context of cellphone ringtones). Thus we see no support in *Cablevision* or in this Court's subsequent decisions for the Plaintiffs' argument that *Cablevision's* interpretation of the Transmit Clause is confined to technologies similar to the VCR.[FN13]

Plaintiffs' fourth argument for distinguishing *Cablevision* is that Cablevision's RS–DVR copies "broke the continuous chain of retransmission to the public" in a way that **Aereo's** copies do not. Br. of Pls.-Appellants Am. Broad. Cos., et al. at 39. Specifically, they argue that **Aereo's** copies are merely a device by which **Aereo** enables its users to watch nearly live TV, while Cablevision's copies, by contrast, could only serve as the source for a transmission of a program after the original transmission, that is the live broadcast of the program, had finished. As a result, **Aereo's** copies lack the legal significance of Cablevision's RS–DVR copies and are no different from the temporary buffer copies created by internet streaming, a process that this Court has assumed produces public performances. *See, e.g., ivi,* 691 F.3d at 278; *ASCAP,* 627 F.3d at 74.

This argument fails for two reasons. First, **Aereo's** copies do have the legal significance ascribed to the RS–DVR copies in *Cablevision* because the user exercises the same control over their playback. The **Aereo** user watching a copy of a recorded program that he requested be created, whether using the "Watch" feature or the "Record" feature, chooses when and how that copy will be played back. The user may begin watching it nearly live, but then pause or rewind it, resulting in playback that is no longer concurrent with the program's over-the-air broadcast. Or the user may elect not to begin watching the program at all until long after it began airing. This volitional control over how the copy is played makes **Aereo's** copies unlike the temporary buffer copies generated incident to internet streaming. A person watching an internet stream chooses the program he wishes to watch and a temporary buffer copy of that program is then created, which serves as the basis of the images seen by the person watching the stream. But that person cannot exercise any control over the manner in which that copy is played—it cannot be paused, rewound, or rewatched later. As a result, the imposition of a temporary buffer copy between the outgoing stream and the image seen by the person watching it is of no significance, because the person only exercises control *before* the copy is created in choosing to watch the program in the first place. By

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

contrast, the **Aereo** user selects what program he wishes a copy to be made of and then controls when and how that copy is played.[FN14] This second layer of control, exercised *after* the copy has been created, means that **Aereo's** transmissions from the recorded copies cannot be regarded as simply one link in a chain of transmission, giving **Aereo's** copies the same legal significance as the RS–DVR copies in *Cablevision*.[FN15]

**\*12** Second, Plaintiffs' argument fails to account for **Aereo's** user-specific antennas. Each user-associated copy of a program created by **Aereo's** system is generated from a unique antenna assigned only to the user who requested that the copy be made. The feed from that antenna is not used to generate multiple copies of each program for different **Aereo** users but rather only one copy: the copy that can be watched by the user to whom that antenna is assigned. Thus even if we were to disregard **Aereo's** copies, it would still be true that the potential audience of each of **Aereo's** transmissions was the single user to whom each antenna was assigned. It is beyond dispute that the transmission of a broadcast TV program received by an individual's rooftop antenna to the TV in his living room is private, because only that individual can receive the transmission from that antenna, ensuring that the potential audience of that transmission is only one person. Plaintiffs have presented no reason why the result should be any different when that rooftop antenna is rented from **Aereo** and its signals transmitted over the internet: it remains the case that only one person can receive that antenna's transmissions.[FN16] Thus even without the creation of user-associated copies, which under *Cablevision* means that **Aereo's** transmissions are not public, there is significant reason to believe that **Aereo's** system would not be creating public performances, since the entire chain of transmission from the time a signal is first received by **Aereo** to the time it generates an image the **Aereo** user sees has a potential audience of only one **Aereo** customer.[FN17]

Finally, Plaintiffs argue that holding that **Aereo's** transmissions are not public performances exalts form over substance, because the **Aereo** system is functionally equivalent to a cable television provider. Plaintiffs also make much of the undisputed fact that **Aereo's** system was designed around the *Cablevision* holding, because it creates essentially identical copies of the same program for every user who wishes to watch it in order to avoid copyright liability, instead of using a perhaps more efficient design employing shared copies. However, that **Aereo** was able to design a system based on *Cablevision's* holding to provide its users with nearly live television over the internet is an argument that *Cablevision* was wrongly decided; it does not provide a basis for distinguishing *Cablevision*. Moreover, **Aereo** is not the first to design systems to avoid copyright liability. The same is likely true of Cablevision, which created separate user-associated copies of each recorded program for its RS–DVR system instead of using more efficient shared copies because transmissions generated from the latter would likely be found to infringe copyright holders' public performance right under the rationale of *Redd Horne,* 749 F.2d 154. Nor is **Aereo** alone in designing its system around *Cablevision,* as many cloud computing services, such as internet music lockers, discussed further below, appear to have done the same. *See* Br. of the Computer & Commc'ns Indus. Ass'n & the Internet Ass'n as Amicus Curiae at 5–8. Perhaps the application of the Transmit Clause should focus less on the technical details of a particular system and more on its functionality, but this Court's decisions in *Cablevision* and *NFL,* 211 F.3d 10, held that technical architecture matters.

## IV. The Legislative Intent Behind the 1976 Copyright Act

**\*13** Plaintiffs also contend that the legislative history of the 1976 Copyright Act shows that **Aereo's** transmissions should be deemed public performances of the Plaintiffs' copyrighted works. They argue that cable retransmissions are public performances under the Transmit Clause and **Aereo** is functionally equiv-

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

alent to a cable system. However, this reading of the legislative history is simply incompatible with the conclusions of the *Cablevision* court.

This view of the legislative history also ignores a contrary strand of the history behind the 1976 Copyright Act. Congress recognized when it drafted the 1976 Act that its broad definition of "performance" could create unintended results. The House Report states that under this definition, "any individual is performing whenever he or she plays a phonorecord embodying the performance or communicates the performance by turning on a receiving set." House Report at 63. But because Congress did not wish to require everyone to obtain a license from copyright holders before they could "perform" the copyrighted works played by their television, Congress was careful to note that a performance "would not be actionable as an infringement unless it were done 'publicly,' as defined in section 101." *id.* "Private" performances are exempted from copyright liability. *Id.* This limitation also applies to performances created by a "transmission," since, as the *Cablevision* court noted, if Congress intended all transmissions to be public performances, the Transmit Clause would not have contained the phrase "to the public." FN18 *Cablevision,* 536 F.3d at 135–36.

In the technological environment of 1976, distinguishing between public and private transmissions was simpler than today. New devices such as RS–DVRs and Slingboxes complicate our analysis, as the transmissions generated by these devices can be analogized to the paradigmatic example of a "private" transmission: that from a personal roof-top antenna to a television set in a living room. As much as **Aereo's** service may resemble a cable system, it also generates transmissions that closely resemble the private transmissions from these devices. Thus unanticipated technological developments have created tension between Congress's view that retransmissions of network programs by cable television systems should be deemed public performances and its intent that

some transmissions be classified as private. Although **Aereo** may in some respects resemble a cable television system, we cannot disregard the contrary concerns expressed by Congress in drafting the 1976 Copyright Act. And we certainly cannot disregard the express language Congress selected in doing so. That language and its legislative history, as interpreted by this Court in *Cablevision,* compels the conclusion that **Aereo's** transmissions are not public performances.

**V. Stare Decisis**

[12][13] Though presented as efforts to distinguish *Cablevision,* many of Plaintiffs' arguments really urge us to overrule *Cablevision.* One panel of this Court, however, "cannot overrule a prior decision of another panel." *Union of Needletrades, Indus. & Textile Employees, AFL–CIO, CLC v. U.S. I.N.S.,* 336 F.3d 200, 210 (2d Cir.2003). We are "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." *United States v. Wilkerson,* 361 F.3d 717, 732 (2d Cir.2004). There is an exception when an intervening Supreme Court decision "casts doubt on our controlling precedent," *Union of Needletrades,* 336 F.3d at 210, but we are unaware of any such decisions that implicate *Cablevision.* Plaintiffs have provided us with no adequate basis to distinguish *Cablevision* from the **Aereo** system.FN19 We therefore see no error in the district court's conclusion that Plaintiffs are unlikely to prevail on the merits.

**VI. The Other Preliminary Injunction Factors**

*14 [14] We now turn to the remaining preliminary injunction factors. *See Salinger,* 607 F.3d at 79–80. Because the Plaintiffs are not likely to prevail on the merits, we consider whether the Plaintiffs have demonstrated "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor." *Id.* at 79. Given our conclusion that **Aereo's** service does not infringe Plaintiffs' public performance right when it transmits a program still airing on broadcast television, we do not believe the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

Plaintiffs have demonstrated "sufficiently serious questions going to the merits to make them a fair ground for litigation." _Id._

[15] Moreover, we find no abuse of discretion in the district court's determination that the balance of hardships does not tip decidedly in the Plaintiffs' favor. The district court reached this decision based on its conclusions (1) that the Plaintiffs were likely to suffer irreparable harm in the absence of an injunction and (2) that **Aereo** would suffer significant hardship if an injunction should issue, since this would likely be the end of its business. _See Am. Broad. Cos., Inc. v. Aereo,_ 874 F.Supp.2d at 397–403. The parties do not appear to contest the district court's factual determinations supporting these conclusions and we see no clear error in them. Plaintiffs do argue that any harm suffered by **Aereo** should be disregarded in the balance of hardships analysis because **Aereo's** business is illegal and "[i]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product." _ivi,_ 691 F.3d at 287. But this argument hinges on the conclusion that **Aereo's** business infringes the Plaintiffs' copyrights. Because we conclude that it does not—at least on the limited question before us of whether **Aereo's** transmissions of unique copies of recorded programs to the **Aereo** users who directed that they be created are public performances—the harms **Aereo** would suffer from an injunction are legally cognizable and significant. There is thus no reason to disturb the district court's conclusion that the balance of hardships does not tip "decidedly" in the Plaintiffs' favor.

## CONCLUSION

We conclude that **Aereo's** transmissions of unique copies of broadcast television programs created at its users' requests and transmitted while the programs are still airing on broadcast television are not "public performances" of the Plaintiffs' copyrighted works under _Cablevision._ As such, Plaintiffs have not demonstrated that they are likely to prevail on the merits on this claim in their copyright in-

fringement action. Nor have they demonstrated serious questions as to the merits and a balance of hardships that tips decidedly in their favor. We therefore affirm the order of the district court denying the Plaintiffs' motion.

CHIN, Circuit Judge:
  **\*15** I respectfully dissent.

Defendant-appellee **Aereo**, Inc. ("**Aereo**") captures over-the-air broadcasts of television programs and retransmits them to subscribers by streaming them over the Internet. For a monthly fee, **Aereo's** customers may "Watch" the programming "live" (that is, with a seven-second delay) on their computers and other electronic devices, or they may "Record" the programs for later viewing. **Aereo** retransmits the programming without the authorization of the copyright holders and without paying a fee.

The Copyright Act confers upon owners of copyrights in audiovisual works the exclusive right "to perform the copyrighted work publicly." 17 U.S.C. § 106(4). This exclusive right includes the right "to transmit or otherwise communicate a performance ... to the public, by means of any device or process." _Id._ § 101. In my view, by transmitting (or retransmitting) copyrighted programming to the public without authorization, **Aereo** is engaging in copyright infringement in clear violation of the Copyright Act.

**Aereo** argues that it is not violating the law because its transmissions are not "public" performances; instead, the argument goes, its transmissions are "private" performances, and a "private performance is not copyright infringement." It contends that it is merely providing a "technology platform that enables consumers to use remotely-located equipment ... to create, access and view their own unique recorded copies of free over-the-air broadcast television programming."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

Aereo's "technology platform" is, however, a sham. The system employs thousands of individual dime-sized antennas, but there is no technologically sound reason to use a multitude of tiny individual antennas rather than one central antenna; indeed, the system is a Rube Goldberg-like contrivance, over-engineered in an attempt to avoid the reach of the Copyright Act and to take advantage of a perceived loophole in the law. After capturing the broadcast signal, **Aereo** makes a copy of the selected program for each viewer, whether the user chooses to "Watch" now or "Record" for later. Under **Aereo's** theory, by using these individual antennas and copies, it may retransmit, for example, the Super Bowl "live" to 50,000 subscribers and yet, because each subscriber has an individual antenna and a "unique recorded cop[y]" of the broadcast, these are "private" performances. Of course, the argument makes no sense. These are very much *public* performances.

**Aereo** purports to draw its infringement-avoidance scheme from this Court's decision in *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir.2008), cert. denied, —— U.S. ——, 129 S.Ct. 2890, 174 L.Ed.2d 595 (2009) (" *Cablevision* "). But, as discussed below, there are critical differences between Cablevision and this case. Most significantly, Cablevision involved a cable company that paid statutory licensing and retransmission consent fees for the content it retransmitted, while **Aereo** pays no such fees. Moreover, the subscribers in *Cablevision* already had the ability to view television programs in real-time through their *authorized* cable subscriptions, and the remote digital video recording service at issue there was a supplemental service that allowed subscribers to store that authorized content for later viewing. In contrast, no part of **Aereo's** system is authorized. Instead, its storage and time-shifting functions are an integral part of an unlicensed retransmission service that captures broadcast television programs and streams them over the Internet.

**\*16 Aereo** is doing precisely what cable compa-

nies, satellite television companies, and authorized Internet streaming companies do—they capture over-the-air broadcasts and retransmit them to customers—except that those entities are doing it legally, pursuant to statutory or negotiated licenses, for a fee. By accepting **Aereo's** argument that it may do so without authorization and without paying a fee, the majority elevates form over substance. Its decision, in my view, conflicts with the text of the Copyright Act, its legislative history, and our case law.

For these and other reasons discussed more fully below, I would reverse the district court's order denying plaintiffs-appellants' motion for a preliminary injunction.

### *DISCUSSION*

When interpreting a statute, we must begin with the plain language, giving any undefined terms their ordinary meaning. *See Roberts v. Sea–Land Servs., Inc.*, —— U.S. ——, 132 S.Ct. 1350, 1356, 182 L.Ed.2d 341 (2012); *United States v. Desposito*, 704 F.3d 221, 226 (2d Cir.2013). We must "attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Pettus v. Morgenthau*, 554 F.3d 293, 297 (2d Cir.2009). Where Congress has expressed its intent in "reasonably plain terms, that language must ordinarily be regarded as conclusive." *Negonsott v. Samuels*, 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993) (internal quotation marks and citation omitted); *see Devine v. United States*, 202 F.3d 547, 551 (2d Cir.2000). If we conclude that the text is ambiguous, however, we will look to legislative history and other tools of statutory interpretation to "dispel this ambiguity." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 697 F.3d 154, 159 (2d Cir.2012).

I begin, then, by considering the text of the relevant sections of the Copyright Act. To the extent there is any arguable ambiguity in the statutory language, I next turn to its legislative history. Finally, I conclude

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

with a discussion of *Cablevision* as well as other relevant precedents.

### A. *The Statutory Text*

Section 106 of the Copyright Act sets out six exclusive rights held by a copyright owner; these include the right "to perform the copyrighted work publicly." 17 U.S.C. § 106(4).

As defined in section 101, "[t]o perform ... a work 'publicly' means," among other things:

to transmit or otherwise communicate a performance or display of the work ... to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Id.* § 101. "To 'transmit' a performance" is "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." *Id.* Hence, the use of a device or process to transmit or communicate copyrighted images or sounds to the public constitutes a public performance, whether members of the public receive the performance in the same place or in different places, whether at the same time or at different times.

*17 It is apparent that **Aereo's** system fits squarely within the plain meaning of the statute. *See, e.g., Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC,* No. CV 12–6921, ——F.Supp.2d ——, —— – ——, 2012 WL 6784498, at *1–6 (C.D.Cal. Dec. 27, 2012)* (holding that a service "technologically analogous" to **Aereo's** was engaged in public performances). The statute is broadly worded, as it refers to "*any* device or process." 17 U.S.C. § 101 (emphasis added); *see also id.* (defining "device" and "process" as "one now known or later developed"). **Aereo's** system of thousands of antennas

and other equipment clearly is a "device or process." Using that "device or process," **Aereo** receives copyrighted images and sounds and "transmit[s] or otherwise communicate[s]" them to its subscribers "beyond the place from which they are sent," *id.,* that is, " 'beyond the place' of origination," *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.,* 866 F.2d 278, 282 (9th Cir.1989). The "performance or display of the work" is then received by paying subscribers "in separate places" and "at different times." 17 U.S.C. § 101.

Even assuming **Aereo's** system limits the potential audience for each transmission, and even assuming each of its subscribers receives a unique recorded copy, **Aereo** still is transmitting the programming "to the public." *Id.* Giving the undefined term "the public" its ordinary meaning, *see Kouichi Taniguchi v. Kan Pacific Saipan, Ltd.,* —— U.S. ——, 132 S.Ct. 1997, 2002, 182 L.Ed.2d 903 (2012), a transmission to anyone other than oneself or an intimate relation is a communication to a "member[ ] of the public," because it is not in any sense "private." *See* Webster's II: New Riverside University Dictionary 951 (1994) (defining "public" as "[t]he community or the people as a group"); *see also id.* at 936 (defining "private" as, *inter alia,* "[n]ot public: intimate"). *Cf. Cablevision,* 536 F.3d at 138 ("[T]he identity of the transmitter ... [is] germane in determining whether that transmission is made 'to the public.' "); *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 299–300 (3d Cir.1991) (construing "to the public" in section 106(3) and concluding that "even one person can be the public").

What **Aereo** is doing is not in any sense "private," as the Super Bowl example discussed above illustrates. This understanding accords with the statute's instruction that a transmission can be "to the public" even if the "members of the public capable of receiving the performance. receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101. Because **Aereo** is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

transmitting television signals to paying strangers, all of its transmissions are "to the public," even if intervening "device[s] or process[es]" limit the potential audience of each separate transmission to a single "member[ ] of the public." *Id.*

By any reasonable construction of the statute, **Aereo** is engaging in public performances and, therefore, it is engaging in copyright infringement. *See id.* §§ 106(4), 501(a).

**B.** *The Legislative History*

*18 Even if the language of the transmit clause were ambiguous as applied to **Aereo's** system, *see Cablevision,* 536 F.3d at 136 ("[T]he transmit clause is not a model of clarity ...."), the legislative history reinforces the conclusion that **Aereo** is engaging in public performances. The legislative history makes clear that Congress intended to reach new technologies, like this one, that are designed solely to exploit someone else's copyrighted work.

Just before the passage of the 1976 Copyright Act, the Supreme Court held in *Fortnightly Corp. v. United Artists Television, Inc.,* 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), and *Teleprompter Corp. v. Columbia Broadcasting System, Inc.,* 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974), that community antenna television ("CATV") systems—which captured live television broadcasts with antennas set on hills and retransmitted the signals to viewers unable to receive the original signals—did not infringe the public performance right because they were not "performing" the copyrighted work. *See Teleprompter,* 415 U.S. at 408–09, 94 S.Ct. 1129; *Fortnightly,* 392 U.S. at 399–400, 88 S.Ct. 2084. In reaching this conclusion, the Court reasoned that:

If an individual erected an antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be 'performing' the programs he received on his television set.... The

only difference in the case of CATV is that the antenna system is erected and owned not by its users but by an entrepreneur.

*Fortnightly,* 392 U.S. at 400, 88 S.Ct. 2084. This rationale is nearly identical to the justification advanced by **Aereo:** each subscriber could legally use his own antenna, digital video recorder ("DVR"), and Slingbox [FN1] to stream live television to his computer or other device, and so it makes no legal difference that the system is actually "erected and owned not by its users but by an entrepreneur." *Id.*[FN2]

But Congress expressly rejected the outcome reached by the Supreme Court in *Fortnightly* and *Teleprompter. See Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 709, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984) ("Congress concluded that cable operators should be required to pay royalties to the owners of copyrighted programs retransmitted by their systems on pain of liability for copyright infringement."); *see also WPIX, Inc. v. ivi, Inc.,* 691 F.3d 275, 281 (2d Cir.2012); *Fox Television Stations,* —— F.Supp.2d at ——, 2012 WL 6784498, at *5. In the 1976 Copyright Act, Congress altered the definitions of "perform" and "publicly" specifically to render the CATV systems' unlicensed retransmissions illegal. *See Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 469 n. 17, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); H.R.Rep. No. 94–1476, at 63, reprinted in 1976 U.S.C.C.A.N. 5659, 5676–77 ("[A] cable television system is performing when it retransmits the broadcast to its subscribers ...."); *id.* at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678 ("Clause (2) of the definition of 'publicly' in section 101 makes clear that the concept[ ] of public performance ... include[s] ... acts that transmit or otherwise communicate a performance or display of the work to the public....").

*19 Congress was not only concerned, however, with the then newly-emerging CATV systems. Recognizing that the *Fortnightly* and *Teleprompter* decisions arose in part because of the "drastic technolog-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

ical change" after the 1909 Act, *Fortnightly,* 392 U.S. at 396, 88 S.Ct. 2084, Congress broadly defined the term "transmit" to ensure that the 1976 Act anticipated future technological developments:

> The definition of 'transmit' ... is broad enough to include all conceivable forms and combinations of wires and wireless communications media, including but by no means limited to radio and television broadcasting as we know them. Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a 'transmission,' and if the transmission reaches the public in [any] form, the case comes within the scope of <u>clauses (4)</u> or <u>(5) of section 106.</u>

H.R.Rep. No. 94–1476, at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678. Further anticipating that there would be changes in technology that it could not then foresee, Congress added that a public performance could be received in different places and at different times. This change was meant to clarify that:

> a performance made available by transmission to the public at large is 'public' even though the recipients are not gathered in a single place, and even if there is no proof that any of the potential recipients was operating his receiving apparatus at the time of the transmission. The same principles apply whenever *the potential recipients of the transmission represent a limited segment of the public,* such as the occupants of hotel rooms or the *subscribers of a cable television service.*

*Id.* at 64–65, *reprinted at* 1976 U.S.C.C.A.N. at 5678 (emphasis added).

While Congress in 1976 might not have envisioned the precise technological innovations employed by **Aereo** today, this legislative history surely suggests that Congress could not have intended for such a system to fall outside the definition of a public performance. To the contrary, Congress made clear its intent to include within the transmit clause "all conceivable forms and combinations of wires and wireless communications media," and if, as here, "the transmission reaches the public in [any] form, the case comes within the scope of <u>clauses (4)</u> or <u>(5) of section 106.</u>" H.R.Rep. No. 94–1476, at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678. **Aereo's** streaming of television programming over the Internet is a public performance as Congress intended that concept to be defined.

*C. Cablevision*

**Aereo** seeks to avoid the plain language of the Copyright Act and the clear import of its legislative history by relying on this Court's decision in *Cablevision.* That reliance, in my view, is misplaced.

Cablevision was a cable operator with a license to retransmit broadcast and cable programming to its paying subscribers. *See <u>Cablevision,</u> 536 F.3d at <u>123–25; Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.,</u> 478 F.Supp.2d 607, 610 <u>(S.D.N.Y.2007),</u> rev'd sub nom., <u>Cartoon Network LP v. CSC Holdings, Inc. (Cablevision),</u> 536 F.3d 121 (2d Cir.2008).* The content providers sought to enjoin Cablevision from introducing a new Remote Storage DVR system (the "RS–DVR") that would "allow[ ] Cablevision customers who do not have a stand-alone DVR to record cable programming" and "then receive playback of those programs through their home television sets." *<u>Cablevision,</u> 536 F.3d at 124.* The lawsuit challenged only whether Cablevision needed additional licenses to allow its subscribers to record shows and play them back later through the RS–DVR system. *See <u>Twentieth Century Fox,</u> 478 F.Supp.2d at 609.* If subscribers wanted to watch "live" television, they would watch it through Cablevision's licensed retransmission feed. *See <u>Cablevision,</u> 536 F.3d at 124* (explaining that Cablevision split its programming data stream, sending one "immediately to customers as before"); Amicus Br. of Cablevision Sys. Corp. at 20.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

**\*20** The RS–DVR worked as follows. Cablevision split its licensed data stream, and sent a stream to a remote server, where the data went through two buffers. _Cablevision,_ 536 F.3d at 124. At the first buffer, the system made a temporary copy of 0.1 seconds of programming while it inquired whether any subscribers wanted to copy that programming. _Id._ A customer could make such a request "by selecting a program in advance from an on-screen guide, or by pressing the record button while viewing a given program." _Id._ at 125. If a request had been made, the data moved to the second buffer and then was permanently saved onto a portion of a hard drive designated for that customer. _Id._ at 124. At the customer's request, the permanent copy was transmitted to the customer and played back to him. _Id._ at 125.

_Cablevision_ held that the RS–DVR did not infringe either the reproduction or the public performance rights. _Id._ at 140. Unlike the majority here, I do not think we can view _Cablevision's_ analyses of each right in isolation. _See_ Majority Opin., _supra,_ at ——. As _Cablevision_ explained, "the right of reproduction can reinforce and protect the right of public performance." _Cablevision,_ 536 F.3d at 138. "Given this interplay between the various rights in this context," _id., Cablevision's_ holding that "copies produced by the RS–DVR system are 'made' by the RS–DVR customer," _id._ at 133, was critical to its holding that "each RS–DVR playback transmission ... made to a single subscriber using a single unique copy _produced by that subscriber_ ... [is] not [a] performance[ ] 'to the public,' " _id._ at 139 (emphasis added); _see also_ Amicus Br. of the United States at 17–19, _Cable News Network, Inc. v. CSC Holdings, Inc.,_ 129 S.Ct. 2890 (2009), _denying cert., Cartoon Network LP v. CSC Holdings, Inc. (Cablevision),_ 536 F.3d 121 (2d Cir.2008) [hereinafter "U.S. _Cablevision_ Amicus Br."].

With this concept in mind, it is clear that **Aereo's** system is factually distinct from Cablevision's

RS–DVR system. First, Cablevision's RS–DVR system "exist[ed] only to produce a copy" of material that it already had a license to retransmit to its subscribers, _Cablevision,_ 536 F.3d at 131, but the **Aereo** system produces copies to _enable_ it to transmit material to its subscribers. Whereas Cablevision promoted its RS–DVR as a mechanism for recording and playing back programs, **Aereo** promotes its service as a means for watching "live" broadcast television on the Internet and through mobile devices. Unlike Cablevision, however, **Aereo** has no licenses to retransmit broadcast television. If a Cablevision subscriber wanted to use her own DVR to record programming provided by Cablevision, she could do so through Cablevision's licensed transmission. But an **Aereo** subscriber could not use her own DVR to lawfully record content received from **Aereo** because **Aereo** has no license to retransmit programming; at best, **Aereo** could only illegally retransmit public broadcasts from its remote antennas to the user. _See, e.g., Fortnightly Corp.,_ 392 U.S. at 400, 88 S.Ct. 2084, _overruled by statute as recognized in, Capital Cities Cable,_ 467 U.S. at 709, 104 S.Ct. 2694; _ivi, Inc.,_ 691 F.3d at 278–79; _see also_ U.S. _Cablevision_ Amicus Br., _supra,_ at 21 (arguing that the legality of a hypothetical unlicensed system that only allowed subscribers to copy and playback content "would be suspect at best, because [the subscriber] would be ... copying programs that he was not otherwise entitled to view"). **Aereo's** use of copies is essential to its ability to retransmit broadcast television signals, while Cablevision's copies were merely an optional alternative to a set-top DVR. The core of **Aereo's** business is streaming broadcasts over the Internet in real-time; the addition of the record function, however, cannot legitimize the unauthorized retransmission of copyrighted content.

**\*21** Second, subscribers interact with **Aereo's** system differently from the way Cablevision's subscribers interacted with the RS–DVR. Cablevision subscribers were already paying for the right to watch television programs, and the RS–DVR gave them the additional option to "record" the programs. _Ca-_

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

blevision, 536 F.3d at 125. In contrast, **Aereo** subscribers can choose *either* "Watch" or "Record." *Am. Broad. Cos. v. AEREO, Inc.,* 874 F.Supp.2d 373, 377 (S.D.N.Y.2012). Both options initiate the same process: a miniature antenna allocated to that user tunes to the channel; the television signal is transmitted to a hard drive; and a full-length, permanent copy is saved for that customer. *Id.* at 377–79. If the subscriber has opted to "Watch" the program live, the system immediately begins playing back the user's copy at the same time it is being recorded. *Id.* **Aereo** will then automatically delete the saved copy once the user is done watching the program, unless the subscriber chooses to save it. *Id.* at 379.

These differences undermine the applicability of Cablevision to **Aereo's** system. *Cablevision* found that the RS–DVR was indistinguishable from a VCR or set-top DVR because Cablevision's system "exist[ed] only to produce a copy" and its subscribers provided the "volitional conduct" necessary to make a copy by "ordering that system to produce a copy of a specific program." *Cablevision,* 536 F.3d at 131; *see also* U.S. *Cablevision* Amicus Br., *supra,* at 16 (noting that *Cablevision* turned on whether RS–DVR was more analogous to set-top DVR or video-on-demand service). The RS–DVR was not designed to be a substitute for viewing live television broadcasts. **Aereo's** system, however, was designed to be precisely that. It does not exist only, or even primarily, to make copies; it exists to stream live television through the Internet. Its users can choose to "Watch" live television instead of "Record" a program, but the system begins to produce a full-length copy anyway because, even under its own theory, **Aereo** cannot legally retransmit a television signal to them without such a copy.[FN3] **Aereo's** system is much different than a VCR or DVR—indeed, as **Aereo** explains, it is an antenna, a DVR, and a Slingbox rolled into one—and for that reason *Cablevision* does not control our decision here.

I note also that in *Cablevision* this Court "emphasize[d]" that its holding "does not generally permit

content delivery networks to avoid all copyright liability by making copies of each item of content and associating one unique copy with each subscriber to the network, or by giving their subscribers the capacity to make their own individual copies." 536 F.3d at 139. Likewise, when the United States opposed the grant of certiorari in *Cablevision,* it argued that "the Second Circuit's analysis of the public-performance issue should not be understood to reach ... other circumstances beyond those presented." U.S. *Cablevision* Amicus Br., *supra,* at 21.[FN4] *Cablevision* should not be extended to cover the circumstances presented in this case. Indeed, it is telling that **Aereo** declines to offer its subscribers channels broadcast from New Jersey, even though its antennas are capable of receiving those signals, for fear of being subject to suit outside the Second Circuit, *i.e.,* outside the reach of *Cablevision. Cf. Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC,* No. CV 12–6921, ——F.Supp.2d ——, ———— ———, 2012 WL 6784498, at *3–4 (C.D.Cal. Dec. 27, 2012) (declining to follow *Cablevision* and enjoining an **Aereo**-like system based on plain meaning of § 101).

**\*22** Finally, the majority's decision in my view runs afoul of other decisions of this Court. Although the issue was not even contested, in *ivi* we recognized that the retransmission of copyrighted television programming by streaming it live over the Internet constituted a "public performance" in violation of the Copyright Act. 691 F.3d at 278, 286, 287.[FN5] Similarly, in *United States v. American Society of Composers, Authors, Publishers ("ASCAP"),* where, again, the issue was not even contested, we observed that the streaming of a song, like the streaming of a "television or radio broadcast," is a public performance. 627 F.3d 64, 74 (2d Cir.2010) (but holding in contrast that downloads of music do not constitute "public performances"); [FN6] *accord Infinity Broad. Corp. v. Kirkwood,* 150 F.3d 104, 106–07, 111–12 (2d Cir.1998) (holding that device allowing users to access private phone line to listen to public radio broadcasts infringed right of public performance, in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

the absence of a defense, and was not fair use).

In *ivi,* we addressed the need for a preliminary injunction to enjoin ivi from streaming copyrighted works over the Internet without permission:

Indeed, ivi's actions—streaming copyrighted works without permission—would drastically change the industry, to plaintiffs' detriment.... The absence of a preliminary injunction would encourage current and prospective retransmission rights holders, as well as other Internet services, to follow ivi's lead in retransmitting plaintiffs' copyrighted programming without their consent. The strength of plaintiffs' negotiating platform and business model would decline. The quantity and quality of efforts put into creating television programming, retransmission and advertising revenues, distribution models and schedules—all would be adversely affected. These harms would extend to other copyright holders of television programming. Continued live retransmissions of copyrighted television programming over the Internet without consent would thus threaten to destabilize the entire industry.

*691 F.3d at 286.* These concerns apply with equal force here, where **Aereo** is doing precisely what ivi was enjoined from doing: streaming copyrighted works over the Internet without permission of the copyright holders. Today's decision does not merely deny the broadcasters a licensing fee for **Aereo's** activity; it provides a blueprint for others to avoid the Copyright Act's licensing regime altogether. *See* Appellant **ABC,** Inc. Br. at 10 (citing articles reporting on the rise of copycat services). Congress could not have intended such a result.

### *CONCLUSION*

Based on the plain meaning of the statute, its legislative history, and our precedent, I conclude that **Aereo's** transmission of live public broadcasts over the Internet to paying subscribers are unlicensed

transmissions "to the public." Hence, these unlicensed transmissions should be enjoined. *Cablevision* does not require a different result. Accordingly, I dissent.

FN* The Honorable John Gleeson, United States District Court for the Eastern District of New York, sitting by designation.

FN1. The two actions, although not consolidated in the district court, proceeded in tandem and the district court's order applied to both actions.

FN2. A Slingbox is a device that connects the user's cable or satellite set-top box or DVR to the internet, allowing the user to watch live or recorded programs on an internet-connected mobile device, such as a laptop or tablet.

FN3. The technical operation of **Aereo's** system, discussed below, results in a slight delay in transmitting the program, which means that an **Aereo** subscriber using the "Watch" feature sees the program delayed by approximately ten seconds.

FN4. Thus if an **Aereo** user starts watching a program five minutes after it first began airing, he can rewind back to the five-minute mark, but not earlier.

FN5. Thus if an **Aereo** user starts watching a program five minutes after it first began airing and presses the "Record" button at the twenty-minute mark, the recorded copy will begin from the five-minute mark.

FN6. As mentioned in the text above, the lone factual dispute below was whether **Aereo's** antennas function independently or as one unit. The district court resolved this

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))

dispute in favor of **Aereo**, finding that its antennas operate independently. *Am. Broad. Cos., Inc. v. Aereo,* 874 F.Supp.2d 373, 381 (S.D.N.Y.2012). The Plaintiffs do not contest this finding on appeal.

FN7. **Aereo's** system usually assigns these antennas dynamically. **Aereo** users "share" antennas in the sense that one user is using a particular antenna now, and another may use the same antenna when the first is no longer using it. But at any given time, the feed from each antenna is used to create only one user's copy of the program being watched or recorded. Thus if 10,000 **Aereo** users are watching or recording the Super Bowl, **Aereo** has 10,000 antennas tuned to the channel broadcasting it.

FN8. Put briefly, the statute allows cable systems to retransmit copyrighted works from broadcast television stations in exchange for paying a compulsory license to the U.S. Copyright Office calculated according to a defined formula. The fees paid by cable systems are then distributed to copyright holders. *See ivi,* 691 F.3d at 281; *E. Microwave, Inc. v. Doubleday Sports, Inc.,* 691 F.2d 125, 128–29 (2d Cir.1982).

FN9. Plaintiffs assert that **Aereo's** transmissions of recorded programs when the original program is no longer airing on broadcast television are also public performances and that **Aereo's** system infringes other exclusive rights granted by the Copyright Act, such as the reproduction right. Plaintiffs did not, however, present these claims as a basis for the preliminary injunction. They are therefore not before us and we will not consider them.

FN10. The RS–DVR was therefore unlike a video-on-demand service because it did not enable a customer to watch a program that had already been broadcast unless that customer had previously requested that the program be recorded and because it generated user-associated copies instead of using a shared copy or copies.

FN11. Aggregating private transmissions generated from the same copy is in some tension with the *Cablevision* court's first conclusion that the relevant inquiry under the Transmit Clause is the potential audience of the particular transmission. This interpretation of the Transmit Clause began with Professor Nimmer. He notes that it is difficult to understand precisely what Congress intended with the language in the Clause stating that a public performance can occur when the audience receives the work "at different times." *See* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.14[C][3], at 8.192.8 (Matthew Bender rev. ed.). Arguing that this language on its face conflicted with other language in the statute and produced results Congress could not have intended, he proposed that by this language Congress wished to denote instances where the same copy of the work was repeatedly performed by different members of the public at different times. *See id.* at 192.8(1)–192.8(6). The *Cablevision* court's focus on the potential audience of each particular transmission would essentially read out the "different times" language, since individuals will not typically receive the same transmission at different times. But Nimmer's solution—aggregating private transmissions when those transmissions are generated from the same copy—provides a way to reconcile the "different times" language of the Clause.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

FN12. The *Cablevision* court concluded in its discussion of the reproduction right that Cablevision's customers, not Cablevision, "made" the RS–DVR copies. *See* 536 F.3d at 133.

FN13. And even if such analogies were probative, **Aereo's** system could accurately be analogized to an upstream combination of a standard TV antenna, a DVR, and a Slingbox.

FN14. It is true that an **Aereo** user in "Watch" mode will often not exercise volitional control over the playback of the program, because the program will automatically begin playing when selected and he will watch it through to the end. But that is not significant because the **Aereo** user can exercise such control if he wishes to, which means that the copy **Aereo's** system generates is not merely a technical link in a process of transmission that should be deemed a unity transmission. Moreover, the "Watch" feature's automatic playback is merely a default rule. The user can accomplish the same thing by using the "Record" feature, save that he must take the additional step of pressing "Play" once enough of the program has been recorded for playback. If this additional step were sufficient to break the chain of transmission, we see no reason why the "Watch" feature's default in favor of playback should change our analysis.

FN15. We also note that the **Aereo** system's use of copies gives it two features that would not be present were it simply to transmit the television programs its antennas receive directly to the user. First, it allows the **Aereo** user to pause and rewind seemingly live TV. This is because while the **Aereo** user has been watching the program "live," **Aereo's**

system has in fact been creating a complete copy of the program. Thus if the user wishes to rewind thirty seconds or to the beginning of the program, he can easily do so. Second, if a user in "Watch" mode decides during a program he has been watching that he would like to save the program for later viewing, he can simply press the "Record" button. When the user does this, the entire program from the time he first began watching it is saved, not merely the portion beginning from the time when he pressed "Record." Were **Aereo** to transmit the signal from its antennas directly to each **Aereo** customers, neither of these features would be possible, because the image seen by the customer would be generated from a live feed, not a copy of the program. **Aereo's** users may well regard these two features as valuable and they provide an additional reason for regarding **Aereo's** copies as legally significant and not merely technical artifacts of a system to transmit live TV.

FN16. This makes **Aereo's** system unlike the early cable TV systems at issue in *Fortnightly,* 392 U.S. 390, 88 S.Ct. 2084, and *Teleprompter,* 415 U.S. 394, 94 S.Ct. 1129, because the signals from those community TV antennas were shared among many users. When Congress drafted the 1976 Copyright Act, it intended that such transmissions be deemed public performances. But, as discussed below, Congress clearly believed that, under the terms of the Act, some transmissions were private. The methodology Congress proscribed for distinguishing between public and private transmissions is the size of the potential audience, and by that methodology, the feed from **Aereo's** antennas is a private transmission because it results in a performance viewable by only one user. The 1976 Congress may not have anticipated that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

later technology would make it possible to mimic the functionality of early cable TV by means of private transmissions, but that unexpected result does not change the language of the statute.

FN17. Because **Aereo's** system uses both user-associated antennas and user-associated copies, we need not decide whether a system with only one of these attributes would be publicly performing copyrighted works.

FN18. This is particularly appropriate given that in 1976, when cable TV was still in its infancy, many Americans used rooftop antennas. Thus Congress would have certainly wished to avoid adopting language that would make millions of Americans copyright infringers because they transmitted broadcast television programs from their personal rooftop antennas to their own television sets.

FN19. Stare decisis is particularly warranted here in light of substantial reliance on *Cablevision.* As mentioned above, it appears that many media and technology companies have relied on *Cablevision* as an authoritative interpretation of the Transmit Clause. One example is cloud media services, which have proliferated in recent years. These services, which allow their users to store music on remote hard drives and stream it to internet-connected devices, have apparently been designed to comply with *Cablevision.* Just like **Aereo's** system and Cablevision's RS–DVR, they seek to avoid public performance liability by creating user-associated copies of each song rather than sharing song files among multiple users. *See* Brandon J. Trout, Note, *Infringers or Innovators? Examining Copyright Liability for Cloud–Based Music Locker Services.* 14 Vand. J. Ent. & Tech. L. 729, 746–48 (2012).

FN1. A "Slingbox" is a set-top box that permits consumers to shift their television programming to their portable devices. Slingbox describes its service as "placeshifting": "Placeshifting is viewing and listening to live, recorded or stored media on a remote device over the Internet or a data network. Placeshifting allows consumers to watch their TV anywhere." *See Placeshifting,* Slingbox.com, http://www.slingbox.com/get/placeshifting (last visited March 5, 2013). The Slingbox thus enables a consumer to view on a remote device content that he is already entitled to receive from a licensed cable company or other authorized source to view on his television.

FN2. **Aereo's** contention that each subscriber has an individual antenna is a fiction because the vast majority of its subscribers are "dynamic users" who are randomly assigned an antenna each time they use the system. Although each antenna is used only by one person at a time, it will be randomly assigned to another person for the next use. In other words, this is a shared pool of antennas, not individually-designated antennas.

FN3. **Aereo's** web page does contain a conspicuous notice under the "Watch" button that reads, "When you press 'Watch' you will start recording this show." Users thus have no choice but to record the show if they wish to watch it live, making it unlikely that the subscribers are voluntarily "ordering that system to produce a copy." *Cablevision,* 536 F.3d at 131.

FN4. By opposing the grant of certiorari, the government was not embracing *Cablevision's*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341
**(Cite as: 2013 WL 1285591 (C.A.2 (N.Y.)))**

construction of the transmit clause. To the contrary, the United States took the position that "scattered language in the Second Circuit's decision could be read to endorse overly broad, and *incorrect,* propositions about the Copyright Act." U.S. *Cablevision* Amicus Br., *supra,* at 6 (emphasis added). Specifically, the government was concerned with the suggestion "that a performance is not made available 'to the public' unless more than one person is capable of receiving a *particular* transmission" because it might "undermine copyright protection in circumstances far beyond those presented here, including with respect to ... situations in which a party streams copyrighted material on an individualized basis over the Internet." *Id.* at 20–21. Despite these "problematic" aspects, *id.* at 22, the United States considered *Cablevision* an "unsuitable vehicle" for deciding these issues, due to the absence of any conflicting circuit court decisions at the time and the limitations imposed by the parties' stipulations, *id.* at 6.

FN5. There are companies in the market that stream television programming over the Internet pursuant to licenses, such as Hulu, Netflix, Amazon, and channel-specific websites like ComedyCentral.com. *See* Appellant WNET Br. at 12, 28, 43; Amicus Br. of Paramount Pictures Corp. et al. at 29. In general, however, these "negotiated Internet retransmissions ... typically delay Internet broadcasts as not to disrupt plaintiffs' broadcast distribution models, reduce the live broadcast audience, or divert the live broadcast audience to the Internet." *WPIX, Inc. v. ivi, Inc.,* 691 F.3d 275, 285 (2d Cir.2012).

FN6. In *ASCAP,* we left open "the possibility ... that a transmission could constitute both a stream and a download." *United States v. Am.*

*Soc'y of Composers, Authors and Publishers (ASCAP),* 627 F.3d 64, 74 n. 10 (2d Cir.2010). While streaming performances over the Internet constitutes a transmission "to the public," *see ivi, Inc.,* 691 F.3d at 278–79; *ASCAP,* 627 F.3d at 74, allowing a consumer to download a copy so he can later play it back for himself does not, *see ASCAP,* 627 F.3d at 73, 75; *Cablevision,* 536 F.3d at 139. To the extent that **Aereo's** system immediately plays back from a copy that is still being recorded, it is clearly "both a stream and a download," *ASCAP,* 627 F.3d at 74 n. 10, and at a minimum the streaming portion constitutes an unlicensed public performance. If 50,000 **Aereo** subscribers choose to "Watch" the Super Bowl live, each subscriber receives a "performance or display" of the exact same broadcast on a seven-second delay, even if **Aereo** is also simultaneously creating a unique copy for each subscriber so that each one has the option to pause, rewind, or save the copy for later if they wish. Until the subscriber exercises that option, the existence of the copy is irrelevant; the broadcast is streaming "live" to each user at the same time just as it did in *ivi.*

C.A.2 (N.Y.),2013.
WNET, Thirteen v. Aereo, Inc.
--- F.3d ----, 2013 WL 1285591 (C.A.2 (N.Y.)), 2013 Copr.L.Dec. P 30,406, 106 U.S.P.Q.2d 1341

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit C



# AEREO SETS LAUNCH DATE FOR BOSTON

*More than 4.5 million Boston-area consumers will have access to Aereo's groundbreaking antenna technology to watch live television online*

*Starting May 15, pre-registered consumers will begin to receive invitations to join Aereo; General membership access begins on May 30*

*CEO Chet Kanojia will give a 'sneak peak' tonight at <u>Boston New Tech Meet Up</u> hosted at <u>StartUp Lab Allston</u>*

**Boston, Mass. (April 23, 2013)** – <u>Aereo, Inc.</u>, today announced plans to launch its groundbreaking online television technology in the Boston metropolitan area.  Beginning May 15, consumers who have pre-registered with Aereo will receive a special invitation to join and be one of the first to experience Aereo's technology.  After May 30, Aereo will make membership available to all eligible consumers across the Boston designated market area (DMA), which includes more than 4.5 million consumers in 16 counties in Massachusetts, New Hampshire and Vermont.  Boston is the second city to launch as part of Aereo's <u>expansion</u> announced in January.

"Aereo is simply the easiest, most convenient way for consumers to access broadcast television online using an antenna," **said <u>Aereo CEO and Founder Chet Kanojia</u>**.  "Consumers deserve more choice and flexibility in how they experience television and Aereo provides them a high-quality, rationally-priced alternative.  This is an exciting step forward for the company.  Today's announcement is even more meaningful and special for our more than 60 employees who call the Boston area home, including me. I'm proud of our team and what we've accomplished in such a short period of time."

Aereo's innovative remote (cloud-based) antenna/DVR technology makes watching television simple and user-friendly.  Using <u>Aereo's technology</u>, consumers can pause, rewind and fast-forward any program that they are watching live, or save a program for future viewing.  In Boston, there are 28 over-the-air broadcast channels accessible through Aereo's antenna/DVR technology, including major networks such as WGBH (PBS), WBZ-TV (CBS), WCVB (ABC), WHDH (NBC), WLVI (CW) and WFXT (Fox); special interest channels such as The Country Network, PBS Kids, Ion and Qubo; and Spanish-language broadcast channels such as Univision and Telemundo. In addition, consumers can also add Bloomberg Television, for a total of 29 channels.

Aereo works on 'smart' devices from tablets to phones to laptop computers.  Aereo is <u>currently supported</u> on iPad, iPhone, iPod Touch, Chrome, Internet Explorer 9, Firefox, Safari, Opera, AppleTV (via airplay) and Roku devices.

*(more)*

Aereo membership is available to consumers residing in the following counties in Massachusetts: Barnstable, Dukes, Essex, Middlesex, Nantucket, Norfolk, Plymouth, Suffolk, and Worcester; in New Hampshire's Belknap, Cheshire, Hillsborough, Merrimack, Rockingham and Strafford counties; and in Vermont's Windham County.

Aereo has offices in Long Island City (Queens), Downtown Brooklyn and in Boston's Innovation District.  Aereo employs more than 60 people in the Boston area, primarily engineers and developers. For information on hiring, please visit Aereo.com/careers.

###

**For media inquiries:**
Virginia Lam, Aereo, Inc.
vlam@aereo.com / 347.647.1210

LaunchSquad for Aereo
aereo@launchsquad.com

# Exhibit D

**DEADLINE | HOLLYWOOD**

## Les Moonves Says CBS Will Keep Suing Aereo As It Expands

By DAVID LIEBERMAN, Executive Editor Wednesday May 1, 2013 @ 2:58pm PDT



The streaming service had better have a lot of lawyers lined up. CBS chief Les Moonves told analysts today that when Aereo expands from its first market in New York "we'll sue them again" in different jurisdictions. "We'll follow it." Aereo plans to offer its service in Boston beginning this month, and add 21 other cities by year end. CBS and other broadcasters have said they might move their stations to pay TV if the courts — beginning in New York — reject their claim that Aereo infringes on their copyrights when it streams their over-the-air programming without payment. Aereo says it merely leases antennas and streaming capabilities to consumers so they can exercise their right to watch free, over-the-air TV. Moonves says he doesn't think CBS will have to go nuclear because "we're going to win the case legally." He adds, though, that CBS could make the shift with little effort. "It would only be in markets where the courts said Aereo could exist." And CBS wouldn't have to change agreements with local affiliates. They'd move to pay TV and maintain relationships with CBS "as they are now." Despite his saber-rattling, Moonves says that Aereo "really has gotten way too much attention. We're not losing sleep over it. It's an insignificant player." The broadcaster also denies that its recent investment in Syncbak — another company that streams local TV programming — was a response to Aereo. Syncbak "preserves the current ecosystem," CFO Joe Ianniello says. If consumers want to access broadcast TV via tablets and mobile devices then "we want to make sure we have an ability to deliver it that way."

This article was printed from http://www.deadline.com/2013/05/les-moonves-says-cbs-will-keep-suing-aereo-as-it-expands/

# Exhibit E

Dana McClintock (Dana_McClintock) on Twitter

Have an account? **Sign in** ▾

**Tweets**

Following

Followers

Favorites

Lists

## Follow Dana McClintock

Full name

Email

Password

View all photos and videos

| 813 | 183 | 456 |
|-----|-----|-----|
| TWEETS | FOLLOWING | FOLLOWERS |

## Tweets

**Dana McClintock** @Dana_McClintock — 59m
@bristei This time believe me it did!
View conversation

**Dana McClintock** @Dana_McClintock — 1h
If you ask for a quote, and we give you a quote, we expect you to use the quote.
Expand

**Dana McClintock** @Dana_McClintock — 2h
CNBC: "Bulls Are Staying Tuned to $CBS " cnbc.com/id/100704444
View summary

**Dana McClintock** @Dana_McClintock — 2h
ICYMI #redsox fans, we got no less than @SeanGrandePBP added to our broadcast mix. bo.st/Yr4lyz
View summary

**Dana McClintock** @Dana_McClintock — 19h
@TimAMolloy Was more hoping to see if we'd get that 52-week high at the close, but I assure you your question was top of mind for me too!
View conversation

**Dana McClintock** @Dana_McClintock — 20h
I'm sure if one were to do research they'd find a trove of convincing info explaining why its so hard to put wifi on planes, right @United?
Expand

**Dana McClintock** @Dana_McClintock — 1 May
@Majsheppard There's an old Star Trek line where Spock says "As Mars goes, so goes the Universe."
View conversation

**CBS IR** @CBSInvestors — 1 May
$CBS Moonves: Strong pipeline for domestic syndication through 2014 – H50, Blue Bloods, Dexter, Californication et al #CBSEarnings
Retweeted by Dana McClintock
Expand

Worldwide Trends · Change
#TWFollowFanFriday
#IWishIWas
#CitePessoasQueJamaisVaiEsquecer
#LaTropaEsChavezyMaduro
#1DThisIsUsFF
YatcazKalkcazYatcazKalkcaz HopŞampiyonuz
Glen Taylor
Dia Mundial de la Libertad de Prensa
Ayem
Lenka

© 2013 Twitter About Help Terms Privacy
Blog Status Apps Resources Jobs
Advertisers Businesses Media Developers
Directory

Have an account? Sign in ▾

**Dana McClintock** @Dana_McClintock
Ianniello: @CBSLocal's double digit profit growth and margin expansion "especially impressive given that this is a non-political year." $CBS
Expand

**CBS IR** @CBSInvestors    1 May
$CBS Moonves: "Scatter pricing up double digits over last year's Upfront pricing" #CBSEarnings
Retweeted by Dana McClintock
Expand

**CBS IR** @CBSInvestors    1 May
$CBS Network ad growth positive with and without Super Bowl contribution #CBSEarnings
Retweeted by Dana McClintock
Expand

**Dana McClintock** @Dana_McClintock    1 May
Ianniello: $CBS 1Q "Network advertising revenue was up 14% fueled by the #Superbowl." #UnderlyingRevenueAlsoUp #CBSEarnings
Expand

**Dana McClintock** @Dana_McClintock    1 May
Ianniello: "We have the right strategy in place to continue our transformation, and drive earnings growth in the years ahead." #CBSEarnings
Expand

**Dana McClintock** @Dana_McClintock    1 May
Moonves on #CBSEarnings call: "We are entering an era of opportunity unlike anything we have ever seen." $CBS
Expand

**Dana McClintock** @Dana_McClintock    1 May
Moonves on tragic events in Boston: "WBZ's wall to wall coverage once again proved the enduring vitality of local television." @CBSBoston
Expand

**Dana McClintock** @Dana_McClintock    1 May
Moonves on @CBSLocal: "Our CBS stations in the top 3 markets each earned the biggest local revenue share we have on record."
Expand

**Dana McClintock** @Dana_McClintock    1 May
Moonves: Digital sales for @simonschuster are now 30% of overall revenue. Some major bestsellers up to 50%.
Expand

**Dana McClintock** @Dana_McClintock    1 May
Moonves on #CBSEarnings call: "Obviously the world is waiting with great anticipation for another season of #Homeland." #Showtime
Expand

**Dana McClintock** @Dana_McClintock    1 May
Moonves: CBS Interactive revenue up 22% in Q1 with @CNET up 24%, @CBSi China up 35% and overall video revenue up 76%.
Expand

**Dana McClintock** @Dana_McClintock    1 May

Moonves on #Retrans: "Certainly helps in negotiations to have the @NFL, the #NCAA, #NCIS, #BigBangTheory and @60Minutes in our arsenal."
Expand

**Dana McClintock**@Dana_McClintock                           1 May
Moonves on deals with #Netflix and #Amazon:  "We're confident they will continue to be extended beyond their current terms"
Expand

**Dana McClintock**@Dana_McClintock                           1 May
Moonves: "I can say with absolute confidence that we will once again lead the marketplace in both pricing and volume." #Upfronts $CBS
Expand

**Dana McClintock**@Dana_McClintock                           1 May
Moonves: "Unless there is a network on Mars we're not aware of, we are the #1 watched network in the entire universe." #CBSEarnings
Expand

**Dana McClintock**@Dana_McClintock                           1 May
Moonves says $CBS has already begun programming 2014/15 primetime schedule right now. #CBSEarnings
Expand

**Dana McClintock**@Dana_McClintock                           1 May
Moonves: "Having now personally seen most of our pilots, I can assure you that next season is going to be another terrific year" for $CBS
Expand

**Dana McClintock**@Dana_McClintock                           1 May
Moonves: "40% of the shows on our prime-time entertainment schedule are 3 years old or less" #CBSEarnings
Expand

**Dana McClintock**@Dana_McClintock                           1 May
Moonves: #CBS is one of two b'cast networks that will finish season up over last year. The other? @CW_network
Expand

**Dana McClintock**@Dana_McClintock                           1 May
Moonves: "No matter how many other choices are out there, big-event television is pulling in audiences like never before." #CBSEarnings
Expand

**Dana McClintock**@Dana_McClintock                           1 May
Moonves on success of @ACMawards: "It even topped the competing country music awards show that airs on another network." #CBS
Expand

**Dana McClintock**@Dana_McClintock                           1 May
Moonves on #CBSEarnings call: "He who has the best content has the best options." $CBS
Expand

**Dana McClintock**@Dana_McClintock                           1 May
Moonves: Post-Outdoor, $CBS will be "singularly focused on capitalizing on our great future as a content Company" #CBSEarnings
Expand

Have an account? Sign in ▾

**Dana McClintock**@Dana_McClintock                              1 May
Moonves: \$CBS's record results reflect "strength of our base businesses and the ongoing success of our strategy to grow..recurring revenue."
Expand

**Dana McClintock**@Dana_McClintock                              1 May
Best-selling titles for @simonschuster in Q1 include #ProofOfHeaven by @LifeBeyondD and #TheStoryteller by @jodipicoult
Expand

**Dana McClintock**@Dana_McClintock                              1 May
\$CBS EPS of 73 cents versus First Call consensus of 68 cents. #ThatsFiveCents
Expand

**Dana McClintock**@Dana_McClintock                              1 May
\$CBS Retrans and reverse compensation up 62%. #CBSEarnings
Expand

**Dana McClintock**@Dana_McClintock                              1 May
First time \$CBS quarterly revenue has topped \$4 Billion. #CBSEarnings
Expand

**Dana McClintock**@Dana_McClintock                              1 May
Attention wire copy headline writers: \$CBS bottom line GAAP net income up 22%. #CBSEarnings
Expand

**Dana McClintock**@Dana_McClintock                              1 May
\$CBS announces best earnings ever with rev up 6%; OIBDA up 15%; operating income up 18%; EPS up 24% #CleanQuarterNoAdjustments #CBSEarnings
Expand

**Dana McClintock**@Dana_McClintock                              1 May
@bristei @crupicrupicrupi You'll just have to tune in to find out
View conversation

**Dana McClintock**@Dana_McClintock                              1 May
Another quarterly installment of \$CBS Live Tweeting begins here at 4:30 ET. #CBSEarnings
Expand

**Dana McClintock**@Dana_McClintock                              26 Apr
A twitter feed reliant upon speculation calling itself @Real_MNA That's rich!
Expand

**Dana McClintock**@Dana_McClintock                              26 Apr
Takeaway: Social media should enhance company disclosure, but not be sole means. dealbook.nytimes.com/2013/04/25/bus...
View summary

**Dana McClintock**@Dana_McClintock                              25 Apr
Presidential #PR challenges for \$100, Alex nyti.ms/12KpcMG
View summary

**Dana McClintock**@Dana_McClintock                              25 Apr

The #NFL knows how to take care of the press on #DraftDay. Best seats in the house. Awaiting the first pick...
pic.twitter.com/mvvF6qZh3D
View photo

Have an account? Sign in ▾

**Robert Bianco**@BiancoRobert                                    25 Apr
The season-closing May Sweeps kicks off tonight with one of the season's biggest winners:CBS's 'Big Bang': usat.ly/11QSRzO
    Retweeted by Dana McClintock
    View summary

**CBS IR**@CBSInvestors                                          25 Apr
Morgan Stanley (Swinburne) raises target price on $CBS to $50... Bull case scenario of $57. Third analyst target price increase in a week.
    Retweeted by Dana McClintock
Expand

**Dana McClintock**@Dana_McClintock                              24 Apr
@BCMikeMalone And I'm sure certain guys will seek out the event just to be part of the favorable ratio...
    View conversation

**Dana McClintock**@Dana_McClintock                              24 Apr
Being a guy named Dana includes being mistakenly solicited for events like this #WouldntHappenToLeslie bcwomenofny.com
    Expand

**Dana McClintock**@Dana_McClintock                              24 Apr
@JohnMaloney No doubt...company info and spin narrative should be always be vetted by your friendly Corporate Communications dept!
    View conversation

**Dana McClintock**@Dana_McClintock                              24 Apr
Celebrities and their gadgets from @CNET and @omgInsider cnet.com/hooked-up
    Expand

**Dana McClintock**@Dana_McClintock                              24 Apr
#VampireDiaries goes where the gamers are #Xbox #CW variety.com/2013/digital/n...
    Expand

**Dana McClintock**@Dana_McClintock                              24 Apr
@StephenEspinoza bets @FloydMayweather can lift #Showtime to new heights usatoday.com/story/sports/b...
    View summary

**Dana McClintock**@Dana_McClintock                              24 Apr
Settle down @TheRealJRSmith (...please?)
    Expand

**Dana McClintock**@Dana_McClintock                              23 Apr
@JasonHirschhorn Input from influencers is always strongly considered. Safe travels.
    View conversation

**Dana McClintock**@Dana_McClintock                              23 Apr
@JasonHirschhorn Yes, Dana from your fav big media co :) Hello to you too!
    View conversation

**Dana McClintock**@Dana_McClintock    23 Apr
Have an account? Sign in ▾
@JasonHirschhorn Indeed, which is why 3rd parties shouldn't
charge for them.
View conversation

**Dana McClintock**@Dana_McClintock    23 Apr
"Analyst Ryvicker Optimistic About #Radio In 2013"
fmqb.com/article.asp?id…
Expand

**Yinka Adegoke**@YinkaWrites    23 Apr
Fighting talk this am from the normally corporate
@Dana_McClintock. Seems @AereoTV showing up in beloved
Boston pushed him over the edge
   Retweeted by Dana McClintock
Expand

**Dana McClintock**@Dana_McClintock    23 Apr
@benpopper @RichBTIG Yet it's ok for Aereo to profit from the
same public. Hmmm...
View conversation

**Dana McClintock**@Dana_McClintock    23 Apr
@RichBTIG We will sue, and stealing our signal will be found to
be illegal in Boston, just as it will be everywhere else.
View conversation

**Dana McClintock**@Dana_McClintock    23 Apr
Then again, if Aereo's business is as successful in Boston as it's
been in NY, it has its own problems to deal with.
Expand

**Dana McClintock**@Dana_McClintock    23 Apr
Stealing our signal will be found to be illegal in Boston, just as it
will be everywhere else.
Expand

**Dana McClintock**@Dana_McClintock    23 Apr
And we will be there to sue them RT: "@TimAMolloy: Aereo
Expands to Boston - First City Outside NYC - Next Month
thewrap.com/tv/column-post…"
   View conversation

**CBS IR**@CBSInvestors    23 Apr
$CBS target price raised to $54 by Doug Mitchelson (Deutsche
Bank)
   Retweeted by Dana McClintock
Expand

**Dana McClintock**@Dana_McClintock    22 Apr
NYC "broke its own record for number of TV shows filmed in its
borders this year" #BlueBloods #GoodWife #Elementary
nypost.com/p/news/local/g…
Expand

**Dana McClintock**@Dana_McClintock    22 Apr
"I am particularly pleased that #CBS has recognized the role
that @Syncbak can play as broadcasting evolves" says
@JackPerry_TV
Expand

**Dana McClintock**@Dana_McClintock    22 Apr
#CBS makes strategic investment in @Syncbak, streaming
platform for broadcasters. bit.ly/11xHaQ1

Expand    Have an account? Sign in ▾

**Joe Flint** @JBFlint    19 Apr
Goodbye CNN. Going to WBZ-TV via web.
  Retweeted by Dana McClintock
Expand

**Sean Grande** @SeanGrandePBP    19 Apr
A break for all living and dying with the coverage from
Boston...to remind us why we gladly give ourselves to sports;
cbssports.com/mlb/blog/eye-o...
  Retweeted by Dana McClintock
Expand

**Dana McClintock** @Dana_McClintock    19 Apr
As Boston bombing story unfolds, a stellar showing from local
TV. #WBZ cjr.org/behind_the_new...
Expand

**Dana McClintock** @Dana_McClintock    18 Apr
Boston's @985TheSportsHub finishes first in most recent
ratings book. #WEEI sixth. boston.com/sports/touchin...
  View summary

**Dana McClintock** @Dana_McClintock    18 Apr
Go Prominent Expert "Strong #PR and Corp Comms Strategy Is
Vital for Publicly Traded Companies Says Prominent Expert"
online.wsj.com/article/PR-CO-...
Expand

**Dana McClintock** @Dana_McClintock    18 Apr
$CBS Given "Overweight" Rating at Barclays Capital
dailypolitical.com/finance/stock-...
Expand

**Chris Ender** @soundbyte53    16 Apr
#CBS averaged more viewers last week in prime (10.8 mil) than
top 5 ent cable networks combined (Disney, USA, Nick, History, A&E
= 10.6 mil)
  Retweeted by Dana McClintock
Expand

**Dana McClintock** @Dana_McClintock    15 Apr
Horrible. cbsnews.com/2718-201_162-1...
Expand

**Dana McClintock** @Dana_McClintock    15 Apr
"Masters Helps CBS Dominate Sunday Night Ratings Race"
variety.com/2013/tv/news/m...
Expand

**Dana McClintock** @Dana_McClintock    15 Apr
Already in the bottom of the 1st at Fenway. #BostonMarathon
well underway too. #HappyPatriotsDay
Expand

**Chris Ender** @soundbyte53    15 Apr
@Carr2n likes his #Masters app...@CBS likes +26% #Masters
ratings...disruption or rising tide lifts all boats?
  Retweeted by Dana McClintock
Expand

**Dana McClintock** @Dana_McClintock    15 Apr

@carr2n Sunday's #MASTERS ratings were up 26% from year ago,
much bigger increase than last time we had a playoff.
Have an account? **Sign in**
#BestScreenAvailableWins

View conversation

**Dana McClintock** @Dana_McClintock                                          15 Apr
#CBS Sports 2013 #MASTERS Final Round Ratings up 26%
over last year. bit.ly/15alqyq

Expand

# EXHIBIT F



# AEREO SETS LAUNCH DATE FOR ATLANTA

*Atlanta will be the third city to launch Aereo's groundbreaking technology*

*More than 5.3 million Atlanta metropolitan-area consumers will have access to Aereo's innovative antenna technology to watch live television online*

*Starting June 17, pre-registered consumers will begin to receive invitations to join Aereo; General membership access begins on June 24*

**Atlanta, Georgia (May 14, 2013)** – Aereo, Inc., today announced plans to launch its groundbreaking online television technology in the Atlanta metropolitan region. Beginning June 17, consumers who have pre-registered with Aereo will receive a special invitation to join and be one of the first to experience Aereo's technology. After June 24, Aereo will make membership available to all eligible consumers across the Atlanta designated market area (DMA), which includes more than 5.3 million consumers in 55 counties across Georgia, Alabama and North Carolina. Atlanta joins Boston as the third city to launch as part of Aereo's expansion announced in January.

"We're grateful and humbled by the continued support we've received from consumers for our technology," said **Aereo CEO and Founder Chet Kanojia**. "The response and enthusiasm from consumers across all of our expansion cities has been phenomenal. It's clear that consumers want more choice and flexibility in how they watch television and they don't want to be fenced into expensive, outdated technology. Aereo's antenna/DVR technology brings the old-fashioned antenna into the 21st Century, providing consumers access to the over-the-air broadcast signals that belong to them. We're thrilled to be coming to Atlanta and look forward to our launch in June."

Aereo's innovative remote (cloud-based) antenna/DVR technology makes watching television simple and user-friendly. Using Aereo's technology, consumers can pause, rewind and fast-forward any program that they are watching live, or save a program for future viewing. In Atlanta, there are 27 over-the-air broadcast channels accessible through Aereo's antenna/DVR technology, including major networks such WSB-HD (ABC), WAGA-TV (FOX), WXIA-TV (NBC), WGCL-TV (CBS) and WPBA (PBS); special interest channels such as France24, BounceTV, MyTV, and AntennaTV; and Spanish-language broadcast channels such as Univision, MundoFox, and UniMas. In addition, consumers can also add Bloomberg Television, for a total of 28 channels.

Aereo works on 'smart' devices from tablets to phones to laptop computers. Aereo is currently supported on iPad, iPhone, iPod Touch, Chrome, Internet Explorer 9, Firefox, Safari, Opera, AppleTV (via airplay) and Roku devices.

*(more)*

Aereo membership is available to consumers residing in the following counties in Georgia: Banks, Barrow, Bartow, Butts, Carroll, Chattooga, Cherokee, Clarke, Clayton, Cobb, Coweta, Dawson, DeKalb, Douglas, Fannin, Fayette, Floyd, Forsyth, Fulton, Gilmer, Gordon, Greene, Gwinnett, Habersham, Hall, Haralson, Heard, Henry, Jackson, Jasper, Lamar, Lumpkin, Madison, Meriwether, Morgan, Newton, Oconee, Oglethorpe, Paulding, Pickens, Pike, Polk, Putnam, Rabun, Rockdale, Spalding, Towns, Troup, Union, Upson, Walton and White; Clay County in North Carolina; and Cleburne and Randolph counties in Alabama.

###

**For media inquiries:**
Virginia Lam, Aereo, Inc.                          LaunchSquad for Aereo
vlam@aereo.com / 347.647.1210          aereo@launchsquad.com

# EXHIBIT G



# AEREO ANNOUNCES EXPANSION PLANS FOR 22 NEW U.S. CITIES

*Aereo closes a $38 million round of Series B financing, led by IAC and Highland Capital Partners to fund the company's rapid growth and expansion plans;*

*Aereo's expansion will provide more than 97 million American consumers with more choice, flexibility and ability to access over-the-air broadcast television*

**Las Vegas, Nevada (January 8, 2013)** – Building on its successful 2012 launch in New York City, Aereo, Inc., today announced that it plans to expand its operations to 22 U.S. cities in 2013, making its groundbreaking remote antenna/DVR technology accessible to more than 97 million consumers.  Those cities identified for expansion are: **Boston**, **Miami**, **Austin**, **Atlanta**, **Chicago**, **Dallas**, **Houston**, **Washington, DC**, **Baltimore**, **Detroit**, **Denver**, **Minneapolis**, **Philadelphia, Pittsburgh, Tampa, Cleveland, Kansas City, Raleigh-Durham (NC)**, **Salt Lake City**, **Birmingham (AL)**, **Providence (RI)**, and **Madison (WI)**.  Using Aereo's technology, consumers in these markets will be able to record and watch live, local over-the-air broadcast television online, on their compatible, internet-connected devices, subject to capacity.  These 22 markets represent the first phase of Aereo's planned nationwide expansion.

Aereo also today announced that it has closed on a $38 million Series B round of financing, led by existing investors IAC and Highland Capital Partners.  Previous investors from Aereo's Series A funding round, including FirstMark Capital, First Round Capital, High Line Venture Partners, and select individuals, also participated in this second round of financing.  Today's announcements were made by Aereo's CEO and Founder, Chet Kanojia, at the Citi Global Internet, Media & Telecommunications Conference in Las Vegas.  To watch a replay of the event, visit: http://www.veracast.com/webcasts/citigroup/imt2013/65204406.cfm.

"Aereo's technology is simply one of the easiest, most convenient ways for consumers to access broadcast television," said **CEO and Founder Chet Kanojia**.  "We've been working hard to bring Aereo to consumers across the country and we're excited to expand our reach to these 22 new cities. Consumers want and deserve choice.  Watching television should be simple, convenient and rationally priced.  Aereo's technology provides exactly that: choice, flexibility and a first-class experience that every consumer deserves."

Aereo's innovative technology enables consumers to access live broadcast television on compatible Internet connected devices, at home or on the go.  Aereo's innovative remote antenna/DVR technology makes watching television simple.  Using Aereo's technology, consumers can pause, rewind and fast-forward any program that they are watching live, or save a program for future viewing, just as you can with a home DVR.  There are no wires to connect and no box to install, so consumers don't have to worry about installing equipment or waiting for the 'cable guy.'  No cable subscription is required to use Aereo and membership plans begin at $1/day, $8/month or $80/year.

*(more)*

Aereo plans to launch its technology in these 22 cities over the course of 2013, starting in late spring.  Access to Aereo will be available initially via invitation.  Consumers can request invitations through the Aereo website.  Aereo also plans to provide in each market Aereo's *Try for Free* feature, which allows consumers the ability to access Aereo's technology to watch television for a continuous one-hour period each day, free of charge.

Aereo is currently supported on iPad, iPhone, Chrome, Internet Explorer 9, Firefox, Safari, Opera, AppleTV and Roku.

###

**For media inquiries:**

Aereo, Inc.                                                          LaunchSquad for Aereo
Virginia Lam, VP Communications              aereo@launchsquad.com
vlam@aereo.com / 347.647.1210